**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| THOMAS BISHOP, | ) | |
| | ) | No. 16 C 6040 |
| *Plaintiff,* | ) | |
| | ) | Hon. Jorge Alonso, |
| v. | ) | District Judge |
| | ) | |
| JOSEPH WHITE, PEDRO ORTIZ, | ) | Hon. Jeffrey Gilbert, |
| CARLOS DELATORRE, JAMES GOCHEE, | ) | Magistrate Judge |
| MARK MENDEZ, NEIL EVANS, PHILLIP | ) | |
| RIDER, WADE GOLAB, HENRY | ) | |
| MORRISON, RYAN MILLER, STACY | ) | |
| HEUBAUM as Special Representative for | ) | |
| deceased JAMES HEUBAUM, BRIDGET | ) | |
| BRUBAKER and the CITY OF CHICAGO, | ) | JURY TRIAL DEMANDED |
| | ) | |
| *Defendants.* | | |

## <u>FOURTH AMENDED COMPLAINT</u>

Plaintiff THOMAS BISHOP, by and through his attorneys, Loevy & Loevy and the Law

Offices of Scott T. Kamin, complains of Defendants JOSEPH WHITE, PEDRO ORTIZ,

CARLOS DELATORRE, JAMES GOCHEE, MARK MENDEZ, NEIL EVANS, PHILLIP

RIDER, WADE GOLAB, HENRY MORRISON, RYAN MILLER, STACY HEUBAUM as

Special Representative for deceased JAMES HEUBAUM, BRIDGET BRUBAKER and the

CITY OF CHICAGO, stating as follows:

### INTRODUCTION

1.      On a Thursday night in October 2014, Plaintiff Thomas Bishop was walking

home from his grandmother's house when he came across Defendants White, Morrison,

Brubaker, and Ortiz, who were all Chicago Police officers.

2.      Defendants White and Ortiz ran up to Plaintiff, and Defendant White shot

Plaintiff twice from behind, hitting him in the neck and the back of the head.

3.      There was absolutely no justification for the shooting. Plaintiff had his back turned toward Defendants White and Ortiz at the time he was shot. He was unarmed, and he did not take any action that could have been perceived as threatening.

4.      Defendants knew the shooting was unjustified. Rather than acknowledge this, Defendants fabricated evidence to cover up their misconduct and create a false narrative that would justify what they knew was an unjustifiable shooting.

5.      As part of their cover-up, Defendants fabricated evidence to frame Plaintiff for a crime they knew he had not committed.

6.      As a result of Defendants' egregious misconduct, Plaintiff suffered extreme pain and permanent injury. His suffering continues today. Defendants' misconduct further caused Plaintiff to spend four years incarcerated for a crime he did not commit and of which he was ultimately acquitted.

7.      Plaintiff brings this action pursuant to 42 U.S.C. § 1983 and Illinois law in order to hold Defendants accountable for their misconduct and for violating Plaintiff's constitutional rights, as well as to redress the pain, suffering, and loss of liberty that Defendants so cruelly caused him to endure.

**JURISDICTION AND VENUE**

8.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343.

9.      Venue is proper under 28 U.S.C. § 1391(b). The events giving rise to this complaint occurred in this judicial district, and on information and belief the Defendants reside in this judicial district.

## PARTIES

10.     Plaintiff Thomas Bishop is a 46-year-old, African-American man who, at all times relevant to this action, was a resident of Chicago.

11.     At all times relevant to the events described in this Complaint, Defendants Joseph White, Pedro Ortiz, Carlos Delatorre, James Gochee, Mark Mendez, Neil Evans, Phillip Rider, Wade Golab, Henry Morrison, Ryan Miller, and Bridget Brubaker were employed by the City of Chicago as police officers with the Chicago Police Department.

12.     Stacy Heubaum is named as a defendant in her capacity as Special Representative for deceased James Heubaum. At all times relevant to the events described in this Complaint, James Heubaum was employed by the City of Chicago as a police officer with the Chicago Police Department. He is now deceased.

13.     Each and every individual Defendant acted under color of law and within the scope of his or her employment at all times relevant to this lawsuit. Each of the individual Defendants is sued in his or her individual capacity unless otherwise noted.

14.     Defendant City of Chicago is an Illinois municipal corporation that is or was the employer of the above-named Defendants. At all times relevant to the events described in the Complaint, each of the individual Defendants acted as agents or employees of the City of Chicago. The City of Chicago is liable for all torts committed by the Defendants pursuant to the doctrine of *respondeat superior*. The City of Chicago is additionally responsible for the policies and practices of the Chicago Police Department.

## FACTUAL ALLEGATIONS

### Defendants Shoot Plaintiff without Justification

3

15. On October 23, 2014, Plaintiff was walking home from his grandmother's house on 76th Street just before midnight. He heard shots, saw Defendants White and Ortiz with their guns drawn, became frightened, and turned away from them.

16. As Plaintiff had his back toward Defendants, Defendant White shot Plaintiff twice, hitting him in the neck and back of the head.

17. Plaintiff did not have a firearm or other weapon in his possession. Nor did he pose any threat to Defendants or the public, or take any actions that could have been perceived as threatening.

18. Plaintiff fell to the ground, unconscious, and bleeding profusely.

19. Defendants provided no medical care to Plaintiff at the scene of the shooting.

20. Rather than provide medical care or call for help, Defendants White, Ortiz, Morrison, Mendez, Gochee, and Delatorre handcuffed and searched Plaintiff while he lay unconscious on the ground, before pulling him on to his feet.

