## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THOMAS BISHOP,

                    Plaintiff,

        v.

JOSEPH WHITE, et. al.,

                    Defendants.

No. 16 C 6040

Magistrate Judge Jeffrey T. Gilbert

## MEMORANDUM OPINION AND ORDER

This case comes before the Court on Plaintiff's Motion to Quash the Detective Defendants' Subpoena Seeking Plaintiff's Recorded Phone Calls [ECF No. 250]. For the reasons discussed below, Plaintiff's Motion is granted without prejudice to Defendants potentially proposing a narrower inquiry into Plaintiff's recorded phone calls from Cook County Jail than is portended by the broad subpoena currently before the Court.

## BACKGROUND

On the night of October 23, 2014, four people were shot in the 7900 block of South Justine Street in Chicago, Illinois: Tepete Davis ("Davis"), Antwon Lee ("Lee"), Isaiah Watkins ("Watkins"), and Plaintiff. Shortly before midnight, Davis, Lee, and Watkins were shot multiple times during the course of a robbery. Davis died from his wounds, while Lee, who was shot six times in the leg, arm, and head, and Watkins, who was shot once, were both taken to the hospital and survived. These are the only facts about which Plaintiff and Defendants agree regarding the events of October 23rd.

Plaintiff's recollection of the night of October 23rd is that he was walking home from his grandmother's house on 76th Street around the time of the shooting when he came upon Chicago Police Officers, including some of the named Defendants, in an alley. Unarmed and frightened at being approached by police officers, he turned his back to them, at which time, Plaintiff claims, Defendant White shot him in the neck and back of the head without provocation. He was taken to the hospital, and although he survived, Plaintiff contends that his medical care was inadequate both on scene and at the hospital as Defendants scrambled to justify the shooting. Defendants, according to Plaintiff, decided to frame Plaintiff for the Davis murder in order to validate their wrongful use of force after-the-fact. As part of this scheme, Plaintiff alleges that Defendants not only fabricated evidence and falsified reports, but they coerced Lee, a central, surviving witness to the shooting, to identify Plaintiff as the shooter both in a photo array and before a grand jury.

Defendants describe the events that unfolded on October 23, 2014 quite differently. As they responded to the sound of gunfire near South Justine Street, Defendants assert that they saw Plaintiff discharging a firearm in an alley near where Davis was murdered and Lee and Watkins were shot. When they approached, Defendants told Plaintiff to stop and not move, but he refused. According to Defendants, Plaintiff turned and began to run away from the officers, gun in hand. Defendant White then discharged his weapon twice and struck Plaintiff in the upper body, after which Plaintiff was taken to the hospital and treated for two gunshot wounds. No weapon was recovered on scene, but as Defendants continued their investigation of the shooting, Defendants claim they recovered evidence giving rise to probable cause that Plaintiff shot Davis and Lee. Importantly, Defendants assert that when they interviewed Lee from his hospital bed, Lee confidently and voluntarily identified Plaintiff as the shooter: an identification that he repeated during multiple interviews and a photo array. Lee also testified before a grand jury regarding the

same. Plaintiff was subsequently charged with one count of first-degree murder and two counts of attempted murder related to shooting Davis and Lee.

Almost two years after the shooting and while Plaintiff was still in custody awaiting trial, Lee recanted his identification of Plaintiff as the shooter in a sworn affidavit dated September 20, 2016. Although Lee's affidavit is dated and notarized as of September 20, 2016, by all accounts, it materialized for the first time during Plaintiff's criminal trial in 2018. In the affidavit, Lee states that Plaintiff was not the man who shot him and explains that he was in such fear of going to jail or being accused of a crime himself that he "merely did as the police officers told" him when he wrongly identified Plaintiff as the shooter. [ECF No. 237-1] at 2. Lee also testified consistent with his recantation affidavit at trial and reiterated that although he saw the shooter, he was sure it was not Plaintiff. At the close of the evidence, Plaintiff was found not guilty of all criminal charges.

Unsurprisingly, the parties' perspectives of the events leading up to and following Lee's recantation are also at odds. Plaintiff asserts that Lee, "motivated by a simple desire to tell the truth and do the right thing," voluntarily recanted his false identification and the grand jury testimony he was coerced into providing. [ECF No. 258] at 3. Defendants, however, maintain they have evidence that Plaintiff "obtained the recantation by intimidating Lee and promising to pay him thousands of dollars" to change his testimony. [ECF No. 254] at 6. According to Defendants, Plaintiff, while still in pretrial custody, directed others to communicate with Lee and arrange for him to be paid $10,000 to sign an affidavit recanting his identification. [ECF No. 254] at 4-6.