21. Later, an ambulance arrived to take Plaintiff to Christ Hospital, where he finally received medical care.

22. Once at the hospital, Defendants interfered with Plaintiff's treatment by repeatedly interrogating him and conducting tests on him while the hospital staff was attempting to provide him with emergency medical care. Defendants Evans, Golab, and Rider forced Plaintiff's medical treaters to forgo providing necessary medical care to Plaintiff. Instead, they permitted Plaintiff's treaters only to bandage his wounds before insisting on Plaintiff's release from the hospital into their custody.

**Defendants Fabricate Evidence to Create a False
Justification for the Shooting and to Frame Plaintiff for a Crime He Did Not Commit**

23.     Near the location where Defendants shot Plaintiff, an unknown individual or individuals had attempted to commit a robbery. In the course of that attempted robbery, two victims were shot, one fatally ("Davis homicide and robbery").

24.     Plaintiff had absolutely no involvement in or connection to this incident. He is innocent of the Davis homicide and robbery.

25.     Instead, Plaintiff was on his way home—and was just a few blocks away from his destination—when the Davis homicide and robbery occurred nearby.

26.     Despite the fact that there was no reason to believe Plaintiff was involved in the incident, Defendants White and Ortiz used deadly force against Plaintiff.

27.     After Defendant White shot Plaintiff, Defendants White, Ortiz, Morrison, Mendez, Gochee, and Delatorre arrested Plaintiff on false accusations that he was the perpetrator of the Davis homicide and robbery.

28.     Defendants had no probable cause to arrest or detain Plaintiff for the Davis homicide and robbery, or for any other crime.

29.     There was absolutely no evidence or reason to suspect that Plaintiff had committed any crime.

30.     Defendants decided to fabricate evidence to frame Plaintiff for the Davis homicide and robbery in order to provide a false justification for their wrongful use of force.

31.     Defendants White, Ortiz, and Morrison all provided statements and reports stating, among other things, that they saw Plaintiff shoot a gun in the alley nearby where the Davis homicide and robbery took place just before they shot Plaintiff.

32.     Defendant Delatorre attested to a report stating that Defendants White, Ortiz, and Morrison saw Plaintiff discharge a handgun in the alley.

33. These were deliberately false statements. Defendants did not see Plaintiff shoot a gun. Plaintiff did not have a gun or any other weapon in his possession. After Plaintiff was shot, the only item in Plaintiff's hand was a black skullcap.

34. Defendants Miller and Heubaum, who were the detectives assigned to the case, later fabricated additional evidence to frame Plaintiff for the Davis homicide and robbery.

35. Just after the shooting, Defendants Miller and Heubaum went to Stroger hospital to question Antwon Lee, the surviving victim of the Davis homicide and robbery.

36. Mr. Lee had been shot six times and had serious injuries.

37. Defendants Miller and Heubaum showed Mr. Lee a photo array which included a photo of Plaintiff, as well as photos of other individuals. The Defendants had circled Plaintiff's photo before they showed the array to Mr. Lee.

38. Defendants Miller and Heubaum told Mr. Lee that they were sure Plaintiff was the man who had shot him and pressured Mr. Lee to identify him and to sign the photo array to indicate that he had (falsely) identified Plaintiff.

39. The Defendants threatened Mr. Lee with criminal punishment if he did not identify Plaintiff.

40. Mr. Lee was scared and traumatized, and he worried that if he did not identify Plaintiff, then he would be sent to jail, where we would not receive adequate medical care for his serious injuries.

41. Mr. Lee signed the photo array indicating that he had identified Plaintiff as the shooter, even though he had not, solely because of the unduly suggestive identification procedures and the coercive behavior and threats made by Defendants Miller and Heubaum.

42.     Defendants Miller and Heubaum knew that Mr. Lee did not identify Plaintiff as the man who shot him.

43.     Defendants Miller and Heubaum knew that Mr. Lee was certain that another man—not Plaintiff—had shot him.

44.     Still, Defendants Miller and Heubaum submitted the false identification as evidence of Plaintiff's guilt, and they suppressed all of their misconduct by which they had obtained the false identification.

45.     Mr. Lee later provided a sworn affidavit and testified at trial that Plaintiff was not the man who had shot him.

46.     The fabricated evidence discussed in the preceding paragraphs was used to prosecute Plaintiff for a crime that Defendants knew he did not commit.

47.     Plaintiff was charged with one count of first degree murder and two counts of attempted murder. Pending trial on these charges, Plaintiff was held in Cook County Jail.

48.     There was absolutely no probable cause to arrest or prosecute Plaintiff for these crimes.

49.     Following a criminal trial, Plaintiff was acquitted by a jury on December 4, 2018.

**Defendants' Conduct is Part of CPD Policy and Widespread Practice**

**Policy and Practice of Using Excessive Force**

50.     Twenty years ago, in 1999, following two high profile police shootings, the City Council held public hearings on the prevalence of police brutality and unjustified shootings, as well as the failure of the Department's disciplinary system. At those hearings, members of the Council assured the public that changes would be made to the Chicago Police Department policies and practices to address these issues.