This civil action was filed in 2016 but stayed during the proceedings in Plaintiff's state criminal case. After the jury found Plaintiff not guilty at his criminal trial in 2018, the District Judge presiding in this case allowed this civil suit to proceed. [ECF Nos. 61, 63]. The circumstances and substance of Lee's initial identification and subsequent recantation have

developed into crucial evidence for both parties in this litigation. [ECF Nos. 237, 244, 247]. As part of ongoing fact discovery, Defendants issued a Rule 45 subpoena to non-party Cook County Department of Corrections ("CCDOC") on July 30, 2020 seeking "any and all phone call records/logs and recordings of inmate calls in your possession and control relating to Thomas D. Bishop (IR 945595; DOB [redacted]) for the time period 10-23-14 through 11-28-18." [ECF No. 250-1] at 2. Defendants believe evidence of Plaintiff's alleged effort to convince Lee to recant his identification of Plaintiff as the shooter will be found in Plaintiff's recorded telephone calls while he was in pretrial custody in Cook County Jail. [ECF No. 254], at 2-6. CCDOC did not move to quash the subpoena, and in fact, has already produced some responsive materials in the form of a log of Plaintiff's phone calls between October 26, 2014 and June 13, 2019. [ECF No. 254-7] at 1.

Plaintiff filed the instant Motion asking the Court to quash Defendants' subpoena to the CCDOC on two grounds. First, as a matter of procedure, Plaintiff submits that Defendants did not properly meet and confer under Local Rule 37.2 and attempt to resolve this dispute without court intervention. The subpoena, Plaintiff reasons, should be held in abeyance until the meet and confer process takes place. On the merits, Plaintiff argues that the Court should quash the subpoena pursuant to Rule 45(d) because Defendants' broad subpoena for all of his telephone calls while in the custody of CCDOC is an unjustified fishing expedition, and his privacy interest in the phone calls sought outweighs any benefit of production of those recordings on such a wholesale basis, particularly where the phone calls may include privileged attorney-client communications. The Court addresses each argument below in turn.

**DISCUSSION**

### I.    Local Rule 37.2 and the Meet & Confer Process

As an initial matter, the Court declines to grant Plaintiff's Motion based on perceived inadequacies of the meet and confer process. The purpose of Local Rule 37.2, and the meet and confer process as a whole, is to "curtail undue delay and expense in the administration of justice.'" *Autotech Techs. Ltd. P'ship v. Automationdirect.com, Inc.,* 2007 WL 2736681, at *2 (N.D. Ill. 2007) (quoting L.R. 37.2); *see also* FED.R.CIV.P. 1 ("These rules…should be construed, administered, and employed by the court and the parties to secure the just, speedy, and inexpensive determination of every action and proceeding."). Defendants have made it clear in their brief that they are not amenable to Plaintiff's proposal that Defendants "narrow the list of possibly relevant and non-privileged calls using the call log, [so that] Plaintiff's counsel can review those calls, produce those that are indeed discoverable, and prepare a privilege log for those that are not." [ECF No. 250] at 10. Simply put, Defendants believe the law entitles them to all of Plaintiff's recorded calls, and Plaintiff firmly disagrees. Neither position seems likely to change absent court intervention. Indeed, based on the briefs filed by both sides, it does not seem there are any issues raised that could have been, or still could be, avoided by a proper meet and confer. Granting Plaintiff's Motion for failure to comply with Rule 37 and Local Rule 37.2 would therefore result in nothing more than the parties engaging in a futile meet and confer process and filing additional briefs that would be the same, or at least substantially similar, to what they already have filed. That does not seem to be a good use of anyone's time.

The Court agrees with Plaintiff that the Local Rule 37.2 process generally is a prerequisite to the type of motion Defendants have filed. In this instance, though, the Court will not require strict compliance with Local Rule 37.2 for the reasons discussed above. Further, to the extent the

Court is granting Plaintiff's Motion without prejudice to Defendants potentially proposing a narrower inquiry into Plaintiff's telephone calls from Cook County Jail, it may be that this Memorandum Opinion and Order will be of some help to the parties should a meet and confer process be necessary in the future. The Court, therefore, turns to the merits of Plaintiff's Motion.