7

51.     On September 28, 1999, the then-Superintendent of Police gave a speech highlighting problems with the City's policies and practices relating to the use of force. Then-Superintendent Hillard spoke specifically of the need for (1) better in-service training on the use of force, (2) an effective disciplinary system, and (3) officer accountability for the use of force.

52.     In a review commissioned by the Superintendent, John Marshall Law School found that although the City of Chicago's written policy on the use of force was in compliance with the law, more training of police officers was necessary for the written policy to be effective in practice.

53.     In January 2000, the Chairman of the Committee on Police and Fire of the Chicago City Council submitted an official resolution recognizing that "[Chicago] police officers who do not carry out their responsibilities in a professional manner have ample reason to believe that they will not be held accountable, even in instances of egregious misconduct."

54.     A study performed a year later by the Justice Coalition of Greater Chicago concluded that the CPD lacked many of the basic tools necessary to identify, monitor, punish, and prevent police misconduct and brutality.

55.     Although the City has long been aware that its supervision, training, and discipline of police officers are entirely inadequate, it has not enacted any meaningful measure to address that failure.

56.     Redress promised by the City Council and the Superintendent has gone unfulfilled. In 2017, the Department of Justice concluded the following:

a.      Deficiencies in CPD's training, supervision, accountability, and other systems had contributed to a pattern and practice of excessive use of force;

8

b.   The CPD failed to review its force practices as a whole to identify problematic trends and patterns that endangered the officers and the community; and

c.   The CPD failed to provide its officers with adequate guidance to understand how and when they may use force or how to safely and effectively control and resolve encounters to reduce the need to use force.

57.   As a result of Chicago's inadequate training and supervision, officers on the streets are ill-equipped to make the necessary decisions on the use of force. The lack of training and supervision greatly increases the susceptibility of officers to improper and violent abuses of their police power through the unjustified use of force, such as the shooting of Plaintiff.

58.   At the time that Defendant White shot Plaintiff, the CPD had a widespread practice of using excessive force, especially against individuals of color. For example:

a.   In 2013, CPD officers unreasonably held three-year-old Davianna Simmons and her grandmother Emily Simmons (both African American) at gun point during an execution of a search warrant. Consequently, Davianna experienced significant injuries from psychological trauma.

b.   That same year, CPD Officer Marco Pronao fired 16 shots into a car full of teenagers, injuring two African American victims. The CPD determined at the time the shooting was justified. In August of 2017, Officer Pronao was convicted by a federal criminal jury of several rights abuses and excessive force. This conviction was affirmed by the Seventh Circuit in 2019.

c.   In 2014, four CPD officers drew their guns on an unarmed African American man named Roshad McIntosh. Officer Robert Slechter fired multiple shots at him,

9

killing him without cause or provocation. The surveillance footage corroborated this version of events and caused multiple officers to revise their original accounts.

d.  Also in 2014, CPD Officer Wilfredo Ortiz shot three African American siblings, Michael Williamson, Princeton Williamson, and Kierra Williamson, while they were in or directly outside of their home, causing significant injuries to the three siblings.

e.  Also in 2014, CPD Officer Jason Van Dyke shot 16 times at 17-year-old Laquan McDonald, hitting him multiple times in the back and killing him. Initial police reports concluded that the fatal shooting was justified, and Officer Van Dyke was not disciplined. But video footage released over a year later made it clear that Laquan was walking away from police when he was shot and that the shooting was not justified. A subsequent DOJ investigation and report confirmed the use of force was excessive, and a jury convicted Officer Van Dyke of second-degree murder.

f.  In 2016, CPD Officers Sean Hitz and Richard Riordan pursued Pierre Loury, a 16-year-old African American teenager. The chase ended with Officer Hitz firing two fatal shots that resulted in Pierre's death. One eyewitness reported Pierre was shot while he was climbing a fence in order to escape pursuit.

59.  On August 29, 2017, the Illinois Attorney General sued the City for, "engaging in a repeated pattern of using excessive force, including deadly force, and other misconduct that disproportionately harms Chicago's African American . . . residents."

60.     On July 27, 2018, four years after Plaintiff was shot by Defendant White, the City and State of Illinois reached a consensus on structural reforms needed to address CPD's practice of using excessive force against African Americans like Plaintiff.

61.     As part of the Consent Decree, the City agreed to implement de-escalation techniques to prevent or reduce the need for force; track and analyze incidents where CPD officers use force and/or a firearm; develop a training bulletin providing guidance on use of weapons; and implement policies for supervision, investigation, and accountability relating to use of force by officers, among other things.

62.     Although "CPD has made strides to address the consent-decree requirements," a recent independent monitoring report has found that the City has missed deadlines or is otherwise not in compliance with various agreed improvements related to use of force by CPD officers.

### Policy and Practice of Impunity

63.     At all times relevant to the wrongful shooting and prosecution of Plaintiff, the City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police detectives recommended charging an innocent person with a serious crime, and no Chicago Police officer has ever been disciplined as a result of his misconduct in any of those cases.

64.     The City of Chicago and the Chicago Police Department routinely failed to investigate cases in which Chicago Police detectives used excessive force and/or arrested an individual without probable cause.

65.     Prior to and during the period in which Plaintiff was shot, arrested, charged, and prosecuted for the Davis homicide and robbery, the City of Chicago also operated a

dysfunctional disciplinary system for Chicago Police officers accused of serious misconduct. The City almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. The Chicago Police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in misconduct.