## II. Plaintiff's Standing and Privacy Interests in the Recordings Sought

A district court must quash or modify a subpoena that "(1) fails to allow a reasonable time for compliance, (2) requires a nonparty to travel more than 100 miles, (3) 'requires disclosure of privileged or other protected matter, if no exception or waiver applies,' or (4) 'subjects a person to undue burden.'" *TCYK, LLC v. Doe,* 2013 WL 5567772 (N.D. Ill. 2013) (quoting FED.R.CIV.P. 45(c)(3)(A)). Yet before the court may exercise its authority under Rule 45(c), a party must have standing to move to quash the subpoena in question. As a general rule, in order for a party to have standing to quash a subpoena issued to a nonparty, the subpoena must implicate that person's "legitimate interests." *See United States v. Raineri,* 670 F.2d 702, 712 (7th Cir. 1982). The movant must have either a claim of privilege, or privacy interests upon which the subpoena will impinge, in order to have standing. *Simon v. Nw. Univ.,* 2017 WL 66818, at *2 (N.D. Ill. 2017); *Hard Drive Prods. v. Doe*, 2012 WL 2196038 (N.D. Ill. 2012) ("Generally, a party lacks standing to quash a subpoena issued to a nonparty unless the party has a claim of privilege attached to the information sought or unless it implicates a party's privacy interest."). Even a minimal privacy interest has been found sufficient to confer standing. *HTG Capital Partners, LLC v. Doe,* 2015 WL 5611333 (N.D. Ill. 2015); *Sunlust Pictures, LLC v. Does 1-75*, 2012 WL 3717768, at *2 (N.D. Ill. 2012).

Although Defendants do not appear to contest it, Plaintiff nevertheless must establish that he has standing to move to quash Defendants' subpoena to third-party CCDOC. *See generally, Wauchop v. Domino's Pizza, Inc.,* 138 F.R.D. 539, 543 (N.D. Ind. 1991) ("The burden of

6

persuasion in a motion to quash a subpoena…is borne by the movant."). Plaintiff need only show a minimal privacy interest to demonstrate standing, as Plaintiff must only establish enough of a privacy interest to invoke the Court's discretionary authority to control discovery in a civil case.

Plaintiff has established at least a minimal privacy interest in the telephone recordings Defendants seek. Plaintiff was incarcerated at CCDOC for over four years before he was ultimately acquitted at trial, and during that time, Plaintiff made almost 8,000 recorded phone calls to "attorneys, friends, family members, and loved ones." [ECF Nos. 250, 254-7]. As courts in this district have recognized, although Plaintiff may reasonably have expected prison officials or law enforcement to have access to recordings of his phone calls from Cook County Jail because of security concerns inherent in managing prisons and prisoners, he may not have anticipated that parties to a civil proceeding would be privy to those conversations. *Pursley v. City of Rockford,* 2020 WL 1433827, at *2 (N.D. Ill. 2020); *Simon* at *2; *Coleman v. City of Peoria,* 2016 WL 3974005, at *3 (C.D. Ill. 2016). That distinction also animates the Court's recognition of Plaintiff's privacy interest in the telephone calls at issue in this case. Even if Plaintiff could have expected that his telephone calls would be monitored by prison officials, he would not necessarily have expected that recordings of those calls would be handed over in bulk to an adverse party in a civil case. *Id.*; *see also* [ECF No. 250] at 5-6. Therefore, Plaintiff has standing to challenge Defendants' subpoena to the CCDOC because he has the minimum privacy interest the law requires for him to raise the arguments he now is raising before the Court.

### III. The Relevance of the Information Sought and the Court's Balancing Test Under Rule 45

Having established Plaintiff has standing to bring this Motion under Rule 45, the Court must next consider whether Defendants' subpoena imposes an undue burden; namely, "whether the burden of compliance with [the subpoena] would exceed the benefit of production of the

7

material sought." *Nw. Mem'l Hosp. v. Ashcroft,* 362 F.3d 923, 927 (7th Cir. 2004). Where the subpoena is directed to a third-party but implicates a different individual's privacy interests, courts weigh the relevance of the information sought against the strength of that privacy interest rather than conduct the familiar assessment of how burdensome production would be on the third party recipient of the subpoena in terms of time and volume of information. *See, e.g., Simon,* 2017 WL 66818, at *2; *Coleman,* 2016 WL 3974005, at *3. "The scope of material that may be secured by Subpoena is as broad as that permitted under the discovery rules," *Coleman* at *3 (citing *Graham v. Casey's General Stores,* 206 F.R.D. 251, 253-54 (S.D. Ind. 2002)), and consists of evidence that is relevant to any party's claim or defense and proportional to the needs of the case. FED.R.CIV.P. 26(b)(1). As with most discovery matters, the decision about whether to quash a subpoena rests squarely within the Court's discretion. *TCYK, LLC,* 2014 WL 273806, at *2 (citing *Griffin v. Foley,* 542 F.3d 209, 223 (7th Cir. 2008)).

In weighing the interests at stake here, the Court must first evaluate the nature and strength of Plaintiff's privacy interests. Plaintiff was a pretrial detainee at Cook County Jail between 2014 and 2018 and placed almost 8,000 telephone calls during that time period. [ECF No. 254-7]. At the time he placed the recorded phone calls at issue, Plaintiff was aware that his telephone conversations were being recorded. [ECF No. 250] at 5-6 ("Moreover, although Plaintiff was aware that his calls at the Cook County Jail might be monitored for security purposes, he never imagined those calls would be heard by anyone other than security personnel. Plaintiff knew he was not doing anything on those calls constituting a security threat; anyone at the Jail who heard his calls would move on to more serious matters. Weighing that low risk against the value of maintaining personal connections, including with his minor children, Plaintiff decided to make phone calls anyway."); [ECF No. 254-8] at 26 ("Telephone calls may be monitored unless prior

special arrangements have been made (court ordered) to make confidential telephone calls to your attorney."). And were this a criminal case, the privacy analysis might end here, as an individual who knows his communications are being monitored, recorded, and preserved cannot be said to have a reasonable expectation of privacy in those communications for Fourth Amendment purposes. *Coleman,* 2016 WL 3974005, at *3.