66.     The U.S. Department of Justice recently issued a report finding that there were "engrained deficiencies in the systems CPD uses to provide officers with supervision and training." In particular, on the subject of training, the DOJ concluded that the "CPD's inattention to training needs, including a longstanding failure to invest in the resources, facilities, staffing, and planning required to train a department of approximately 12,000 members, leaves officers underprepared to police effectively and lawfully. Officer errors and misconceptions that result from lack of training are not corrected in the field, because CPD has neither structured supervision in a way that will adequately support officers, nor invested in programs and systems that will detect when officers are in need of help or exhibiting behavior that must be corrected. Officers' ability to stay safe, protect public safety, and police within constitutional standards suffers as a result."

67.     On the subject of supervision, the DOJ concluded among other things that "[i]nstead of encouraging the chain of command to instill proper policing tactics and respect for constitutional policing in CPD officers, CPD provides little incentive, or even opportunity, for supervisors to meaningfully guide and direct CPD officers. CPD provides even less incentive for supervisors to hold officers accountable when they deviate from CPD policy and the law. The City has long known that CPD's direct supervision of officers is inadequate, including through the fact that multiple reports in the last two decades have highlighted deficiencies in CPD's

supervisory practices. Yet, City and CPD leadership have not made the necessary reforms to CPD's supervision structure and processes, and community and officer safety suffer as a result."

68.     The DOJ "confirmed that CPD's accountability systems are broadly ineffective at deterring or detecting misconduct, and at holding officers accountable when they violate the law or CPD policy." In particular, the Department of Justice found that the City failed to investigate nearly half of misconduct complaints; where investigations did occur, there were "consistent patterns of egregious investigative deficiencies"; and where misconduct complaints are sustained, discipline was inconsistent and unpredictable.

69.     Similarly, the Chicago Police Accountability Task Force reported in April 2016 that "[g]oing back years, and continuing to the present day, CPD has missed opportunities to make accountability an organizational priority."

70.     Between 2004 and 2016, the City paid more than $500 million to settle or pay judgments in police misconduct cases, without even conducting disciplinary investigations in more than half of the cases, and while recommending discipline in fewer than 4% of those cases.

71.     Between 2011 and 2015, nearly half of complaints filed against Chicago Police officers were not even investigated.

72.     More than 95% of complaints against the Chicago Police are found to be "unsustained."

73.     Less than 2% of complaints against the Chicago Police resulted in any discipline.

74.     As a matter of both policy and practice, municipal policy makers and department supervisors condoned and facilitated a code of silence within the Chicago Police Department. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the misconduct at issue in this case.

75.     The failure of police supervision and discipline in the City of Chicago during the relevant time period is a fact admitted by City policymakers and Chicago Police officers.

76.     Former Mayor of the City of Chicago Rahm Emanuel has acknowledged that a "code of silence" exists within the Chicago Police Department.

77.     In December 2016, the President of the police officers' union in Chicago admitted that there is a "code of silence" in the Chicago Police Department.

78.     In 2017, the U.S. Department of Justice found that current officers of the CPD and former high-level officials of the CPD acknowledged a "code of silence."

79.     Recently, Mayor-Elect Lori Lightfoot urged federal prosecutors to examine the trial of Chicago Police officers accused of covering up the Laquan McDonald shooting, saying "[w]e've got to have transparency and healing."

80.     The code of silence in the Chicago Police Department has been longstanding.

81.     In the case of *Klipfel v. Bentsen*, No. 94 C 6415 (N.D. Ill.), a federal jury found that as of 1994 the Chicago Police maintained a code of silence that facilitated police misconduct.

82.     In *Obrycka v. City of Chicago*, No. 07 C 2372 (N.D. Ill.), a different federal jury found that, as of February 2007, "the City had a widespread custom and/or practice of failing to investigate and/or discipline its officers and/or code of silence."

83.     The same code of silence and ineffective system of police oversight were in place when Plaintiff's constitutional rights were violated in 2014.

84.     As a result of the City of Chicago's established practice of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence

14

within the Chicago Police Department, officers (including the Defendants here) have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of the Chicago Police Department act with impunity when they violate the constitutional and civil rights of citizens. This includes Defendants in this case.

85.     Moreover, an integral aspect of the code of silence in the Chicago Police Department concerns the cover-up of police shootings. Repeatedly in incidents where Chicago Police officers shoot civilians, the officers involved in the shooting and other officers of the Chicago Police Department manufacture false evidence and suppress evidence in an effort to create a narrative that justifies the police officers' use of force, often in situations where the use of force is unjustified. In many of these cases, the victims of police shootings are charged with crimes they did not commit in order to cover up police shootings. These cover-ups occur with knowledge and approval of supervising police officers in the Chicago Police Department.

86.     According to the DOJ, CPD "officers who engaged in force against a civilian routinely file baseless police assault and battery charges against the victim and other witnesses to the misconduct."