But this is a civil, not a criminal, case. Although Plaintiff's privacy interest may be minimal – or at least less than that of a private citizen making calls from home without any sense the calls are being monitored by third parties – it is not nonexistent. *See, e.g., Pursley,* 2020 WL 1433827, at *3. During the thousands of recorded phone calls at issue, Plaintiff engaged in conversations with family members about intimate and sensitive subjects, including conversations with his wife while she was battling cancer, subsequently grieving his wife's death with family and friends, and also discussing his son's heart attack. He had personal conversations with his minor children, dealt with his grandmother's death, and spoke about countless matters that likely have nothing to do with the subject matters that would be relevant to the claims or defenses in this case. Plaintiff is entitled to some degree of privacy in the personal content of those conversations, even though he knew others could listen to, and record, those conversations because he was in jail. *Id.*

Turning now to the relevance of the information sought, it is possible that relevant information may be contained somewhere within Plaintiff's 8,000 recorded phone calls – but only if Lee is to be believed, and then only to a point. As it stands, the sole basis for Defendants' subpoena is what Lee has said over the years in that Defendants' belief that relevant information is contained in Bishop's telephone calls comes either from Lee's own recorded jail phone calls or Lee's deposition testimony in this case. Yet Lee is an admitted liar who has told at least four stories about matters relevant to this case. Lee first said Plaintiff was the shooter, and then recanted that

story saying he was forced by the police to tell it and Plaintiff, in fact, was not the shooter. Lee also was recorded on telephone calls while he was in the custody of the Illinois Department of Corrections ("IDOC") saying Plaintiff was reaching out to him through third party intermediaries and offering to pay him $10,000 to say Plaintiff was not the shooter. Then, in his recent depositions in this case, Lee says that it was he who was trying to extort Plaintiff to pay him $10,000 to change his story, and he denied that it was Plaintiff who was trying to bribe him.

Defendants would say that whether Plaintiff was trying to bribe Lee to change his story or Lee was trying to extort Plaintiff to the same effect, evidence related to either scheme could be contained in Plaintiff's recorded calls, and such evidence would be relevant to the claims or defenses in this case. Yet at least one of those stories most likely is a lie, and the bare assertion that the material sought *may* contain relevant information is insufficient to allow an unlimited subpoena, especially when that assertion is based on the kind of shaky and potentially unreliable evidence that Defendants are relying upon here. *See, e.g., Wilson v. O'Brien,* 2009 WL 763785, at *8 (N.D. Ill. 2009).

Further, even were the Court to accept only the portions of Lee's various stories that support Defendants' position as true – namely, that Plaintiff was trying to bribe Lee to change his initial, truthful identification of Plaintiff as the shooter – there still is no solid evidence before the Court that Plaintiff ever used the *telephone* to communicate directly or indirectly with Lee or any of his intermediaries to accomplish that purported goal. The only method of communication between Lee and Bishop reflected of record in this case so far is by letter.[1] To gain access to

---

[1] "Q: Uh-huh. And so was this letter or these letters that you sent out, were those addressed to Mr. Bishop?
MS. LEFF: Objection. Asked and answered.
A: No, sir.
Q: Who was it addressed to?
MS. LEFF: Objection. Asked and answered.

Plaintiff's recorded phone calls, there must be *some* credible evidence that the potentially relevant information will be found where it is being sought.

To that point, Defendants urge the Court to conclude this case falls more within the orbit of *Coleman*, where the court allowed a subpoena for recorded prison calls, than recent decisions in *Pursely* and S*imon*, two cases in which courts rejected similar subpoenas for an inmate's recorded phone calls as overly broad. As this Court highlighted during the hearing in this case on September 8, 2020, [ECF No. 261], the evidence in *Coleman* established that the civil plaintiff whose recorded IDOC calls were sought had, in fact, used the telephone to communicate with seven individuals who were his co-defendants and witnesses in a criminal case about relevant subject matters. *Coleman*, 2016 WL 3974005, at *2 ("Deposition testimony taken during discovery indicates that Coleman had telephone conversations with Nixon, James Coats, Roberson, McKay, Brooks, Robert Coats, and Deondre Coleman while Coleman was in the custody of the Illinois

---

A: They was addressed -- they was address to Beebo.
Q: Uh-huh. And did the letter itself refer to Mr. Bishop? Did it start, "Dear Mr. Bishop," or "Dear Thomas," or "Dear Tommy Gun"? Do you know how -- how did -- how -- how did he know it was about that?
A. Never once said his real name in them. From the situation I was in, it's a street lingo, we use the word "dude." From the situation, dude know what he did or do, we'll use the terminology like that, you know what I'm saying? It'll go from there. We'll know, you know? We just don't write letters and just explain everything on them 'cause they could be intercepted, they could be read leaving or anything, so you -- you -- you -- you speak with lingo, so I don't know what type of letter you want or words you want out of it."