87.     The following recent cover-ups of police shootings constitute a non-exhaustive list of examples:

       a.     In 2009, CPD Lieutenant Glenn Evans wrongfully arrested Rennie Simmons for battery, trying to pin a false criminal charge on him to cover up the fact that Evans and other officers had used unjustified force against Rennie. Evans and other officers attacked Rennie, who is partially paralyzed on the right side of his

body following a stroke, because Rennie placed a water-shutoff notice on a drain pipe of Evan's home. Charges against Rennie were later dismissed. Rennie then brought a civil suit alleging that Evans falsely arrested him to cover up Evans' abuse, which the City settled for $100,000.

b.  In 2014, two CPD officers, Saharat Sampim and Nicola Zodo, provided false statements to cover up CPD Officer Slecther's unjustified killing of Roshad McIntosh, an unarmed African American. The two both stated that they saw Roshad with a gun in his outstretched hand just before Slechter shot him. Video footage was then released contradicting these statements and showing that neither officer witnessed Slechter kill Roshad. The video further showed that Sletchter killed Roshad without provocation.

c.  In 2014, three CPD officers attempted to cover up Van Dyke's unjustified killing of Laquan McDonald. CPD Officers Thomas Gaffney, Joseph Walsh, and David March filed false reports supporting Van Dyke's account of the shooting, and interfered with efforts to investigate whether the shooting was justified. Additionally, the City refused to release dash-cam video that contradicted the statements of Van Dyke, Gaffney, Walsh, and March until it received a court order to do so over a year after the shooting.

d.  In 2015, CPD Officer Anthony Babicz shot Alfontish Cockerham five times. Alfontish died the next day, but only after he was charged with aggravated assault of a police officer based on a statement from Babicz that Alfontish pointed a gun at him. Video footage was later released showing that Alfontish was running away from Babicz at the time of the shooting.

e.  In 2015, Nathaniel Taylor, a 19-year-old with severe cognitive delays, was
walking his younger brother home from school when he walked through the yard
of CPD Officer Matthew Jackson. Jackson beat, kicked, and stuck his gun in the
mouth of Nathaniel, who was treated at the hospital for his injuries. Nathaniel was
then charged with aggravated battery of a police officer. Those charges were later
dismissed.

**Policy and Practice of Wrongly Convicting Innocent Persons in Violation of Due Process**

88.     The Chicago Police Department is responsible by virtue of its official polices for
scores of miscarriages of justice like that inflicted upon Plaintiff.

89.     Since 1986, no fewer than 70 cases have come to light in which Chicago police
officers fabricated false evidence and/or suppressed exculpatory evidence in order to cause the
convictions of innocent person for serious crimes that they did not commit.

90.     These cases include many in which Chicago Police Department officers used the
same tactics that Defendants employed against Plaintiff in this case, including: (1) fabricating
eyewitness identifications; (2) fabricating witness statements; (3) concealing exculpatory
evidence; (4) manipulating witnesses in order to influence their testimony; and (5) using other
tactics to secure the arrest, prosecution, and conviction of a person without probable cause and
without regard to the person's actual guilt or innocence.

91.     At all relevant times, members of the Chicago Police Department, including the
Defendants in this action, routinely manufactured evidence against innocent persons by coercing,
manipulating, threatening, pressuring, and offering inducements to suspects and witnesses to
obtain false statements implicating innocent persons, knowing full well that those statements
were false. As a matter of widespread practice, members of the Chicago Police Department,

17

including the Defendants in this action, contrived false witness narratives that were fed to vulnerable witnesses, who then adopted those narratives as their own for the purpose of wrongly convicting an innocent person. In addition, Chicago Police Department offices routinely fabricated and manipulated identification procedures to procure identifications of individuals that they knew to be inaccurate. Furthermore, Chicago Police Department officers systematically suppressed exculpatory and/or impeaching material by concealing evidence that a witness was coerced, manipulated, threatened, pressured or offered inducements to make false statements.

92. The municipal policy and practice described in the paragraphs above was recently described in a Federal Bureau of Investigation FD-302 Report of an interview with Assistant State's Attorney Terence Johnson. The Report documents, *inter alia*, that Chicago police detectives would feed information to witnesses and coach them through court-reported and handwritten statements, coerce witnesses into sticking to a detective's theory of the case, physically abuse witnesses, and work together to develop and rehearse false narratives so there were no inconsistencies in the witnesses' stories.

93. Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, fabricated reports, witness identifications, and other evidence, which was used to wrongfully prosecute Plaintiff.

94. At all times relevant hereto, members of the Chicago Police Department, including the Defendants in this action, systematically suppressed exculpatory and/or impeaching material by intentionally secreting discoverable reports, memos and other information in files that were maintained solely at the police department and were not disclosed to the participants of the criminal justice system. As a matter of widespread custom and practice, these clandestine files were withheld from the State's Attorney's Office and from criminal

defendants, and they were routinely destroyed or hidden at the close of the investigation, rather than being maintained as part of the official file.

95.     Consistent with the municipal policy and practice described in the preceding paragraph, employees of the City of Chicago, including the named Defendants, concealed exculpatory evidence from Plaintiff.

96.     The existence of this policy and practice of suppressing exculpatory and/or impeaching material in clandestine files was established and corroborated in the cases of, *inter alia*, *Fields v. City of Chicago*, No. 10 C 1168 (N.D. Ill.), and *Jones v. City of Chicago*, Nos. 87 C 2536, 88 C 1127 (N.D. Ill.).

97.     The policy and practice of suppressing exculpatory or impeaching material evidence was alive and well at the time of the investigation into the Davis homicide and robbery, for which Plaintiff was wrongfully arrested and prosecuted.