[ECF No. 254-1] at 16-17.

"MR. LEE: I forgot to check -- Guess who the fuck wrote a letter to me though?
UNIDENTIFIED SPEAKER: Who?
MR. LEE: Now, you know, Dover know the nigger that shot me, right?
UNIDENTIFIED SPEAKER: Uh-huh.
MR. LEE: Why this nigger then reach out to Dover to send me a letter to ask me would I help him get out of jail, he made a mistake, and he's sorry and all this? Is you serious?"

[ECF No. 254-2] at 2-3.

Department of Corrections (IDOC). Coleman made some of these calls through his sister, Kim Coleman, and others. Coleman called his sister or others, and they would set up a three-way call with Coleman, who was in custody, and one of the witnesses listed above. Other times, Coleman made the call to Kim Coleman while one of these disclosed witnesses was with Kim Coleman, and the witness spoke to Coleman."). No such direct evidence exists in this case. In the Court's view, therefore, Defendants' subpoena falls more within the broad fishing expeditions described and rejected in *Pursley* and *Simon* than the documented, proportional effort allowed in *Coleman.*

Notwithstanding the lack of direct evidence that Plaintiff communicated with Lee or his intermediaries by telephone, Defendants say it is reasonable to assume Plaintiff was doing so because telephone is the most ubiquitous of the three forms of communication – phone calls, in-person visitation, and letters – available to inmates at Cook County Jail. Defendants argue, therefore, that it is almost a foregone conclusion that Plaintiff used the telephone in furtherance of his purported scheme to influence Lee's testimony. As of now, though, this is nothing more than speculation unsupported by any hard evidence. It may be that Plaintiff, in an effort to avoid placing phone calls he knew were being recorded, communicated with Lee's intermediaries by other means. Plaintiff, for example, could have corresponded with Lee's intermediaries by letter, as Lee intimated Plaintiff did in one of his recorded telephone calls from IDOC, *see* footnote 1, *supra,* citing [ECF No. 254-2] at 2-3, or through intermediaries of his own. This speculation by the Court, presented here only to make a point, also is of no consequence without any evidence.

The bottom line is that neither the Court nor Defendants have enough evidence that convincingly supports any theory as to how Plaintiff may have communicated with Lee's people if such communications, in fact, occurred at all. There must be some basis, beyond mere supposition, that Plaintiff used the telephone to communicate directly or indirectly with Lee or his

intermediaries before Defendants can be given license to rummage through Plaintiff's 8,000 personal telephone calls. The mere possibility that relevant information may be found in Plaintiff's recorded phone calls, which is all Defendants have at this juncture, is insufficient to overcome Plaintiff's privacy interest, especially given the breadth of Defendants' subpoena encompassing 8,000 telephone calls over a four-year period. *Wilson,* 2009 WL 763785, at *8 (the "meager" assertion that "the material sought may contain relevant information" is insufficient to allow an unlimited subpoena).

It often is said that "pretrial discovery is a fishing expedition and one can't know what one has caught until one fishes." *Nw. Mem'l Hosp. v. Ashcroft,* 362 F.3d 923, 931 (7th Cir. 2004). "But Fed.R.Civ.P. 45(c) allows the fish to object, and when they do so the fisherman has to come up with more" than Defendants have been able to do in this case. *Id.* If some of what Lee says is to be believed, then there may at least have been some indirect communication between Lee and Plaintiff relating to Lee's anticipated testimony at Plaintiff's criminal trial. But Defendants have not yet established to the Court's satisfaction that this evidence will be found in Plaintiff's recorded phone calls such that Defendant should be given free rein to listen to every call Plaintiff made over a four-year time period. Until Defendants make this connection, the subpoena at issue is overbroad and does not target evidence that is sufficiently relevant to overcome even Plaintiff's minimal privacy interest here. Nor is searching 8,000 phone calls, without any limitation, proportional to the needs of the case.