98.     The City of Chicago and the Chicago Police Department also failed in the years prior to Plaintiff's wrongful arrest and prosecution to provide adequate training to Chicago Police Detectives and other officers in any of the following areas, among others:

a.     The conduct of live lineup, photographic, and other identification procedures.

b.     The constitutional requirement to disclose exculpatory evidence, including how to identify such evidence and what steps to take when exculpatory evidence has been identified in order to ensure that the evidence is made part of the criminal proceeding.

c.     The need to refrain from physical and psychological abuse, and manipulative and coercive conduct, in relation to suspects and witnesses.

d.     The risks of wrongful conviction and the steps police officers should take

to minimize risks.

e.     The risks of engaging in tunnel vision during investigation

f.     The need for full disclosure, candor, and openness on the part of all officers who participate in the police disciplinary process, both as witnesses and as accused officers, and the need to report misconduct committed by fellow officers.

99.     The need for police officers to be trained in these areas was and remains obvious.

**Plaintiff's Injury**

100.     As a result of Defendants misconduct, Plaintiff suffered severe physical injury, pain, and emotional distress. Plaintiff was shot twice in the neck and back of the head, requiring multiple surgeries. Plaintiff is left with continuing physical pain, permanent hearing loss, and permanent damage to his neck.

101.     Defendants' misconduct further caused Plaintiff to be incarcerated for four years at the Cook County jail while he faced a possible life sentence for a crime that Defendants knew he did not commit. During his wrongful incarceration, Plaintiff was denied the ability to engage in the various pleasures of human experience, from the simplest to the most important. While Plaintiff was incarcerated based on evidence fabricated by Defendants, his wife developed cancer and died. Plaintiff was deprived of the ability to spend time with his wife during her final years, and to care for her through her sickness. He was further deprived of the ability to care for and raise their child.

**COUNT I**
**42 U.S.C. § 1983 – Excessive Force**
**Fourth Amendment**

102.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

103.    In the manner described more fully above, Defendants violated Plaintiff's Fourth Amendment right to be free from unreasonable force when they shot Plaintiff twice in the back.

104.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

105.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT II
### 42 U.S.C. § 1983 – Due Process
### Fourteenth Amendment

106.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

107.    As described in detail above, the Defendants, while acting individual, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, deprived Plaintiff of his constitutional right to a fair trial and his right not to be wrongfully convicted and imprisoned.

108.    In the manner described more fully above, Defendants manufactured evidence and solicited false evidenced—including false identifications, false witness statements, and false witness testimony that they knew to be false—from Lee, among others. Defendants also fabricated police reports falsely implicating Plaintiff in the Davis homicide and robbery.

109.    Defendants obtained Plaintiff's prosecution using this false evidence, and they failed to correct fabricated evidence that they knew to be false when it was used against Plaintiff.

110.    In addition, Defendants deliberately withheld exculpatory evidence from state prosecutors, Plaintiff, and Plaintiff's criminal defense attorneys, including evidence that

Defendants had manufactured identifications and witness statements, thereby misleading and misdirecting the criminal prosecution of Plaintiff.

111. In addition, based upon information and belief, the Defendants concealed, fabricated, and destroyed additional evidence that is not yet known to Plaintiff.

112. The Defendants' misconduct resulted in the unjust and wrongful criminal prosecution of Plaintiff and the deprivation of Plaintiff's liberty, thereby denying his constitutional right to a fair trial guaranteed by the Fourteenth Amendment. Absent this misconduct, the prosecution of Plaintiff could not have and would not have been pursued.

113. The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

114. As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

115. The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

### COUNT III
### 42 U.S.C. § 1983 – Unlawful Detention
### Fourth and Fourteenth Amendments

116. Plaintiff incorporates each paragraph of this complaint as if fully restated here.

117. In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as under color of law and within the scope of their employment, accused Plaintiff of criminal activity and exerted influence to initiate, continue, and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so and in

spite of the fact that they knew Plaintiff was innocent, in violation of his rights secured by the Fourth and Fourteenth Amendments.

118.     In so doing, these Defendants caused Plaintiff to be deprived of his liberty without probable cause and subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

119.     The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

120.     As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

121.     The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT IV
### 42 U.S.C. § 1983 – Unreasonable Denial of Medical Care
### Fourth and Fourteenth Amendments

122.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

123.     In the manner described above, Defendants had notice of Plaintiff's serious medical needs, and yet they failed to provide him with necessary medical attention. The further intervened in or prevented the provision of medical care by others, in violation of the Fourth and Fourteenth Amendments of the United States Constitution.

124.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with malice, willfulness, and reckless indifference to Plaintiff's constitutional rights.

125.    As a result of Defendants' misconduct, Plaintiff experienced and continues to experience pain, suffering, emotional distress, and physical injury.

126.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

**COUNT V**
**42 U.S.C. § 1983 – Conspiracy to Deprive Constitutional Rights**

127.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

128.    In the manner described more fully above, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to fabricate evidence and to detain, prosecute, and convict Plaintiff for the Davis homicide and robbery, regardless of Plaintiff's guilt or innocence, and thereby to deprive him of his constitutional rights. They also agreed to fabricate evidence to cover up their use of excessive force against Plaintiff.

129.    In so doing, these co-conspirators agreed to accomplish an unlawful purpose by an unlawful means. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

130.    In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

131.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

24

132.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT VI
### 42  U.S.C. § 1983 – Failure to Intervene

133.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

134.    In the manner described above, during the constitutional violations described herein, one or more of the Defendants stood by without intervening to prevent the violation of Plaintiff's constitutional rights, even though they had the duty and the opportunity to do so.