There is still a significant amount of discovery to be done in this case. Plaintiff is scheduled to be deposed in the very near future, as are other individuals who may have first-hand knowledge of the October 2014 shooting itself or Plaintiff's purported scheme to coerce the testimony of Lee and other witnesses. [ECF Nos. 262, 275]. The deposition of Isaiah Watkins, one of the October

2014 shooting victims, was scheduled for October 8, 2020 – though Watkins did not appear for that deposition and a motion for a rule to show cause is currently pending [ECF No. 269] – and Plaintiff's deposition is scheduled for November 19, 2020. [ECF No. 275]. Since the filing of this Motion, the parties have deposed Karin Campbell, with whom Lee communicated about supposed contacts between Plaintiff and Lee's purported intermediaries, identified by Lee only as Dover and Solo.[2] It may be that further discovery will allow Defendants to uncover the identities of Dover and Solo as well as a third purported intermediary Lee identified only as Beebo. *See* footnote 1, *supra*. Further investigation and discovery also may shed light on how or when these

---

[2] "MR. LEE: Oh. But I know for sure it ain't from no way like that because a mother fucker trying to reach out to me. A mother fucker trying to pay me $10,000 to do whatever. You know what I'm sayin'?
UNIDENTIFIED SPEAKER [since identified as Karin Campbell]: If you do that -- They don't have to pay you $10,000 now Antwon because they could just kidnap your mother fucking kids for you not to do it.
MR. LEE: And who would do that?
UNIDENTIFIED SPEAKER: Are you fucking serious?
MR. LEE: The mother fucker not that's crazy, man. And I know where they wife live, where they kids live.
…
MR. LEE: His name is Thomas Bishop.
UNIDENTIFIED SPEAKER: All right.
MR. LEE: They live [redacted]. That's where they house is at.
UNIDENTIFIED SPEAKER: Okay.
MR. LEE: His wife has a shop around [redacted]. Her name is [redacted].
UNIDENTIFIED SPEAKER: Okay.
MR. LEE: He has four sons. One of them name is Snub, one of them name is TomTom, one of them name is Fat Man, and one of them name is Little T. Now, TomTom is locked up for a double murder. Little T is young. He hang around [redacted]. Really is nothing. Snub that used to hang with Gino that came on our block, Snub is like 33 or 32. He's out there floating a trunk, X pills. He hanging out there. Every time you see Elamack that mean he runs. Every time you see them. His other son hangs around -- they call that shit on a low end like around [redacted]. All up like through there is nothing. You know what I'm sayin'? Fool them that down there who I fuck with, they see him. So that's like shit that I keep tabs around with him. You know what I'm sayin'? Now my man Dover and Solo talks to him. And these are guys I grew up with. That's who communicate with me for him. You know what I'm sayin'? They trying to bag me to get Eichy not to come to court on him.
UNIDENTIFIED SPEAKER: Mm-hmm.
MR. LEE: I'm not touching that shit, Karen. I said it is what it is. I'm not going to court on him, so I'm not a problem, Karen. I don't have no stake in this thing. I'm not going to court to testify on this man. That shit been established when I caught my case in jail. That's why the state got mad at me and gave me all this time because I wouldn't cooperate with that shit, Karen. Now you see what I'm sayin'? I'm not the problem. I ain't got to apologize or a sorry, we made a mistake, he acted out of anger, he was drunk. I'm not the problem, Karen. That man shot me." [ECF No. 254-6] at 9, 10-12.

intermediaries communicated with Plaintiff, as well as when and how Lee's recantation affidavit came into Plaintiff's possession. The parties have identified literally dozens of potential witnesses, both parties and third parties, who may be interviewed or deposed in this case and whose testimony or statements may prove to be important in establishing the relevance of Plaintiff's recorded jail calls. [ECF Nos. 130, 262, 275].

It may be that the subpoena to CCDOC comes too early in the discovery process. To be sure, allowing Defendants access to Plaintiff's telephone calls now would open up for them a large window into much of Plaintiff's life during the four years he spent in pretrial detention, which, in turn, might make it easier for Defendants to find evidence of what they are looking for, if it exists. But the easier path is not always the right path, particularly when a person's privacy interests are at stake. Allowing Defendants the kind of unlimited access to Plaintiff's recorded telephone calls they now seek comes at a cost to even the minimal privacy interests the law recognizes for a pretrial detainee in Plaintiff's position. In the Court's view, Defendants need to present a more convincing argument that relevant evidence will be found in Plaintiff's jailhouse calls before they will be allowed to "go fishing" in that particular pond. Further, depending upon what Defendants come up with, it may be that they will be able to justify fishing in only parts of that pond.

The Court notes that Plaintiff does not appear to object to CCDOC already having produced to Defendants a log of Plaintiff's phone calls during his pretrial detention at Cook County Jail in response to the subpoena at issue. Therefore, this Court's order today otherwise quashing Defendants' subpoena for Plaintiff's telephone calls does not preclude production of that call log by CCDOC without apparent objection by Plaintiff. Perhaps some information contained within that log, which includes every phone number Plaintiff called while incarcerated, can be used, along with other evidence that Plaintiff can provide or Defendants may discover along the way, to narrow

the scope of the subpoena and better target relevant, proportional, and thus discoverable evidence. Until that time, however, the Court is not convinced that the subpoena here is any more narrowly tailored than the broad fishing expeditions rejected by the courts in *Pursley, Simon,* and *Ezell.* The Court similarly rejects Defendants' overbroad subpoena here.