135.    The misconduct described in this Count was objectively unreasonable, was undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

136.    As a result of Defendants' misconduct described in this Count, Plaintiff suffered serious physical injury, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, loss of liberty, and other grievous and continuing injuries and damages as set forth above.

137.    The misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago and the Chicago Police Department, in the manner more fully described below in Count VII.

## COUNT VII
### 42  U.S.C. § 1983 – Policy and Practice Claim against the City of Chicago

138.    Plaintiff incorporates each paragraph of this complaint as if fully restated here.

139.    As described in detail above, the City of Chicago is liable for the violation of Plaintiff's constitutional rights because Plaintiff's injuries were caused by the policies, practices, and customs of the City of Chicago, as well as by the actions of policy-making officials for the City of Chicago.

140.    At all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department and the City of Chicago of using excessive force against individuals, especially individuals of color like Plaintiff, as well covering up or providing false justification for the use of force.

141.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice by officers and agents of the Chicago Police Department and the City of Chicago of manufacturing false evidence, suppressing evidence, and instigating false criminal charges in an effort to create narratives that justify the use of force by CPD officers, often in situations where the use of force was unjustified.

142.    In addition, at all times relevant to the events described in this Complaint and for a period of time prior thereto, the City of Chicago had notice of a widespread practice and custom by officers and agents of the Chicago Police Department and the City of Chicago under which individuals were routinely deprived of their right to due process. For instance, it was common that suspects were prosecuted based on fabricated evidence, including fabricated eyewitness identifications and eyewitness identifications obtained using coercion and/or manipulated photographic or live lineup procedures, as well as fabricated reports.

143.    Specifically, at all relevant times and for a period of time prior thereto, there existed a widespread practice and custom among officers, employees, and agents of the City of Chicago, under which criminal suspects were denied due process, including but not limited to one or more of the following: (1) suspects were selected during identification procedures by eyewitnesses who had been instructed by police on which suspect to identify; (2) suspects were

26

shown suggestive photo arrays; (3) suspects were shown suggestive live lineups;

(4) identification procedures were not accurately documented; and (5) supervisors with

knowledge of permissible and impermissible identification techniques did not properly supervise

or discipline police officers and employees such that the fabricated and improper identifications

continued unchecked.

144.     In addition, at all times relevant to the events described in this Complaint and for

a period of time prior thereto, the City of Chicago had notice of widespread practices by officers

and agents of the Chicago Police Department and the City of Chicago, which included one or

more of the following: (1) officers did not record investigative information in police reports, did

not maintain proper investigative files, or did not disclose investigative materials to prosecutors

and criminal defendants; (2) officers falsified statements, reports, and testimony of witnesses;

(3) officers fabricated false evidence implicating criminal defendants in criminal conduct;

(4) officers failed to maintain or preserve evidence or destroyed evidence; and (5) officers

pursued wrongful convictions through profoundly flawed investigations.

145.     These widespread practices, individually and together, were allowed to flourish

because the leaders, supervisors, and policymakers of the City of Chicago directly encouraged

and were thereby the moving force behind the very type of misconduct at issue by failing to

adequately train, supervise, and control their officers, agents, and employees and by failing to

adequately punish and discipline prior instances of similar misconduct, thus directly encouraging

future abuses such as those affecting Plaintiff.

146.     The above widespread practices and customs, so well settled as to constitute de

facto policies of the City of Chicago, were able to exist and thrive, individually and together,

because policymakers with authority over the same exhibited deliberate indifference to the

problem, thereby effectively ratifying it.

147.    At all times relevant to the events described in this Complaint and for a period of time prior and subsequent thereto, the City of Chicago failed to promulgate proper or adequate rules, regulations, policies, and procedures for: use of force; reporting incidents where excessive force was used; conducting photographic and live lineup procedures by officers and agents of the Chicago Police Department and City of Chicago; the conduct of interrogations and questioning of witnesses and suspects; the collection, documentation, preservation, testing, and disclosure of evidence; the writing of police reports and taking of investigative notes; obtaining statements and testimony from witnesses; and maintenance of investigative files and disclosure of those files in criminal proceedings. In addition or alternatively, the City of Chicago failed to promulgate proper and adequate rules, regulations, policies, and procedures for the training and supervision of officers and agents of the Chicago Police Department and the City of Chicago, with respect to these subjects.

148.    These failures to promulgate proper or adequate rules, regulations, policies, and procedures were committed by officers and agents of the Chicago Police Department and the City of Chicago.

149.    In addition, the misconduct described in this Count was undertaken pursuant to the policies and practices of the City of Chicago in that the constitutional violations committed against Plaintiff were committed with the knowledge or approval of persons with final policymaking authority for the City of Chicago or were actually committed by persons with such final policymaking authority.

150.    As a result of the policies and practices of the City of Chicago, numerous individuals have suffered injury or death resulting from unreasonable use of force.

151.     As a result of the policies and practices of the City of Chicago, numerous individuals have been wrongly prosecuted and imprisoned for, as well as convicted of, crimes that they did not commit.

152.     Plaintiff's injuries were directly and proximately caused by officers, agents, and employees of the City of Chicago, including but not limited to the individually named Defendants, who acted pursuant to one or more of the policies, practices, and customs set forth above in engaging in the misconduct described in this Count.