On a final note, Defendants assert that the information contained in the telephone recordings is independently relevant to the issue of Plaintiff's damages. The subpoena, as currently framed, seeks four years of Plaintiff's calls without limitation. That is to say, the subpoena is not in any way targeted at calls likely to contain information relevant to facts supporting or undermining Plaintiff's claimed physical injuries or the pain and suffering or emotional distress he says he suffered. Instead, Defendants are trying to cast a wide net over all of Plaintiff's recorded phone calls to uncover whatever evidence they can that Plaintiff's asserted damages are overstated or unsupported by the evidence. Using such a wide net, the Court has little doubt that Defendants would catch at least a few recordings they would say might be useful for their cross-examination of Plaintiff at trial, or to challenging Plaintiff's claimed damages from four long years of pretrial detention. But the question is not only whether a broad search of Plaintiff's calls would possibly uncover relevant information, but also whether such a search is proportional to the needs of the case. Weighing Plaintiff's privacy interest in four years of recorded calls against the possible relevance of some of those calls to Plaintiff's asserted damages and Defendants' defense against the same, the Court cannot say relevance carries the day here to justify such a broad-based search.

The Court is not saying, as it pertains to Plaintiff's recorded calls, that some targeted discovery into Plaintiff's emotional or physical state during the time he was incarcerated might not be sufficiently relevant to overcome Plaintiff's privacy interest described above. But Defendant's blunderbuss approach to this issue in seeking to listen to all 8,000 telephone calls

Plaintiff made from Cook County Jail so they can try to undercut his claim that he was injured as a result of serving four years of pretrial detention before his criminal trial, which ended in a not guilty verdict, is not proportional to the needs of the case and unreasonably tramples on Plaintiff's even minimal privacy interests. *See, e.g., Ezell v. City of Chicago*, No. 1:18-CV-01049, ECF No. 230 (N.D. Ill. 2020) ("In other words, in the years of recorded conversations, some bit of evidence about plaintiffs' state mind might possibly be revealed. But the subpoenas are so broad and all–encompassing that they are the very definition of a fishing expedition or of throwing darts in the dark.").

Finally, as should be evident from the discussion above, the issue of whether Defendants' subpoena should be allowed or not is presented to the Court on an all or nothing basis at this point. Defendants say their subpoena is completely proper. Plaintiff says it is overbroad and his counsel should be allowed to review the CCDOC call log, meet and confer with defense counsel, and propose a more limited number of calls for Defendants to review for potentially relevant information. Defendants reject that approach as a non-starter; they want all the calls. Neither side has presented as of now a reasonable alternative either to ordering full production of the recorded telephone calls sought by the subpoena to CCDOC or shutting the process down so the parties can think about and possibly discuss a narrower approach. Faced with this choice, the Court opts for shutting the process down, at least for now.

### IV.    The Attorney-Client Privilege and Plaintiff's Recorded Jail Calls

Finally, Plaintiff asks the Court to quash Defendants' subpoena because disclosure of his recorded jail calls may reveal conversations protected by the attorney-client privilege. Although the Court is quashing Defendants' subpoena for other reasons, the Court will address the attorney-

client privilege issue on the merits because it may be relevant if the Court's ruling is appealed and/or if Defendants present a more narrowly tailored subpoena in the future.

Although the Court must quash or modify a subpoena if it requires the disclosure of privileged information, FED.R.CIV.P. 45(d)(3), the Court disagrees that Plaintiff's attorney-client communications over recorded prison telephone lines are privileged. As the Seventh Circuit has repeatedly explained, the attorney-client privilege protects communications in which legal advice of any kind is sought from a professional legal adviser in his capacity as such, so long as the communication is related to that purpose and "made in confidence…by the client." *Sandra T.E. v. S. Berwyn Sch. Dist. 100*, 600 F.3d 612, 618 (7th Cir. 2010) (citing *United States v. Evans,* 113 F.3d 1457, 1461 (7th Cir.1997)). Although the Seventh Circuit has not yet tackled the issue of whether the attorney-client privilege protects recorded prison telephone calls, several courts in this circuit have held that such communications are not privileged because the inmates in question knew their conversations were being recorded and had no reasonable expectation of confidentiality.[3] *Pursley*, 2020 WL 1433827, at *4; *Simon*, 2017 WL 66818, at *5; *United States v. Thompson,* 2007 WL 2700016, at *2 (C.D. Ill. 2007). Other courts nationwide are in accord. *United States v. Mejia,* 655 F.3d 126, 133 (2d Cir. 2011) ("[W]here an inmate is aware that his or her calls are being recorded, those calls are not protected by a privilege."); *United States v. Hatcher,* 323 F.3d 666, 674 (8th Cir. 2003) ("The presence of the prison recording device destroyed the attorney-client privilege. Because the inmates and their lawyers were aware that their