### COUNT VIII
### Illinois Law – Battery

153.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

154.     In the manner described above, Defendants, acting under color of law within the scope of their employment, engaged in offensive physical contact made without the consent of Plaintiff when Defendant White shot him twice in the neck and back of the head.

155.     These actions were undertaken intentionally, willfully and wantonly, or recklessly.

156.     The misconduct described in this Count was objectively unreasonable and was undertaken with intentional disregard of Plaintiff's rights.

157.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

### COUNT IX
### Illinois Law – Malicious Prosecution

158.  Plaintiff incorporates each paragraph of this complaint as if fully restated here.

159.  In the manner described above, the Defendants, individually, jointly, and in conspiracy with one another, as well as within the scope of their employment, accused Plaintiff

of criminal activity and exerted influence to initiate and to continue and perpetuate judicial proceedings against Plaintiff without any probable cause for doing so.

160.  In so doing, the Defendants caused Plaintiff to be subjected improperly to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued maliciously, resulting in injury.

161.  The judicial proceedings were terminated in Plaintiff's favor and in a manner indicative of his innocence when he was acquitted on December 4, 2018, following a criminal trial.

162.  The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, and in total disregard of the truth and Plaintiff's clear innocence.

163.  As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

## COUNT X
### Illinois Law – Intentional Infliction of Emotional Distress

164.  Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

165.  The actions, omissions, and conduct of the Defendants as set forth above were extreme and outrageous. These actions were rooted in an abuse of power and authority and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff, as is more fully alleged above.

166.  As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

30

**COUNT XI**
**Illinois Law – Willful and Wanton Conduct**

167.     Plaintiff incorporates each paragraph of this Complaint as if fully restated here.

168.     At all times relevant to this complaint the Defendants had a duty to refrain from willful and wanton conduct in connection with the Davis homicide and robbery investigation, as well as their pursuit of Plaintiff following the homicide.

169.     Notwithstanding that duty, the Defendants acted willfully and wantonly through a course of conduct that showed an utter indifference to, or conscious disregard of, Plaintiff's rights.

170.     As a result of the Defendants' misconduct described in this Count, Plaintiff suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT XII**
**Illinois Law – Civil Conspiracy**

171.     Plaintiff incorporates each paragraph of this complaint as if fully restated here.

172.     As described more fully in the preceding paragraphs, the Defendants, acting in concert with other co-conspirators, known and unknown, reached an agreement among themselves to frame Plaintiff for a crime he did not commit and conspired by concerted action to accomplish an unlawful purpose and/or to achieve a lawful purpose by unlawful means. The Defendants also reached an agreement among themselves to cover up and provide false justification for the unlawful shooting of Plaintiff. In addition, these co-conspirators agreed among themselves to protect one another from liability for depriving Plaintiff of these rights.

173.     In furtherance of their conspiracy, each of these co-conspirators committed overt acts and were otherwise willful participants in joint activity.

31

174.   The violations of Illinois law described in this complaint, including Defendants'

malicious prosecution of Plaintiff and their intentional infliction of emotional distress, were

accomplished by Defendants' conspiracy.

175.   The misconduct described in this Count was objectively unreasonable, was

undertaken intentionally, and in total disregard of the truth and Plaintiff's clear innocence.

176.   As a result of the Defendants' misconduct described in this Count, Plaintiff

suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional

pain and suffering, and other grievous and continuing injuries and damages as set forth above.

**COUNT XIII**
**Illinois Law – Respondeat Superior**

177.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

178.   While committing the misconduct alleged in the preceding paragraphs, the

Defendants were employees, members, and agents of the City of Chicago, acting at all relevant

times within the scope of their employment.

179.   Defendant City of Chicago is liable as principal for all torts committed by its

agents.

**COUNT XIV**
**Illinois Law – Indemnification**

180.   Plaintiff incorporates each paragraph of this complaint as if fully restated here.

181.   Illinois statute (745 ILCS 10/9-102) provides that public entities are directed to

pay any tort judgment for compensatory damages for which employees are liable within the

scope of their employment activities.

182.   The Defendants were employees, members, and agents of the City of Chicago,

acting at all relevant times within the scope of their employment in committing the misconduct

described herein.

183.     The City of Chicago is responsible to pay any judgment entered against the Defendants. Plaintiff therefore demands judgment against Defendant City of Chicago, in the amounts awarded to Plaintiff against the individual Defendants as damages, attorneys' fees, costs and interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Thomas Bishop respectfully requests that this Court enter judgment in his favor against Defendants, awarding compensatory damages, punitive damages, attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other relief the Court deems just and appropriate.

## JURY DEMAND

Plaintiff Thomas Bishop demands a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all issues so triable.


Dated: March 3, 2020

Respectfully submitted,

BY:     /s/ Megan Pierce
        One of Plaintiff's Attorneys

Jon Loevy
Arthur Loevy
Steven Art
Alison Leff
Megan Pierce
311 N. Aberdeen Street
3rd Floor
Chicago, IL 60607
T: (312) 243-5900
F: (312) 243-5902
Megan@loevy.com

Scott T. Kamin

Ill. Attorney No. 6226855
Law Offices of Scott T. Kamin
53 W. Jackson Blvd., Suite 1057
Chicago, IL 60604
T: (312) 322-0077
scotttkamin@aol.com