---

[3] Analogizing the attorney-client privilege to the marital communications privilege, these courts noted that the Seventh Circuit has spoken on whether martial communications ordinarily shielded by martial privilege, but recorded by a correctional institution from an inmate, are confidential and protected from disclosure. Because of "the well-known need for correctional institutions to monitor inmate conversation," as well as the indisputable fact that the parties involved knew their conversation was being recorded, the Seventh Circuit concluded that these conversations were no longer protected by the marital privilege. *United States v. Madoch,* 149 F.3d 596, 602 (7th Cir. 1998).

conversations were being recorded, they could not reasonably expect that their conversations would remain private.").

Plaintiff asserts that he "had, at best, no procedure by which he could access or request an unrecorded call with his attorneys except through court order in special circumstances, and Plaintiff understood as a practical matter that he did not have access to unrecorded calls with his attorneys." [ECF No 258] at 9. Yet the fact that an unrecorded, confidential conversation was more difficult for Plaintiff to arrange does not mean he lacked access to such a call, or that he faced an insurmountable "impediment," as contemplated by *Pursely* and *Simon*. Nor does Plaintiff's contention address the fact that in-person, confidential visits with his attorney were readily available upon request, did not require court authorization, and could occur with only a day's notice. [ECF No. 254-8] at 29 ("Lawyers, clergyman, foreign consulate, or a representative of the foreign consulate may visit an inmate any day of the week, but they must call the division in which the inmate is housed, twenty-four (24) hours in advance of their visit to reserve space for a private visit.").

In the Court's view, the attorney-client privilege does not protect Plaintiff's choice to speak to his attorneys on the telephone knowing that the calls were being recorded simply because it was more convenient than adhering to the "process for scheduling an unrecorded private attorney call." *Pursley,* 2020 WL 1433827 at *5. Indeed, Plaintiff's argument that he did not have access to unrecorded phone calls as a "practical matter" says nothing of whether he had access to them as an "actual" matter. [ECF No 258] at 9. The CCDOC Inmate Handbook[4] not only provides that

---

[4] Plaintiff's suggestion that the Court should be wary of the information contained in the Cook County Jail Handbook provided by Defendants because it is "undated" appears to be unwarranted. Copies of the CCDOC Inmate Handbook filed in other cases in this district show that confidential attorney phone calls were available with "prior special arrangements" between 2013 and 2018, which is during the time Plaintiff

each inmate has "the right to speak to [their] attorney by telephone or in person" and "the right to send letters and receive letters from [their] attorney," but it also emphasizes that "[c]onversations with your attorney, letters to and from your attorney are all private and privileged communication between you and your attorney." [ECF No. 254-8] at 8. The Handbook goes on to outline the process by which an inmate can secure a private and privileged communication with his or her attorney; namely, by making special arrangements, by court-order, to make a confidential call to said attorney. [ECF No. 254-8] at 26.

Plaintiff, therefore, clearly had the ability to communicate in confidence either in person or by telephone with his attorneys and preserve his attorney-client privilege but chose not to do so. And because he does not dispute that he knew the calls with his attorneys were being recorded, he has waived any claim of privilege by knowingly proceeding with those conversations on, essentially, an open and recorded line. *See generally, United States v. Evans,* 113 F.3d 1457, 1462 (7th Cir. 1997) ("the attorney-client privilege will not shield from disclosure statements made by a client to his or her attorney in the presence of a third party who is not an agent of either the client or attorney."). Accordingly, if Defendants are given access to at least some of Plaintiff's telephone calls from jail in the future, the attorney client privilege does not, by itself, prevent Defendants from listening to calls between Plaintiff and his various attorneys; assuming, of course, that Defendants can establish relevant information likely will be found in those calls and allowing Defendants to access those calls is proportional to the needs of the case.

---

was held in pretrial detention at Cook County Jail. *See Camacho v. Dart,* 15 CV 3396 [ECF No. 32-2]; *Elizarri v. Sheriff of Cook County,* 17 CV 8120 [ECF No. 92-1].

## V.     Conclusion

For the reasons discussed above, Plaintiff's Motion to Quash the Detective Defendants' Subpoena Seeking Plaintiff's Recorded Phone Calls [ECF No. 250] is granted without prejudice to Defendants proposing a narrower inquiry into Plaintiff's recorded phone calls than the broad subpoena currently before the Court.

It is so ordered.

Jeffrey T. Gilbert
United States Magistrate Judge


Dated: October 20, 2020