## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| THOMAS BISHOP, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 16-cv-6040 |
| | ) | |
| v. | ) | Hon. Jorge Alonso |
| | ) | |
| JOSEPH WHITE, *et al.*, | ) | Hon. Jeffrey Gilbert |
| | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION FOR SANCTIONS

NOW COME Defendant Officers, JOSEPH WHITE, PEDRO ORTIZ, CARLOS DELATORRE, JAMES GOCHEE, MARK MENDEZ, HENRY MORRISON, and BRIDGET BRUBAKER (collectively "Defendant Officers"); Defendant Detectives, WADE GOLAB, NEIL EVANS, RYAN MILLER, and STACY HEUBAUM as Special Representative for JAMES HEUBAUM ("Defendant Detectives"); and the CITY OF CHICAGO (the "City"), (collectively referred to herein as Defendants"); by and through their respective undersigned attorneys, and pursuant to Fed. R. Civ. P. 37 and the inherent authority of this Court, move this Court for sanctions against Plaintiff including dismissal with prejudice and attorney's fees and costs. In support thereof, Defendants state as follows:

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

RELEVANT PROCEDURAL AND FACTUAL BACKGROUND ........................................2

    I.    PLAINTIFF'S FACTUAL THEORIES................................................................................2

    II.   DEFENDANTS' FACTUAL THEORIES .............................................................................3

    III.  ANTWON LEE'S RECORDED CALL FROM IDOC ........................................................5

    IV.  PLAINTIFF'S RECORDED CALLS FROM THE COOK COUNTY JAIL AND HIS PERJURED DISCOVERY RESPONSES AND TESTIMONY. ..................................................................9

    V.   PLAINTIFF COMMITTED NUMEROUS INSTANCES OF PERJURY REGARDING HIS ATTEMPTS TO INTERFERE WITH WITNESSES' TESTIMONY AGAINST HIM. ...........................12

    VI.  PLAINTIFF LIED ABOUT HOW LEE'S RECANTATION AFFIDAVIT WAS PROCURED. ...............20

    VII.  PLAINTIFF'S PERJURED DISCOVERY RESPONSES REGARDING HIS WHEREABOUTS AND ACTIVITIES IN THE TIME LEADING UP TO HIS SHOOTING. ...........................................20

    VIII. PLAINTIFF LIED ABOUT HIS NICKNAMES. ................................................................24

    IX.  PLAINTIFF FAILED TO DISCLOSE HIS RECENT ARREST FOR ANOTHER MURDER. ...............24

    X.   PLAINTIFF'S PERJURED TESTIMONY REGARDING HIS CLAIMED DAMAGES. ....................25

ARGUMENT ....................................................................................................................27

    I.    PLAINTIFF'S EXTENSIVE HISTORY OF PERJURY AND OTHER DISCOVERY VIOLATIONS MERITS DISMISSAL. ................................................................................................27

    II.   PLAINTIFF'S INTENTIONAL AND DECEITFUL WITNESS TAMPERING WARRANTS DISMISSAL AS A SANCTION. ....................................................................................34

    III. DISMISSAL IS THE ONLY APPROPRIATE REMEDY HERE GIVEN THE SEVERITY OF PLAINTIFF'S LITIGATION MISCONDUCT AND ITS PREJUDICE TO DEFENDANTS. ..................37

CONCLUSION ..................................................................................................................40

# TABLE OF AUTHORITIES

## CASES

*ABF Freight Sys., Inc. v. N.L.R.B.*, 510 U.S. 317, 323 (1994) ......................................................31

*Allen c. Chic. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003) ..................................................34

*Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 2002 WL 215535, *2 (N.D. Ill. Feb. 12, 2002) .......................................34

*Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993) ..........................................................29, 37, 38

*Brady v. U.S.*, 877 F. Supp. 444, 453 (C.D. Ill. 1994) ....................................................................31, 34

*Chambers v. NASCO, Inc.*, 501 U.S. 32, 48-49 (1991) ..................................................................27, 29

*China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, 1999 WL 966443, *4 (N.D. Ill. 1999) ......................36

*Chung v. KPMG LLP*, 104 Fed. Appx. 576, 577-78 (7th Cir. 2004) ...............................................36

*Dewitt v. Ritz*, 2021 WL 915146, *1 (D. Md. 2021) ........................................................................36

*Diettrich v. Nw. Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999) ...............................................30

*Dotson v. Bravo*, 202 F.R.D. 559, 572 (N.D. Ill. Aug. 22, 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003) ...............32, 33, 37, 39

*Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.1996) ................................................................29

*Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001) ...................................................................32, 33, 34

*Escamilla v. Jungwirth*, 426 F.3d 868, 870 (7th Cir. 2005) .....................................................31, 33

*Fuery v. City of Chic.*, 2016 WL 5719442, *11 (N.D. Ill. 2016) ............................................29, 34, 38

*Greviskes v. Univ. Research Ass'n, Inc.*, 417 F.3d 752, 758-59 (7th Cir. 2005) ....................28, 29, 30

*Hal Commodity Cycles Mgmt. v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987) ......................28, 37

*Jackson v. Murphy*, 468 Fed. Appx. 616, 619-20 (7th Cir .2012) ...........................................30, 34

*JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981-82 (N.D. Ill. 2011) ................28

*Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997) ...........................................................36

*Lightspeed Media Corp. v. Smith*, 2015 WL 3545253, *5 (S.D. Ill. 2015) ...................................28

*Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000) .......................................................................29

*Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, 2006 WL 2434031, *1 (N.D. Ill. 2006) .......................33

*Malibu Media, LLC v. Tashiro*, 2015 WL 2371597, *37 (S.D. Ind. 2015) ...................................38

*Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 723-24 (7th Cir. 2008) ...........................28

*Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 284-85 (7th Cir.1988) ...............29

*Philips Med. Sys, Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992) ............................37

*Profile Gear Corp. v. Foundry Allied Ind., Inc.*, 937 F.2d 351, 353-54 (7th Cir.1991) ...............37

*Quela v. Payco-Gen. Amer. Credits, Inc.*, 2000 WL 656681, *6 (N.D. Ill. Mya 18, 2000) .............28, 30, 31, 35

*Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) ........................................... passim

*Razier v. Compass Truck Sales, LLC*, 2016 WL 1449933, *9 (N.D. Ill. 2016) ......................29, 37

*Rhodes v. LaSalle Bank, N.A.*, 2005 WL 281221, *3 (N.D. Ill. Feb. 1, 2005) ...................31, 33, 39

*Ridge Chrysler Jeep, LLC v. Daimler Chrysler Serv. N. Am., LLC*, 2006 WL 2808158, *8 (N.D. Ill. Sept. 6, 2006) ...........30, 34

*Rivera v. Drake*, 767 F.3d 685, 686-87 (7th Cir. 2014) ..................................................................31

*Rodriguez v. M & M/Mars*, 1997 WL 349989, *2 (N.D. Ill. June 23, 1997) ...........................31, 33, 34

*Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1180 (7th Cir. 1987) ...........................37

*Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009) .................................27

*Secrease v. W. & So. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015) .................................... passim

*Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir. 2002) ...............30, 33, 34

*Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) .......................................................34

*U.S. v. Alvarez*, 132 S. Ct. 2537, 2540 (2012) ................................................................................30

*U.S. v. DiStefano*, 464 F.2d 845, 854 (2d Cir. 1972) ....................................................................30

*U.S. v. Stokes*, 211 F.3d 1039, 1046 (7th Cir. 2000) .....................................................................30

*White v. Lambert*, 2011 WL 691983, *8 (S.D. Ill. 2011) ...............................................................38

*White v. Williams*, 423 Fed. Appx. 645 (7th Cir. 2011) ...............................................................28

## RULES

F.R.C.P. 37(a)(4) ...............................................................................................................................28

Fed. R. Civ. P. 37(b)(2) ..............................................................................................................28, 30

## INTRODUCTION

"[F]alsifying evidence to secure a court victory undermines the most basic foundations of our judicial system. If successful, the effort produces an unjust result. Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."

*Secrease v. W. & So. Life Ins. Co.*, 800 F.3d 397, 402 (7th Cir. 2015). This case is a near perfect example of the wisdom of these legal principles.

This case arises from Plaintiff Thomas Bishop's ("Plaintiff") arrest and prosecution for the murder of Tepete Davis ("Davis") and attempted murder of Antwone Lee ("Lee") on October 23, 2014, as well as Plaintiff's shooting by responding police officers in the moments leading up to his arrest for these crimes. Simply stated, Plaintiff has engaged in one of the more egregious and repeated patterns of discovery violations and outright perjury one could imagine occurring in a civil case. Discovery (including, most notably, recorded phone calls of Lee from the Illinois Department of Corrections and of Plaintiff from the Cook County Jail) revealed Plaintiff's almost certain involvement in a nefarious and criminal plot to obstruct justice in his underlying criminal case by: (1) arranging for the key witness in his case, Lee, to recant his previous identification of Plaintiff as his shooter in exchange for money and under the implicit threat of violence; (2) intimidating another key occurrence witness, Isaiah Watkins, into violating a subpoena to avoid testifying against Plaintiff; and (3) arranging for a host of criminal cohorts to intimidate any witnesses who dared to testify against Plaintiff at his criminal trial.

Unfortunately, the Cook County State's Attorney's Office ("CCSAO") failed to obtain any of these recordings during the criminal proceedings (*see* Ex. 7 at 46:16-49:14) and, thus, Plaintiff's apparent criminal obstruction was successful in the absence of this "smoking gun" evidence. Lee recanted his testimony. Another occurrence witness (and shooting victim) Isaiah Watkins failed to appear in Court. No evidence was presented to the jury to show the *real reason* these things occurred. Thus, Plaintiff walked free of crimes that he was almost certainly guilty of committing.

While Defendants have been successful in obtaining some highly incriminating evidence, Defendants' attempts to probe into the full and complete facts of this case have unfortunately been

1

stymied by Plaintiff's outright perjury regarding a variety of matters relating to the shooting, Plaintiff's communications regarding his criminal case with intermediaries seeking to have Lee change his identification of Plaintiff, Plaintiff's invocation of the Fifth Amendment to prevent Defendants from learning the real facts underlying his involvement in procuring Lee's fabricated recantation affidavit, and Plaintiff's repeated misstatements and failures to disclose material information in his written discovery responses. Plaintiff also repeatedly lied about his damages.

While this Court need not find such conduct caused actual prejudice to Defendants in order to sanction Plaintiff, the prejudice created by this conduct is both real and irreparable. While Defendants have developed damning evidence against Plaintiff, Defendants have been prevented from developing a full and complete body of evidence to defend on both liability and damages and have been obstructed in locating and deposing witnesses as a direct result of Plaintiff's inability to tell the truth and participate as required in the discovery process. Under these circumstances, it is neither fair nor just to require these Defendants (and, of course, the taxpayers of the City of Chicago who will have to foot the bill for additional litigation expenses of several teams of outside counsel) to shoulder additional resources in litigating this case when Plaintiff has shown himself incapable of following the basic rules of civil litigation. Under well-established law, there is no other appropriate remedy for such transgressions than to dismiss this case with prejudice as well as award monetary sanctions including attorney's fees and costs.

## RELEVANT PROCEDURAL AND FACTUAL BACKGROUND

### I.     Plaintiff's Factual Theories

According to Plaintiff's various pleadings, he was simply "in the wrong place at the wrong time" on October 23, 2014. Plaintiff claims he was simply walking home from his grandmother's house around midnight and was shot by police in the vicinity of 80th and Justine in Chicago, despite being merely an innocent bystander to criminal activity in which he was not involved. *See* Dkt. Nos. 1 at 2-7, 35 at 2-4, 73 at ¶¶ 17-21, 144 at ¶¶ 1-5, 14-16, 22-33, 102-104, 196 at ¶¶ 1-4, 15-18, 23-26, 102-105. Moreover, Plaintiff alleges other Defendant Detectives supposedly misrepresented the circumstances of this shooting and

procured a false statement from victim Lee identifying Plaintiff as his shooter. Dkt. No. 144 at ¶¶ 34-45, 106-109; Dkt. No. 196 at ¶¶ 1-4, 23-46. With respect to this latter theory, in this case and at his criminal trial, Plaintiff relied heavily on an affidavit signed by shooting victim Lee on September 20, 2016 (almost two years later), which recants his previous repeated identifications of Plaintiff and makes various claims of police overreaching in his original identification. *Id.* At Plaintiff's criminal trial, this recantation appears to have carried the day as he was acquitted.

## II. Defendants' Factual Theories

Defendants have a different theory. Plaintiff, and as yet unidentified criminal cohorts, were involved in a rapidly escalating series of attacks with Lee and his own criminal cohorts over the time period from October 20, 2014 until the events of October 23, 2014. Specifically, on October 20, 2014 (approximately 4 days before the shooting), Lee's apartment was burglarized of several thousand dollars as well as several pounds of marijuana. *See* Ex. 1 at 26; Ex. 2; Ex. 3 at 86:14-87:6. After this occurred, Lee stated to his friend Isaiah Watkins that he (Lee) intended "to take care of things on his own" and related he intended to "fuck that boy up" in relation to the persons responsible for the burglary. Ex. 1 at 26. The burglary of Lee's property was reported to the police by Watkins, with his contact information as the victim. *Id.*.

On October 21, 2014, within 24 hours of the Lee burglary, Plaintiff's home was subjected to a violent home invasion by masked and armed individuals who beat Plaintiff's wife, stole cash and personal property, and tied up Plaintiff's wife and teenage son. *See* Ex. 4 at 62-69.

On October 23, 2014, two days after the home invasion, several Defendant Officers were in a police squad car at 80th and Ashland when they heard a barrage of gunfire coming from the area near 80th and Justine. *See* Ex. 1 at 21-22. When they arrived near the mouth of an alley on 80th street between Ashland and Justine, the officers observed Plaintiff, "gun in hand," in the act of shooting Lee. Plaintiff then fled eastbound through a residential gangway upon seeing the police, and was shot and apprehended on Justine after turning toward the officers with a dark object in hand. *Id.*

After Plaintiff was shot, he was arrested. *Id.* Plaintiff's hands were tested for gunshot residue and the Illinois State Police crime laboratory found the samples taken were positive. *See* Ex. 5. A gun was also recovered from the gangway where Defendant Officers observed Plaintiff flee from the alley. Ex. 1 at 4-5. Several rounds of ammunition matching this gun were found in Plaintiff's pocket. *See id.* at 18, 22.

Despite being shot numerous times, Lee survived and was transported to Stroger Hospital. While at the hospital, Lee was interviewed by detectives. Ex. 1 at 23-24. Lee told the Detectives he saw the person who shot him and described the shooter as a dark-skinned black male with dreadlocks and a skull cap. *Id.* Lee indicated he would be able to identify the person who shot him if he saw that individual in a picture. *Id.* The Detectives then later returned to Lee and showed him a photo array, which included a photo of Plaintiff. *Id.* Lee identified Plaintiff as the person who shot him. On November 19, 2014, Lee testified before a grand jury, identifying Plaintiff was the person who shot him. Ex. 3 at 21:4-8; Ex 6.

As noted above, Lee executed an affidavit in September 2016 recanting his identification of Plaintiff. Defendants contend this recantation was the product of a criminal conspiracy between Plaintiff and Lee (effectuated through intermediaries) to obstruct justice by presenting perjured testimony.

Another victim and witness to the shooting emerged on October 24, 2014. Isaiah "Ikey" or "Eichy" Watkins was with Lee and Davis in the moments leading up to the shooting and observed the assailants. *See* Ex. 1 at 26. Watkins was also struck in the leg by gunfire from these assailants. *Id.* Watkins testified at the grand jury which lead to Plaintiff's indictment. *See* Ex. 7. Watkins was also subpoenaed to appear as a witness for the prosecution. *See* Ex. 8 at 83:12-84:3. The prosecution intended to call Watkins as a witness, but Watkins successfully ducked the court order. *Id.* Thus, Watkins did not render testimony against Plaintiff at the criminal trial. It is Defendants' theory that this failure to appear was the result of Plaintiff directing intermediaries to ensure Watkins' lack of cooperation.

On November 12, 2020, after failing to appear for his deposition, Watkins relayed to Judge Gilbert that he was scared for his life and that he did not want to have anything to do with Plaintiff. Ex. 9 at 3:3-18. During the rule to show cause hearing, Watkins expounded on his fear of Plaintiff, stating:

4

Yes, sir. I mean, I -- Judge, I only said that because -- it's somebody died that night, and I don't want to die from the hands of nobody. I don't want to be involved with these people. I don't want somebody to say I said something bad. I don't want his lawyers to say, hey, well, he called and he said he is scared for his life. That may tick them off or somebody they know off. Not Mr. Bishop. I have nothing but good things to say about him because I don't want anything to happen to me. I don't know if it's true or false, but I want to stay the hell away from him. Ex. 10 at 10:11-21.

### III.     Antwon Lee's Recorded Call From IDOC

Given the above, the circumstances under which Lee decided to change his story from identifying Plaintiff as his shooter to recanting via an affidavit signed nearly two years later was of central importance during discovery. Indeed, the suspicious nature of Lee's recantation was further heightened by the facts surrounding the affidavit. First, it was not effectuated until nearly two full years after Lee's initial identification. Second, Lee was incarcerated in the Illinois Department of Corrections ("IDOC") at Robinson Correctional Center ("Robinson") on an unrelated criminal case for essentially the entire time between the shooting and when his affidavit was procured in September 2016. Given the notoriously poor reception of "snitches" in prison, this status preceding the production of the affidavit was also highly suspect. Third, the affidavit was revealed in a most unusual fashion: it was sent directly to the presiding criminal judge via an U.S. Postal Service envelope purporting to emanate from a P.O. Box outside of IDOC registered to persons without any apparent connection to this case and bearing the name of Hollywood movie star "Ryan Reynolds." *See* Ex. 11. This indicated, at minimum, that Lee had been assisted in his endeavors to complete his recantation and that the identity/identities of such confederates was being actively concealed.

Knowing that IDOC records all inmate communications via phone with outsiders, Defendants subpoenaed Lee's recorded communications for the relevant time period leading to both the execution of the recantation affidavit as well as Lee's testimony at Plaintiff's criminal trial. What was revealed in these recordings entirely confirmed Defendants' suspicions that a criminal scheme to obstruct justice was afoot. Indeed, the content of these calls were nothing less than shocking in the explicitness with which they revealed both Plaintiff's guilt for the shootings as well as the details of the scheme to procure a false recantation of Lee in exchange for promises of a payout as well as implied threats of violence to Lee and

his family and friends. These calls also identify by name the persons acting as intermediaries between Plaintiff and Lee: individuals referred to by nicknames as Dover/Dober and Solo. The references to this scheme and the implication of Plaintiff as Lee's shooter contained in these calls are far too extensive to comprehensively detail here. However, a few examples are illustrative.

Before providing the recantation affidavit, Lee was captured on IDOC recordings repeatedly identifying Plaintiff *by name* as his shooter to friends and family. For example, in March 2016, Lee was speaking to a friend, Meshar Levi and specifically identified Plaintiff by name as his shooter, described Plaintiff being shot by the police, and indicated they had associates in common:

> **Levi:** Did you know the person that did that --
> **Lee:** You know, actually --
> **Levi:** -- to you?
> **Lee:** You know, actually what's so crazy? One of my little guys from off the block -- As it all comes down, once the guy got shot -- Once the guy got shot by the police and they put his picture all up, you know, a few people commented like on Facebook and all like show pictures of his son. You know, my home -- one of my little guys off the block hang with one of his sons. You know what I'm sayin'? And that's how I found out really who this guy was….He an older cat, you know. And I heard he was getting a little money. You know, he was like one of them all aggressified n****rs, you know. Wanted everybody to listen to him and all that….The n****r name is Thomas Bishop. They call him Tommy Gun. Ex. 12 at 7:05-8:52.

Indeed, while incarcerated, Lee admitted he told *hundreds* of people that Plaintiff was the person who shot him. *See* Dkt. Nos. 254 at 1, 3-6, 74, 254-6 at 6, 27-28.

Just two weeks before Lee executed the recantation affidavit, Lee called his sister, Lorene Overton, and the following exchange took place relating to Plaintiff's attempts to get him to recant:

> **Lee:**…Guess who the fuck wrote a letter to me though?
> **Overton:** Who?
> **Lee:** Now, you know, Dover know the n****r that shot me, right?
> **Overton:** Uh-huh.
> **Lee:** Why this n****r then reach out to Dover to send me a letter to ask me would I help him get out of jail, he made a mistake, and he's sorry and all this? Is you serious?...
> Like n****r, you know you was doing something wrong in the first place. Why would you even do that to me and kill my friend anyway? You know what I'm sayin'?
> …
> Come on, man. That's all about all this time that you want to send apologetic letters. Mother fucker, you could have been there then when the mother fucker was out there when I first got locked up. Now you trying to get out of jail and now you need me. This shit all backwards, man.
> **Overton:** What the fuck he need you for? What the fuck you supposed to do?

6

**Lee:** I don't know what he want me to do. The police seen you shootin' us up. The police was right there. That's why they shot you in your neck and it came out your jaw, bitch. So pretty much how can I help you?
**Overton**: Exactly.
**Lee:** They want me saying that it wasn't him and all this. Ex. 13 at 11:18-13:18; Ex. 3 at 43-45.

Ten days after signing the recantation affidavit, Lee once more discussed with Ms. Overton Plaintiff's attempts to have Lee get him out of jail:

You know that n****r been trying to get in contact with me trying to help me to get—he want me to help him get out of jail…. Like, man, you did some goofy ass shit, n****r. Now you still on the side of stupid. Gonna get a hundred years. It ain't even – I don't even do nothing. The police think you shoot me. That's why they shot you, dumb mother fucker…. He should have thought about that shit before you pulled that mother fucker pistol out. Right. For nothing. Now you feeling stupid as hell. You did some stupid shit. You know what I'm sayin'? Now you want help. Man, mother fucker crazy man. You know, I don't know, man. I'm gonna see how that shit go hopefully. Ex. 13 at 21:4-22:1; *see* Ex. 3 at 72:11-74:13.

During a December 17, 2017 recorded call, Lee told his friend, Gerry Lee ("Gerry"), that Plaintiff offered to pay him to change his testimony. Ex. 3 at 80:13-81:14. Just a little over a week later, Lee specifically told Gerry the amount Plaintiff was willing to pay him to sign a recantation affidavit:

Yeah, man. Now the n****r tryin' to pay a mother fucker to sign an affidavit for him. No, he was wrong in the first place. Man, I don't want your money, stud…You in the wrong. Now you looking for help. Police, nailed you. Jumped out and shot you. You then drop your move at me and get me all fucked up…. Now the n****r tryin' to talk about he got 10,000. Man, I don't play no games, man. I aint trying to be playing with you, bro. Show me the money, n****r. Ex. 14, at 17:19-19:17.

Again, in March 24, 2018, Lee told Gerry about Plaintiff's bribe. Ex. 3 at 124:4-126:9; Ex. 15, at 16:3-8, ("And the n****r that shot me up, the police shot him in the back of his neck. It came out his jaw. He got attempt and he got a murder. The n****r trying to get up with me to sign an affidavit for him.").

In addition to identifying Plaintiff as his assailant and detailing the scheme to pay him off, Lee identified the names of the people who were acting as intermediaries in this scheme: Dober/Dover and Solo, indicated he had made his mind up not to testify against Plaintiff despite Plaintiff's guilt, and indicated Plaintiff and his cohorts were attempting to get him to Watkins not to testify either. On August 21, 2018, Lee stated to his child's mother, Karin Campbell, in reference to his shooting:

**Campbell:** What is his name?...
**Lee:** His name is Thomas Bishop.
**Campbell:** All right.
…
**Lee:** He has four sons. One of them name is Snub, one of them name is TomTom, one of them name is Fat Man, and one of them name is Little T. Now, TomTom is locked up for a double murder…*Now my man Dover and Solo talks to him. And these are guys I grew up with. That's who communicate with me for him. You know what I'm sayin'? They trying to beg me to get Eichy not to come to court on him.*
**Campbell:** Mm-hmm.
**Lee:** I'm not touching that shit, Karen. I said it is what it is. I'm not going to court on him, so I'm not a problem, Karen. *I don't have no stake in this thing. I'm not going to court to testify on this man.* That shit been established when I caught my case in jail. That's why the state got mad at me and gave me all this time because I wouldn't cooperate with that shit, Karen. Now you see what I'm sayin'? I'm not the problem. I ain't got to apologize or a sorry, we made a mistake, he acted out of anger, he was drunk. I'm not the problem, Karen. *That man shot me.* Ex. 16 at 27:10- 29:2.

Lee testified that Solo was someone he spoke to as a liaison with Bishop's people. Ex. 3 at 198:12-199:1. Lee knew he could speak to Solo to get information back to Bishop. *Id.* at 199:2-8, 200:9-18.

Further, Lee's jail calls also revealed Plaintiff's intimidation tactics to get Lee to recant. On August 21, 2018, as the criminal trial approached, Lee called the mother of his child and told her Plaintiff was out of Cook County Jail on bond. Ex. 16 at 6; *see* Ex. 3 at 147. Ms. Campbell then told Lee that someone just broke into her car. Ex. 16 at 6. Lee replied, "But I know for sure it ain't from no way like that because a mother fucker trying to reach out to me. A mother fucker trying to pay me $10,000 to do whatever. You know what I'm saying?" *Id.* at 13. Ms. Campbell responded, "They don't have to pay you $10,000 now Antwon because they could just kidnap your mother fucking kids for you not to do it." *Id.*

A week later, Lee called his child's grandmother, Doris Johnson, who pleaded with Lee not to testify against Plaintiff because of the family's concerns Plaintiff would retaliate. Ex. 17. To wit:

**Johnson:** I don't know if you planned on -- Karen told me about the dude out, and I didn't know if you planned on testifying and shit, but I wish you wouldn't. And the reason why I wish you wouldn't is because, okay, you know how they go after families and shit. You have to worry about Jayden. So we prefer you just to drop it because we don't -- and then we kind of got a scare where Karen's car had been ransacked. But you know -- (indiscernible) -- they didn't take nothing like, you know; but it probably was a regular God damn cigarette lighter. But it kind of opened her eyes that it could be something. We just want to be safe.
…
**Lee:** First of all, I called and told Karen that the guy got out because my homies have been on the guy bumping in jail and then he got out. I have no reason to testify nothing. I wouldn't even be in jail right now if I was going to testify on –

*Id.* at 3-4. Lee reiterated he was communicating with Plaintiff and had been offered $10,000 not to testify. *Id.* at 7:12-14 ("Because my homies know the n****r. My homies own the n****r. The n****r offered me $10,000 to come to court to help him, Doris…The motherfucker reached out for me to help them, and I sent word back to a person that told the person, man. I forgive on what they did to me because they was mislead because I never did nothing to a person…. And they understand what they did to me was wrong. And as the truth of the facts comes out, they know what happened. They know it was wrong.")

Additional recorded calls of Lee, further buttress Plaintiff's active witness tampering of another witness/victim of the shooting, Isaiah "Ikey" Watkins. Watkins, who was found in the hospital with a gunshot wound in the early morning hours of October 24, 2014, gave a recorded statement to the Detectives, explaining that on October 20, 2014, there had been a burglary at Lee's home and that Lee told Watkins that he wanted to take care of things on his own. In the month leading up to Plaintiff's criminal trial, Lee's recorded phone calls support that Plaintiff, and his associates were actively attempting to get Watkins to recant as well. For instance:

- On August 27, 2018, Lee speaks with "Broskie" and says he wants to "holler at 'Ikey'" because he heard Watkins wants to go to court against Bishop. "I hope you have him on the phone. I need to talk to him. Karen has blocked me from the kids. ... I am not going to court and this n****r shot me up and killed Tabik. Why is this n****r [Ikey] going to court. What is he going to court for? My family out there. That affects everybody on Justine. Why is he going to court? What's he doing?" *Id.* at 6-7.

- August 27, 2018, the phone is handed to Watkins, and Lee and Watkins discuss Watkins testifying in the criminal case. Watkins tells Lee "They came at me but I told them I don't have anything to do with this." Lee responds, "His people telling me that they are coming at you." *Id.* at 4.

- On October 4, 2018, in a call between Lee and Antwone Nelson, Nelson tells Lee that he spoke with Isaiah "Ikey" Watkins who is scared. Nelson told Watkins not to go to Court and if he does, he should tell them he did not remember and that he got amnesia. Watkins told Lee that "these people on my heels…streets are watching me." Ex. 18 1:11-4:11.

**IV.    Plaintiff's Recorded Calls From The Cook County Jail And His Perjured Discovery Responses And Testimony.**

Building on the explosive content of Lee's recorded calls, Defendants also attempted to obtain Plaintiff's recorded calls while Plaintiff was in pre-trial detention at the Cook County Jail between his arrest on October 23, 2014 and when he bonded out before trial in August 2018. Plaintiff fought the

9

production of such recordings "tooth and nail" for the better part of a year. *See* Dkt. Nos. 250, 254, 258, 259, 263, 276, 283, 293, 305, 308. Plaintiff argued Defendants' pursuit of these recordings was a "fishing expedition" and an unwarranted intrusion into Plaintiff's personal life. *See* Dkt. No. 250. While these arguments persuaded Magistrate Gilbert in the short term (*see* Dkt. 276), Plaintiff was eventually forced to begin producing these calls. Shortly before a large swath of these recorded calls was due to be produced by Plaintiff's counsel after their review, Plaintiff's Loevy and Loevy attorneys suddenly withdrew their appearances. *See* Dkt. No. 315, 317. It is now clear why Plaintiff objected so forcefully to producing these calls. These calls reveal an equally shocking exposition of the scheme to obstruct justice and establish that Plaintiff committed perjury.

By way of background, both prior and subsequent to the receipt of these recordings, Defendants demanded Plaintiff provide any and all information that might relate to his discussion of his criminal case with anyone; his discussion of Lee and/or Watkins with anyone; his knowledge of and relationship with and discussion of the persons referenced by Lee as intermediaries in the recantation scheme (including "Dober"/"Dover" and "Solo"); and any attempts he made to contact or communicate with any witnesses in his criminal case (either directly or through intermediaries). Specifically, Plaintiff was asked to "[i]dentify/describe any contacts, interactions or communications you had with Antwon Lee and/or Isaiah Watkins, directly or indirectly. If the contact was through an intermediary, identify the names and contact information for each such intermediary including but not limited to the individuals referred to by Antwon Lee as Dover and Solo." Ex. 19 at ¶ 16; Ex. 20 at ¶ 1. In response, Plaintiff stated he "has never communicated with Isaiah Watkins or Antwon Lee, directly or indirectly[,]" and that he "is not aware of any communications with Antwon Lee or Isaiah Watkins directly or through a non-attorney intermediary." *Id.* More generally, Plaintiff was also asked to describe any conversations he had with any persons *about* Antwone Lee or Isaiah Watkins or any other witness while he was in Cook County Jail. Ex. 20 at ¶¶ 3-4. Plaintiff did not list any communications and simply stated that he may have discussed his shooting and his prosecution with his wife. *Id.*

10

Plaintiff also specifically denied asking anyone directly or indirectly to make contact with Isaiah Watkins relating to his criminal case. Ex. 4 at 177:1-15 ("Q. Okay. At any point while you were in jail, did you ever ask or request anyone to attempt to make contact with Watkins relating to your criminal case? A. No. Q. And when I ask that question, I mean either asking someone directly to do it or asking one person to ask another person to do it indirectly? A. No….Q. That never occurred? A. No.").

Plaintiff was asked in Interrogatories to specifically identify the real names and his relationship with persons including "Solo" and "Dover." Ex. 19 at ¶ 11. Plaintiff stated he "does not know any people who go by the names Solo…or…Dover…" *Id.*; *see also* Ex. 21 at ¶ 1 ("I do not know any people who go by the names Solo…[or]…Dover….") *Id.* Plaintiff was further asked to describe the nature of his relationships with "Dover" or "Solo" including when he met them, other persons who know these persons, and how and when he contacted either such person (directly or indirectly). *Id.* at ¶ 3. Plaintiff again stated "I have no relationship – direct or indirect – with anyone named or nick-named Solo." *Id.* Plaintiff was also asked to disclose whether he had anyone ever contact Solo or Dover on his behalf. *Id.* at ¶ 4. Plaintiff answered "not applicable." *Id.*

Plaintiff testified at the front end of his deposition that he made no attempts to have anyone other than attorneys make contact with witnesses in his criminal case. Ex. 4 at 165:17-166:5 ("Q. Okay. While you were in jail awaiting --awaiting your trial, did you take any steps other than through your attorney to have any person make contact with any witnesses in your case? A. No…Q. While you were in the Cook County jail, did you ask anyone to attempt to make contact with any witness or potential witness in your criminal case? A. No."). Plaintiff also denied directing anyone to reach out to Lee, directly or through another intermediary, at any point while he was in Cook County Jail. *Id.* at 166:6-167:1.

Indeed, Plaintiff testified unequivocally he never "discuss[ed] with anyone at any time while [he was] in Cook County jail attempting to see if the person who [he was] accused of attempting to murder would consider saying that [he] did not actually shoot him." *Id.* at 167:9-167:14. Plaintiff went even further and testified he also never asked *anyone* other than his attorney to relay any message to any witness or

potential witness in his criminal case or otherwise communicate with any persons relating to his criminal case whatsoever. *Id.* at 168:10-19.

Plaintiff was also specifically asked during the front part of his deposition about his relationship with the person referred to as "Dober." *Id.* at 169:10-171:25. Despite failing to list this person *at all* in his discovery answers, Plaintiff admitted he *did* know this person. *Id.* When asked about his relationship with this person, Plaintiff claimed this "Dober" worked for CeaseFire and that he had contacted him through an intermediary while he was in prison to attempt to get him to bring people to court to show support for Plaintiff. *Id.* Plaintiff did not mention that he was involved in any criminal or nefarious business with Dober. *Id.* Plaintiff also testified he had contacted Dober through another intermediary (Melvin Haywood) when his trial was approaching in 2018. *Id.* at 173:3-11, 175:4-11. However, Plaintiff categorically denied when first asked that he ever sought to have this Dober do anything other than bring people to court and specifically denied seeking to have Dober contact or communicate with any witnesses. *Id.* at 175:12-176:11. With respect to Solo, Plaintiff similarly denied attempting to have him communicate with witnesses (directly or indirectly). *Id.* at 176:12-19.

This testimony and these sworn statements are undisputedly false. While many of Plaintiff's communications are obvious attempts to use coded language to conceal their true meaning and intent (which Plaintiff himself admits, *see id.* at 217:3-14, 235:14-19, 334:2-6), it does not take an FBI-trained cryptographer to decipher that Plaintiff was almost certainly discussing the same scheme to bribe Lee that Lee described on his own calls. It is also undisputed that Plaintiff attempted to reach out to Isaiah Watkins in relation to his criminal case.

## V. Plaintiff Committed Numerous Instances Of Perjury Regarding His Attempts To Interfere With Witnesses' Testimony Against Him.

First, Plaintiff's denial that he discussed Lee with anyone, much less that he discussed attempting to get Lee to recant his identification is an undisputed lie. On December 2, 2014 (less than two months after the shooting), Plaintiff asked his wife to arrange for "Dober" to bring "the only key witness" to court on the 4th so that this "only key witness" could say it was not Plaintiff who did it. *See* Ex. 24.

12

Plaintiff explained that if this was accomplished that it "might just change the whole situation" because the State did not "have anything concrete" on him. *Id.* Plaintiff also discussed what his "charges" and "indictment" were and having been charged with "a body" (which presumably refers to his charging with accountability murder for the shooting of Davis despite Davis being shot by a confederate). *Id.* Plaintiff's wife then ponders whether, even if they could get "dude" to say it was not Plaintiff who shot him, the State could still charge him with "the body." *Id.* Plaintiff then responds that that is why he wants to explore whether bringing this person in to change his story would "make a difference." *Id.* Plaintiff's wife then says she has to check "with Dude and them" to see "whether he is willing to do that." *Id.* Plaintiff then said he wants to make sure this tactic would "be official" but says that this tactic "might stop the case." *Id.* Plaintiff then offers that this tactic might work because he was not put in as police line up (a fact that Plaintiff emphasized might be beneficial to having this key witness change his identification of Plaintiff). *Id.* Plaintiff then suggests having his wife text someone "911" to see Dober because his court date is coming up soon and that he wants it done. *Id.* Plaintiff's wife then agreed to text and call this individual to put the plan in motion. *Id.*

At his deposition, Plaintiff flailed about, trying various excuses to explain this damning recording, but ultimately was forced to admit the key witness he was referring to having Dober approach to bring into court to say it was not him was, in fact, Antwone Lee. Ex. 4 at 200:4-21 ("Q. To -- to bring Dude in when you go to court on the 4th? A. Like I said, the only thing about court on the 4th could have been about Solo, but -- Q. Yeah, but you are -- A.-- I'm not -- Q. -- what -- it can't be about Solo because you refer to the Dude being brought into court as the key witness in your case, right? Isn't that what you say right after this?·Let's listen. (*Audio played not reported stenographically*) A. Key witness. Q. Okay. Who are you referring to then? That's not Solo, is it, sir? A. No, can't be Solo. Q. Okay. *The key witness is Antwon Lee? A. Only person.*")(emphasis added); *Id.* at 202:7-17 ("Q. Yeah. That's intentional that you're calling him Dude, to not say his name? A. Dude is Head. Q. Right. There's two Dudes. Head is not the one brought into court as the key witness, is he? A. No. Q. That's Antwon Lee? A. Okay. Q. Right? A. Yeah.").

The scheme referenced on this call was not an anomaly. Indeed, Plaintiff repeatedly references this "Dober" in speaking to individuals using language that clearly appears to reference a scheme to interfere with witness testimony at Plaintiff's criminal trial.

On May 10, 2016, while on the phone with his son, "Tom Tom," his son Tyree, and his wife, Plaintiff asks Tom Tom (who was also locked up in Cook County Jail on a different murder) if he remembers "that boy that was just in here with us with the freckles[.]" Ex. 22 at 7:13-14. Plaintiff then tells Tom Tom that the boy called Dober for him from time to time while in there, and Tom Tom says he can get right next to him. Plaintiff goes on to say, "If he can get back to dude and Dober say that, do that, then my whole lick will go away." *Id.* at 8:1-2.

On May 28, 2016, while on a call with his wife, Plaintiff stated that he is "tryin' to get you to spill on that boy though, man, that boy Dober[1], man, about my situation." Ex. 22 at 10:14-16. His wife replied that she will get a number for Dober. *Id.* at pp. 9-11. On June 15, 2016, during another call with his wife, Plaintiff once again relays to her his urgency to speak to Dober. Ex. 23 at 15:08. The stated purpose of this is for Plaintiff to give a "sawbuck" to Dober to "go[] and make it right with the paperwork[,] and "he can get next to Dude and Dude can say that" and "my whole lick will go away." *Id.* at 15:12-19:40.

After being confronted with these recordings, Plaintiff concocted a ludicrous explanation to explain these statements; specifically, that these were coded references that referred to Plaintiff's operation of a drug trafficking business with Dober while Plaintiff was in jail. Ex. 4 at 214:8-215:14 ("Q. Okay. You are referring to a guy with the freckles getting next to Dober, right? A. Uh-huh. Q. And you said if he can get right next to him, he can get next to Dude and Dude can say that my whole lick will go away? A. Uh-huh. Q. What – what does that mean? A. That's street talk about something else. Q. What's – A. I – Q.–your – your lick means your criminal case – A. No – Q.–sir, doesn't it? A. – no, no. Q. What – what are you referring to then? A. To get – I did speak with my attorney about this earlier, but me and

---

[1] For ease of reference, the individual whom Defendants understood to be "Dover" at the time this call was transcribed will be referred to as "Dober" for the remainder of this motion.

Dober used to do marijuana transactions is what we do. Q. Okay. A. So we did, and that's what that mean. Q. Well, you say that my whole lick will go away. What does that mean? A. Stuff that we had out there that was working, being worked on. Q. So – so you were still actively engaged in the narcotics business? A. Small amount, small marijuana, things. Q. You were still engaged in the illegal narcotics business right before –A. Small marijuana and things is my answer."); *see also id.* at 215:15-224:6; 226:13-19 ("You said you were thinking about getting that boy Dober a sawbuck? A. Uh-huh. Q. What's that refer to? A. Ten pounds. Q. Ten pounds of weed? A. Marijuana.").

While this attempt to explain away one crime (i.e. obstruction of justice and suborning perjury) by admitting involvement in another (i.e. drug trafficking) is admittedly a creative attempt at obfuscation, this particular excuse was concocted only after Plaintiff had made previous statements under oath at this same deposition before the incriminating calls were played for him that *directly contradicted* this excuse. *Id.* at 55:7-55:13. Near the beginning of Plaintiff's deposition, Plaintiff was asked about his involvement in the illegal drug trade, including specifically, his involvement in selling marijuana. *Id.* at 52:5-54:6. Plaintiff testified he began engaging in the illegal drug trade (specifically the sale of marijuana) when he was between the ages of 17 and 19. *Id.* These activities eventually resulted in Plaintiff being arrested in 2005 or 2006 and sent to prison for a period of time relating to those activities. *Id.* Plaintiff testified that he was released from prison arising from those charges in approximately 2008. *Id.* at 54:7-54:9. When asked whether he continued to engage in the illegal drug trade at any point after he was released from prison in 2008, Plaintiff answered unequivocally that he had not. *Id.* at 54:24-55:13. To wit:

**Q**. Okay. After you were released, did you continue to engage in illegal narcotics – the illegal narcotics trade after you got out of prison?
**A.** No.
**Q.** Okay. That's -- that's when your testimony is that you stopped doing that?
**A.** I started working at Chicago Sun-Times at that point when I got out.
**Q.** We you also engaged in the illegal drug trade at any point after you got released from prison in 2008?
**A.** No.
**Q.** And at -- at no point after that have you been engaged in it?
**A.** No. *Id.*

15

Confronted with this testimony, Plaintiff admitted he had lied earlier. *Id.* at 214:11-217:2 ("Q. Okay….you told me that you were not engaged in the illegal narcotics trade at any point after 2008. And now you are telling me that that testimony is not true? A. Not true. Q. Okay. Why did you not tell the truth at your deposition under oath, sir? A. What I am saying is I mean I have dealt with some marijuana. Q. Okay. So -- but why did you tell me that you hadn't under oath? A. I made a mistake.").

Plaintiff also admitted he had committed perjury when he stated his relationship with Dober was limited to attempting to have him use his alleged connections with CeaseFire to bring supporters to Plaintiff's criminal trial because Dober was, in fact, part of Plaintiff's criminal drug operation that he operated from Cook County Jail. *Id.* at 217:15-224:6; 226:13-20; 244:15-245:12.

Indeed, contrary to his earlier testimony and his Interrogatory answers, Plaintiff made at least *24 calls* in which he mentioned contacting Dober or Solo. In addition to the above:

- On December 21, 2014, Plaintiff had a telephone conversation with his wife and asked her if she called Dober to see when he is available. Ex. 24 at 5-6;

- On January 1, 2015, Plaintiff had a conversation his wife during which she said she would call Dober tomorrow and explain to him what Plaintiff is trying to do. Ex. 25 at 1-2;

- On March 25, 2015, Plaintiff had a telephone conversation with his wife during which she said Dober told her he would be "in on it[.]" *Id.* at 3-5;

- On May 10, 2016, Plaintiff had a telephone conversation with his wife and his sons in which Plaintiff tells Tom Tom "the boy" can get next to Dober. Ex. 22 at 6-8;

- On May 28, 2016, Plaintiff had a telephone conversation with his wife in which Plaintiff stated he was "trying to get to that boy Dober about my situation." *Id.* at 9-11;

- On June 15, 2016, Plaintiff had a telephone conversation with his wife in which Plaintiff stated, "I am thinking about trying to get that boy Dober." *Id.* at 12-14;

- On July 23, 2016, Plaintiff had a telephone conversation with Tyree and told Tyree that Dober needs to take care of it and meet Dude. *Id.* at 31-33;

- On September 22, 2016, Plaintiff had a telephone conversation with Connie during which Plaintiff said, "Dober should be expecting a call from the attorneys whenever you set that up." *Id.* at 70-72;

- On November 25, 2016, Plaintiff states Dober's telephone number. Ex. 26 at 22:46-24:04; Ex. 27 at ¶¶ 1-13; *see also* Dkt. 385 (deeming Plaintiff's responses to Requests to Admit as admitted).

- On October 25, 2017, Plaintiff had a telephone conversation with Jay Minor in which Plaintiff stated, "Call that boy Dober and put it on his radar." Ex. 28 at 5-6;

16

- On November 3, 2017, Plaintiff had a telephone conversation with his wife in which Plaintiff said, "I talked to that boy Dober" and "Tyree and Minor are supposed to meet with Dober." *Id.* at 7-10;

- On November 13, 2017, Plaintiff had a telephone conversation with Jay Minor and Tom Tom in which Plaintiff stated that "me and Minor just got Dober off the phone" because Plaintiff "wanted him to hear my voice." *Id.* at 11-13;

- On February 3, 2018, Plaintiff had a telephone conversation with Tyree and Jay Minor Allen in which he said, "It's mandatory that I see, I would love to see that boy Solo and Dober….I said I want Solo and Dober and them to be there. I mean, it aint' no maybe, I want them there you know what I'm saying. I need them there." Ex. 29 at 1-3;

- On February 4, 2018, Plaintiff had a telephone conversation with his wife and Tyree during which Plaintiff told Tyree to see if Minor touched base with Dober and if he gave Dober what Plaintiff told him to, and told Tyree to give Dober $50. *Id.* at 15-16;

- On February 5, 2018, Plaintiff had a telephone conversation with Jay Minor in which he asked Jay Minor, "You got with Dober?" After Jay Minor replied affirmatively, Plaintiff replied, "How the hell you do that? He came to see you or you had to go bunker down?" Jay Minor answered, "We got CashApp on the phone." *Id.* at 28-31;

- On March 18, 2018, Plaintiff had a conversation with Tom Tom in which Plaintiff said he wanted to "put Dober in the mix" and that Dober "can do the leg work." *Id.* at 40-43;

- On July 12, 2018, Plaintiff had a telephone conversation with Jay Minor in which Plaintiff stated, "I need you to get with Solo and Dober." *Id.* at 56;

Defendants attempted to follow up on Plaintiff's explanation regarding his communications with Dober by seeking additional information needed to explore the veracity of this relationship including, but not limited to, providing details regarding Plaintiff's drug tracking activities with Dober. Ex. 30 at ¶ 13; *see also* Ex. 4 at 249:2-12. In response, Plaintiff refused to provide any information relating to this relationship insofar as it related to the illegal drug trade involving himself and Dober and invoked his Fifth Amendment Rights against self-incrimination. *Id.* Accordingly, Defendants were prevented from developing further information to rebut Plaintiff's (likely concocted) excuse to explain these damning calls by his wielding the Fifth Amendment as both a sword and a shield. *Id.*

Along these lines, another call stands out in the explicitness in which Plaintiff discusses his attempts to obstruct justice in his criminal case and emphasizes the blatant fabrications Plaintiff engaged in during discovery. On May 27, 2018, as Plaintiff's original trial date approached in early June 2018, Plaintiff was also captured on a recording giving explicit directions to an intermediary to have Dober,

17

Solo, and several other individuals (referred to in coded language as "Sick Boy, Afro Boy, Fast Car and Bird") approach a trial witness referred to as the "light skinned boy" (who Defendants believe is Isaiah Watkins) so he will "feel under the gun" if he testifies in court against Plaintiff. Ex. 29 at 53. Plaintiff explicitly admitted this was an attempt to have intermediaries attempt to influence witness testimony. Ex. 4 at 270:17-271:12. To wit:

> **Q**. You said you like for -- what you said to Jay Minor is that you would like for Dober, Low, Sick Boy, Afro Boy, Fast Car and Bird to get together and be standing there, so dude is going to feel under the gun and he's going to have to pledge an oath in front of all of them?
> **A**. Yes.
> **Q**. Okay. So you are talking about your criminal trial?
> **A**. Possibly.
> **Q**. Okay. And the dude you are referring to is who?
> **A**. Whoever -- whoever testify against me.
> **Q**. Okay. And -- and why was it you wanted these people to be standing there and feeling under the gun when they pledged an oath in front – while they were standing there?
> **A**. Because if somebody send me to the penitentiary for a crime that I didn't do, that's not right, so I need the people that's necessary to be standing there and see it.

These communications were in direct conflict with Plaintiff's previous statements denying communications with anyone regarding witnesses in his case or having intermediaries make contact with witnesses (much less Dober and Solo). Despite previously claiming he had no idea who Solo was, Plaintiff also testified Solo was like family. *Id.* at 280:18-21 ("Q. Dober, Solo, Sick Boy, Afro Boy, Fast Car and Bird are your family? A. Yeah, from the streets, yeah. They are family from the streets.").

In the weeks leading up to Lee signing his recantation affidavit, Plaintiff was also captured on numerous recordings directing intermediaries to make contact with a person in "Robinson" for the purposes of signing a document and paying money to a person there. Specifically, on July 15, 2016 (two months before Lee signed the affidavit), Plaintiff had a three-way call with an unnamed individual and asked this individual if he got a "chance to bump into that boy" who was "in Robinson." Ex. 22 at 15-18. Then, on July 23, 2016, Plaintiff's son is captured on a phone call discussing paying an individual money not to "go to court," getting a "dude in Robinson" to "get on the same page" as them so "they gonna drop this shit," and having this "dude at Robinson" sign and notarize a document to this effect. *Id.* at 24-30. Plaintiff's son remarks on this call to Plaintiff that "if a motherfucker gets on the same page,

18

and they pay it, they'll drop the shit. The lawyer already said it." *Id.* Then Plaintiff's son says, "If dude on the same page with the motherfucker, motherfucker send a lawyer down there right now. Send the lawyer to go see him and get the shit, and they gonna notarize that. You know what I'm sayin'?" Another person on the call remarks, "He in Robinson. Dude at Robinson." Twenty-seven minutes after this call was placed, Plaintiff's son, Tom Tom, calls Plaintiff's other son, Tyree, and outright asks to speak to Dober. Tom Tom then says to "send him down there to do it, to take care of it." *Id.* at 31-33.

Given the timeline at issue and references to the "dude in Robinson," these references almost certainly relate to Lee who was incarcerated and Robinson and who signed a document recanting his identification of Plaintiff just weeks later. At his deposition, Plaintiff again attempted to conjure up an alternate explanation for these damning recordings as well. Specifically, Plaintiff admitted these recordings referenced a request to have an intermediary go pay money to an inmate at Robinson Correctional, but claimed that this referred to *a different inmate* at Robinson, specifically, Plaintiff's old cell mate at the Cook County Jail named Terrence Haynes. Ex. 4 at 251:16-253:23, 255:6-12. This story, while also creative, was also quite false. Terrence Haynes was not in Robinson in July 2016. *See* Ex. 31. Indeed, Haynes was not placed in Robinson until August 2018 (where he was transferred from Shawnee Correctional where he had been since May 2017 after being convicted in April 2017for an armed home invasion). *Id.* At the time in question, Haynes was, in fact, still in Cook County Jail with Plaintiff. Indeed, as Plaintiff later conceded, Haynes was his cell mate for three years in Cook County Jail. Ex. 4 at 255:6-12. Insofar as Plaintiff was not locked up until October 2014, this timeline makes this concocted excuse impossible. *Id.* In other words, Plaintiff offered yet another demonstrably perjured testimony to attempt to explain away highly inculpatory recorded communications.

Finally, it is undisputed that Plaintiff gave directives to an intermediary to make contact with witness Watkins in direct contravention of his sworn testimony and interrogatory responses. On March 22, 2018, as Plaintiff's original criminal trial approached, Plaintiff called an intermediary named Nikishia King and advised her to write down a telephone phone number, 773-798-7037. *See* Ex. 27; Dkt. 385

(deeming Plaintiff's responses as admitted). This phone number was the phone number of Watkins referenced in a police report disclosed to Plaintiff and Plaintiff knew this to be so at the time he provided the number with this intermediary. *Id.* at ¶¶ 10-11. At the time Plaintiff provided this number to this intermediary he intended for this intermediary to contact Watkins on his behalf. *Id.* at ¶¶ 12-13. This is in direct contravention of Plaintiff's earlier denials regarding attempts to contact Watkins.

### VI. Plaintiff Lied About How Lee's Recantation Affidavit Was Procured.

Equally egregious is Plaintiff's blatant lie about his knowledge of the circumstances under which Lee's recantation affidavit was obtained. Plaintiff was asked about any relationship he had with Lee and stated that his "criminal attorney talked to Lee and got an affidavit from him." Plaintiff's Answers to Defendants White's Interrogatories, attached hereto as Ex. 32 at ¶ 23. Plaintiff admitted at his deposition that this information was false. Ex. 4 at 184:15-185:25. To wit:

> **Q**. Okay. You were sent some interrogatories in this case which are the -- the questions that you had to answer in writing, do you recall that, having to sign off on some answers to questions?
> **A**. Yes.
> **Q**. Okay. One of the questions you asked -- you were asked and answered in response to Defendant White's first set of interrogatories was: Describe in detail the nature of your relationship with Antwon Lee and/or TePete Davis, including but not limited to how you met, how long you have known each other and how you came to be with Lee and/or Davis on October of 2014. And your answer was: I never knew Lee or Davis. I know my criminal attorney talked to Lee and got an affidavit from him.
> **A**. Huh?
> **Q**. That's what your answer was.
> **A**. That ain't mine.
> *Q. That is your answer to that question. Are you saying that that is not -- that's not true?*
> *A. That's very not true.*

### VII. Plaintiff's Perjured Discovery Responses Regarding His Whereabouts And Activities In The Time Leading Up To His Shooting.

Plaintiff also provided false, incomplete, and misleading discovery answers regarding his activities in the time leading up to the shooting.

With respect to the home invasion that occurred at Plaintiff's home on October 21, 2014 (which, again, Defendants contend was the driving force behind Plaintiff's planning and execution of a "hit" on Antwone Lee), Plaintiff denied communicating with any persons other than a neighbor named Lisa Johnson and his own wife and kids regarding this incident. Ex. 4 at 68:12-79:15. Plaintiff denied reaching

out to anyone else in relation to the home invasion in order to figure out what had occurred. *Id.* at 72:24-73:5 ("Q. Okay. Did you call anyone from Chicago or people from the neighborhood or people that you knew to see if they had any information about who may be responsible for what happened? A. No. I called a lady named Lisa Johnson for her to go over there and to sit with my wife. I said, go over there and make sure Kim [Plaintiff's wife] is straight."); *id.* at 76:16-77:11.

Plaintiff was also asked in interrogatories to describe all of his activities between October 22 and October 23, 2014 including describing who he was with and what he was doing. *See* Ex. 19 at ¶ 6; Ex. 32 at ¶ 7. In response to the questions regarding the day of the incident, Plaintiff only described being with his grandmother at her home and walking home when he was shot. *Id.* Plaintiff did not disclose the identities of any other persons he may have been in contact with during these crucial periods of time. *Id.*

Plaintiff was asked whether he had ingested any drugs or alcoholic beverages at any point in the 48 hours and to list the names and contact information of any persons who had knowledge of such consumption. Ex. 32 at ¶ 20. Plaintiff answered simply "I drank a pint of Cognac shortly before I was shot" and listed no other information. *Id.*

Plaintiff was also asked to disclose any and all person he communicated with at any time relating to any matter relating to this case. Ex. 19 at ¶¶ 17-18; Ex. 32 at ¶¶ 4, 21. In response, Plaintiff only listed his grandmother, his son (Tyree), a relative named Teresa Boykin, and several other inmates at the Cook County Jail and failed to disclose the substance of even these communications. *Id.*

At his deposition, Plaintiff admitted he was with numerous other individuals during the time period leading up to the shooting not disclosed in his discovery responses including relatives Jerry Bishop and Lamar Bishop as well as a person named Melvin Haywood who Plaintiff claims came to his home before he left to go to his grandmother's home. *See* Ex. 4 at 315:12-318:18. The latter undisclosed

individual is believed to be the former head of the Gangster Disciples nation and a convicted triple-murderer.[2]

Plaintiff was asked but did not identify any person he may have communicated with between the time he left his home and when he was shot while allegedly returning home from this grandmother's. *Id.* at 93:18-101:13. According to his deposition testimony, after he arrived at his grandmother's house, Plaintiff, Lamar, and Jerry all walked to the liquor store to purchase liquor. *Id.* at 98:11-99:2. Plaintiff then testified that he just sat around talking with his relatives and drinking. *Id.* at 101:1. However, Jerry testified at his deposition that he neither went to his grandmother's house nor was he with Plaintiff the night of the October 23rd shooting, but that he was home in his garage that evening. Ex. 33 at 32:2-35:12.

Plaintiff testified that while he was allegedly at his grandmother's home, he does not remember calling anyone and categorically denied texting anyone. Ex. 4 at 99:3-6; 101:6-13. Plaintiff also said he did not recall talking to anyone on the phone and that he did not text anyone after leaving his grandmother's house and before he was shot. *Id.* at 109:9-14. Plaintiff was also asked specifically about his knowledge of the number (773) 949-5545 (which had been referenced in Plaintiff's recorded jail calls as being potentially involved in the scheme to tamper with witnesses at Plaintiff's criminal trial), and he disclaimed knowledge of that number. *Id.* at 325:23-326:6.

On September 16, 2021, Defendants had forensic imaging of Plaintiff's mobile phone completed (which was being held at the Chicago Police Evidence and Recovered Property Section). Once the phone data was made available to review, it provided a plethora of relevant evidence for the first time and indicated Plaintiff had not been candid in his discovery responses regarding his activities and communications on the day in question.

First, contrary to Plaintiff's testimony regarding communications about the October 21st home invasion, Plaintiff engaged in text communications with numerous unidentified individuals and/or

---

[2] *See People v. Haywood*, 60 Ill. App. 3d 236, 244 (1st Dist., 1978); https://www.chicagotribune.com/news/ct-xpm-1996-01-29-9601290113-story.html ("[A]uthorities believe, the GDs are being controlled by Melvin Haywood, 46, the gang's longtime co-chairman who is serving a 100-to 200-year sentence at Dixon for murder."); https://www.chicagotribune.com/news/ct-xpm-1996-01-29-9601290113-story.html; https://chicago.suntimes.com/2015/2/21/18471293/gang-leaders-out-of-supermax-say-they-want-to-help-but-cops-worry.

individuals identified only by nicknames or pseudonyms in the hours after this home invasion that clearly appear to be related to this incident. During the early morning hours after the home invasion, on October 21, 2014 at 4:40 am, Plaintiff received a text message from telephone number (773) 621-7295 with the message, "Antwone McClore 20120504212."[3] *See* Dkt. No. 394-23, Ex. 34 at 69 of 199. Then approximately two minutes later, Plaintiff sent a text message to telephone number (901) 262-9513 that stated, "Bike call me 911 911 911." *Id.* Ten minutes later, Plaintiff texted telephone number (773) 732-5572, saved in his cell phone under the name "Sung," the following message: "Call back asap 911 911 911." *Id.* Two hours later, Plaintiff texted an individual saved in his cell phone as "Bike Jones" the following: "Sorry 4 calling this time of the morning but can u please have bike call me asap I have a 911 911." *Id.* at 68 of 199. Plaintiff also placed eight calls between the hours of 1:30 a.m. and 6:00 a.m. *Id.* at 68-69. Of those eight calls, Plaintiff called "Sung" and "Bike" two times each and an individual named "Breed" as well. *Id.* Plaintiff clearly contacted multiple people during the morning of the burglary, yet failed to admit as much during his deposition.

On the date of the shooting and the time period leading thereto, Plaintiff was also exchanging cryptic text messages with unidentified persons including texting an unidentified person the phone number "773 949 5545" (the number which Plaintiff himself claimed at his deposition not to know). *See* Ex. 34. Plaintiff was also engaged in numerous and lengthy telephone communications with unidentified individuals in the hours leading up to the shooting including with the person referred to as "Bike" (whom Plaintiff contacted "911" likely regarding the home invasion) as well as nearly *two dozen* other calls that occurred while Plaintiff claims he was at his grandmother's home socializing with her. Ex. 35. Several of these calls occurred within the ten minutes or so of the shooting. Plaintiff also received various texts which indicate he was communicating with unidentified individuals during this key time period via a

---

[3] At the time, Antwone McClore was known as high-ranking member of and the "Institutional Coordinator" for the Ganger Disciples, who ran his street gang operation from the confines of his jail cell while facing aggravated intimidation charges. *See* DNA Info News Article Dated July 18, 2014: https://www.dnainfo.com/chicago/20140718/little-village/gangs-jailhouse-coordinator-demands-cash-from-fellow-inmates-mom-charges/.

messaging app called "Tango." *See* Ex. 34. Plaintiff's phone data also suggested Plaintiff had deleted various calls from his call history. *See* Ex. 35.

Defendants attempted to follow up on these issues which contradicted Plaintiff's earlier discovery answers but Plaintiff objected to further discovery. *See* Dkt. Nos. 388, 391, 394. Notwithstanding the contradictory nature of this evidence, Defendants were denied the opportunity to explore these issues further. *See* Dkt. No. 403. Accordingly, the identity of these key persons remains shrouded in secrecy.

### VIII. Plaintiff Lied About His Nicknames.

During discovery, Plaintiff was asked on numerous occasions to identify any nicknames or street names he ever used. *See* Ex. 32 at ¶ 1; Ex. 19 at ¶ 1. In response, Plaintiff either listed no such names (*see* Ex. 32 at ¶ 1; Ex. 19 at ¶ 1) or expressly denied ever using such a name (Ex. 19 at ¶ 1 ("Plaintiff has never gone by a nickname")). In this particular case, the usage of nicknames is of central importance. Lee repeatedly refers to his shooter by reference to nicknames (including "Black," "Guns," and "Tommy Guns"). Plaintiff also repeatedly spoke in code and with otherwise vague references to individuals using nicknames. Thus, Plaintiff's accurate disclosure of any nicknames he used is of central importance in deciphering the often vague and coded language present in the numerous recorded calls.

At his deposition, contrary to his interrogatory answers, Plaintiff admitted he did have a nickname, specifically, "Black" or "Mr. Black." Ex. 4 at 24:13-25:7. Plaintiff also admitted he was referred to by the nickname of Tommy Guns or Tommy Gun after being locked up in jail. *Id.* at 25:8-26:19. However, in Plaintiff's cell phone imaging he specifically refers to himself as "Guns" well before the incident in this case when communicating with other persons. *See* Ex. 34.

### IX. Plaintiff Failed To Disclose His Recent Arrest For Another Murder.

Plaintiff was asked to disclose whether he had ever been arrested or charged with any criminal offense as well as provide any and all details of such arrests/charges. Ex. 32 at ¶ 3; Ex. 19 at ¶ 8. Plaintiff answered "I have had many arrests and several convictions. I remember two gun charges and several cannabis charges" and provided some limited factual information relating to arrests in 1995-96 and 2019.

*Id.* Yet, on October 26, 2021, Plaintiff was arrested on charges of first-degree murder that have since been reduced to aggravated assault charges. *See* Ex. 39. To date, Plaintiff has concealed this information and failed to produce it as part of discovery in his civil case.

### X. Plaintiff's Perjured Testimony Regarding His Claimed Damages.

Plaintiff was asked whether he was claiming any loss of income or wages and, if so, to provide information including his past employment and income (whether it was reported to the IRS or not), his present earnings, and the source of any such present or past earnings from 2010 to the present. Ex. 32 at ¶ 8. Plaintiff answered: "Lost income from 2014 to 2019. See pay stubs. I have been unable to work or find a new job as a result of the false arrest and illegal custody. See tax returns. I do not recall receiving any income that I did not report. In the five years prior to my arrest I received wages varying from $2000 to $18,000." *Id.*

Plaintiff also was asked to list his occupation or job chronologically for the past 10 years including the dates of commencement and termination for each such job. *Id.* at ¶ 15. Plaintiff answered: "2008 to 2011, Sun-Times, forklift operator, supervisor named Richie; 2012-14, Midwest moving, mover, supervisor named Pete." *Id.* Building upon these claims, Plaintiff further claimed that he was seeking "about $100,000 in lost income" and expressly relied upon "check stubs and the records of [his] former employer" in order to "show exactly how much income [he] lost." *Id.* at ¶ 18. These answers were false in almost every conceivable way.

First, Plaintiff admitted that the amounts reflected on his pay stubs and that he claimed on his taxes were not accurate and *significantly understated* his income from his job. Ex. 4 at 44:10-45:5 ("Q. So the -- this, if you look on the last page, it has how much you work and how much you are being paid. A. Uh-huh. *Q. Is it your testimony that you were actually paid more than what is reflected on these documents? A. Yes… Q. But you -- are you saying you received a payroll check from Angel Funding and Leasing that was for amounts that were larger than are reflected in these documents? A. Yes.*")(emphasis added).

Second, contrary to Plaintiff's claims of uninterrupted employment between 2008-14, Defendants discovered that Plaintiff had filed for (and received) unemployment based on claims that he was laid off from his job at the Sun Times in December of 2010. *See* Ex. 36. Plaintiff appears to have received unemployment for nearly two years until approximately July of 2012. *Id.* Moreover, in April 2014 (seven months before the incident at issue here), Plaintiff filed a Bankruptcy Petition in the bankruptcy Court for the Northern District of Illinois which claimed that he was unemployed as of the date of this filing and claiming he had *zero* monthly income from employment. *See* Ex. 37 at 23-24. As with all bankruptcy petitions, Plaintiff swore under penalty of perjury to the veracity of this information in this petition. *Id.* These sworn statements are in direct contravention of Plaintiff's deposition testimony which claimed he had worked for Midwest movers for three years prior to being incarcerated. Ex. 4 at 39:20-40:2.

Third, contrary to Plaintiff's claims of continued unemployment after his release, Plaintiff admitted that he did have both employment and income after he had been released from jail, yet did not list this in his discovery answers. *See id.* at 38:6-39:11; Ex. 32 at ¶¶ 8, 15. Specifically, Plaintiff was in the business of selling cars and also received a survivor's benefit from the death of his wife. *Id.*

Fourth, Plaintiff admitted he generated income from drug trafficking during the relevant period and that he intentionally lied about this in his discovery answers. Ex. 27 at ¶ 18 ("Your answer to Defendant White's Interrogatory Number 8 was false because you had received income during this time period arising from the sale and/or distribution of illegal drugs, specifically, marijuana, and had not reported such income to the IRS. ANSWER: Admitted.").

When Plaintiff was asked to describe the damages he was claiming in this lawsuit, he claimed that "[w]hile I was in jail under false pretense, my house was foreclosed upon..." Ex. 32 at ¶ 9. This was false. The foreclosure proceedings on this home were instituted in *July 2013*. See Ex. 38. In other words, the foreclosure proceedings (and the defaults upon which it was based) had already been the subject of foreclosure proceedings a year and a half *before* the incident at issue in this case. *Id.*

26

Plaintiff also claimed in his interrogatories that he was seeking "$500,000 for future surgeries and other treatments." Ex. 32 at ¶ 18. However, Plaintiff admitted that he had no need for any future medical treatment for any injuries. Ex. 4 at 370:6-12. To wit:

> **Q**. Has any doctor advised you that you need any future medical treatment for your injuries?
> **A**. Not at this point.
> **Q**. Okay. Are you aware of any medical treatment that you are going to need as a result of your injuries at any point in the future?
> **A**. Not at this point.

Plaintiff also admitted he had not had any medical treatment since being released. *Id.* at 368:16-25.

Plaintiff also claimed in his interrogatories he had seen a psychiatrist while in Cook County Jail in relation to his damages. Ex. 32 at ¶ 13 ("I saw a psychiatrist at Cook County Jail"). Plaintiff admitted at his deposition that was not true either. Ex. 4 at 326:24-327:9 ("Q. At some point when you were in Cook County jail, did you see a psychiatrist or get any psychiatric treatment there? A. No psychiatric, but I had issues dealing with my wounds.").

## ARGUMENT

### I. Plaintiff's Extensive History Of Perjury And Other Discovery Violations Merits Dismissal.

The record of Plaintiff's repeated lies, perjury, and related discovery violations is both extensive and essentially undisputed. Plaintiff undisputedly lied about the most central issues in this case, offered perjured testimony to attempt to escape the consequences of his criminal activity, lied about matters in which he was captured on recordings saying the exact opposite, pled the Fifth to avoid being exposed even further, and even lied about his damages in this case. While the courts are occasionally called on to fashion remedies for misconduct during litigation (including imposing the ultimate sanction of dismissal), the cases in this area do not even approach the severity and breadth of the misconduct exposed here.

The power to sanction a civil litigant for discovery and other litigation misconduct arises from a number of sources. A district court has inherent power to sanction a party who "has willfully abused the judicial process or otherwise conducted litigation in bad faith." *Secrease*, 800 F.3d at 401; *Salmeron v. Enter. Recovery Sys., Inc.*, 579 F.3d 787, 793 (7th Cir. 2009); *see Chambers v. NASCO, Inc.*, 501 U.S. 32, 48-49 (1991);

27

*Greviskes v. Univ. Research Ass'n, Inc.*, 417 F.3d 752, 758-59 (7th Cir. 2005). A district court may also dismiss a case for discovery violations, lying in a deposition or other egregious conduct in litigation under Federal Rule of Civil Procedure 37 or under the inherent authority of the district court. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016)("We have construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition."); *Greviskes*, 417 F.3d at 758-59; *White v. Williams*, 423 Fed. Appx. 645 (7th Cir. 2011).

Under Rule 37, the district court may also impose a wide range of remedies including dismissal and awarding of attorney's fees. *See* Fed. R. Civ. P. 37(b)(2) and (c). Other potential remedies include "directing that...designated facts be taken as established for purposes of the action, as the prevailing party claims" and/or "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence." *Id.* Although Rule 37 requires violation of a judicial order before a court imposes sanctions, "[c]ourts can broadly interpret what constitutes an order for purposes of imposing sanctions" and a formal order is not required. *Quela v. Payco-Gen. Amer. Credits, Inc.*, 2000 WL 656681, *6 (N.D. Ill. Mya 18, 2000)(collecting cases); *see also Hal Commodity Cycles Mgmt. v. Kirsh*, 825 F.2d 1136, 1139 (7th Cir.1987); *Lightspeed Media Corp. v. Smith*, 2015 WL 3545253, *5 (S.D. Ill. 2015); *JFB Hart Coatings, Inc. v. AM Gen. LLC*, 764 F. Supp. 2d 974, 981-82 (N.D. Ill. 2011). As explained by Judge Castillo in *Quela*:

> In this case, although there has been no specific court order, we believe such an order is not required to provide notice that parties must not engage in such abusive litigation practices as …lying to the court, and tampering with the integrity of the judicial system. Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable, we can properly consider the sanctions available under Rule 37. *Quela*, 2000 WL 656681 at *6.

Federal Rule of Civil Procedure 37(a)(4) treats an evasive and incomplete answer in discovery as equivalent to no answer, and thus a failure to comply with court-ordered discovery. F.R.C.P. 37(a)(4). Further, the Seventh Circuit has "construed the sanctioning power conveyed by Rule 37 to extend to instances of a party hiding evidence and lying in his deposition." *Ramirez*, 845 F.3d 776 (citing *Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 723-24 (7th Cir. 2008)).

28

Unlike Rule 37, no order of any sort is required to dismiss a case or take other actions based on the inherent authority of this Court. These inherent powers "are governed not by rule or statute but by the control necessarily vested in courts to manage their own affairs so as to achieve the orderly and expeditious disposition of cases." *Chambers*, 501 U.S. at 43. Under these powers, courts can impose sanctions including entering judgment and shifting attorney's fees. *See id.* at 44-45.

In deciding what measure of sanctions to impose, the district court should consider the egregiousness of the conduct in question "in relation to all aspects of the judicial process." *Greviskes,* 417 F.3d at 758-59. The "contumacious" conduct required for dismissal of a case with prejudice occurs "where a party has displayed fault, bad faith, or willfulness." *Id.* (citing *Downs v. Westphal*, 78 F.3d 1252, 1257 (7th Cir.1996)). Willfulness and bad faith are associated with conduct that is either "intentional or reckless[.]" *Long v. Steepro*, 213 F.3d 983, 987 (7th Cir. 2000). For a court to exercise its sanctioning power, the court must "find that the responsible party acted or failed to act with a degree of culpability that exceeds simple inadvertence or mistake before it may choose dismissal as a sanction for discovery violations." *Ramirez*, 845 F.3d at 776; *Secrease*, 800 F.3d at 410. A plaintiff abuses the judicial process when he, among other things, seeks "relief based on information that the plaintiff knows is false." *Secrease*, 800 F.3d at 401.

Courts are not required to impose lesser sanctions if the misconduct is sufficiently serious. *See Patterson by Patterson v. Coca-Cola Bottling Co. Cairo-Sikeston, Inc.*, 852 F.2d 280, 284-85 (7th Cir.1988). Also, in assessing whether dismissal is appropriate under the inherent powers of the Court, the Court need not find party's misconduct caused prejudice. *See e.g. Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, *9 (N.D. Ill. 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Fuery v. City of Chic.*, 2016 WL 5719442, *11 (N.D. Ill. 2016)("Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its

29

own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

If a party is found to have committed litigation misconduct, the court may shift attorney's fees and/or dismiss a case as a sanction. F.R.C.P. 37(b)(2)(A)(v) (finding that a court may use its inherent power to "vacate its own judgment upon proof that a fraud has been perpetrated upon the court" and "assess attorney's fees when a party has "acted in bad faith"); *Diettrich v. Nw. Airlines, Inc.*, 168 F.3d 961, 964 (7th Cir. 1999)(the court's inherent power to sanction a party "permit[s] a court to impose the ultimate sanction of a grant of judgment (or its equivalent, dismissal with prejudice)."); *Quela*, 2000 WL 656681 at *6 ("In addition to these sanctions, Rule 37 provides that a disobedient party may be ordered to pay costs and attorney's fees caused by its failure to obey the discovery order.").

In applying these standards, courts find instances of perjury particularly appropriate subjects on which dismissal is warranted. "[P]erjury strikes at the heart of the integrity of the judicial system...." *U.S. v. Stokes*, 211 F.3d 1039, 1046 (7th Cir. 2000). It "undermines the function and province of the law and threatens the integrity of judgments." *U.S. v. Alvarez*, 132 S. Ct. 2537, 2540 (2012). It "poisons the life blood of the administration of justice." *U.S. v. DiStefano*, 464 F.2d 845, 854 (2d Cir. 1972). Because of its seriousness, perjury in the course of discovery may warrant the sanction of dismissal. *Jackson v. Murphy*, 468 Fed. Appx. 616, 619-20 (7th Cir .2012); *Ridge Chrysler Jeep, LLC v. Daimler Chrysler Serv. N. Am., LLC*, 2006 WL 2808158, *8 (N.D. Ill. Sept. 6, 2006)(dismissing case as a sanction: "When discovery non-compliance [ ] is coupled with lies to both an adversary and the Court in order to gain an advantage in the litigation, the Court must step in and impose the ultimate sanction in order to preserve the integrity of the federal judicial system."); *Thomas v. Gen. Motors Acceptance Corp.*, 288 F.3d 305, 306, 308 (7th Cir. 2002)(dismissing suit with prejudice where plaintiff knowingly filed false application to proceed in forma pauperis).

Courts have a strong interest in both punishing a party's dishonesty and deterring similar misconduct. *See Secrease*, 800 F.3d at 402; *Greviskes*, 417 F.3d at 759. Lying cannot be condoned in any

formal proceeding, including depositions and discovery. *See ABF Freight Sys., Inc. v. N.L.R.B.,* 510 U.S. 317, 323 (1994)("False testimony in a formal proceeding is intolerable."). "Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts." *Quela,* 2000 WL 656681 at \*7. Thus, "[p]arties who wish to use the judicial system to settle disputes have certain obligations and responsibilities" and "[o]ne of those responsibilities is to tell the truth" *Id.* (quoting *Rodriguez v. M & M/Mars,* 1997 WL 349989, \*2 (N.D. Ill. June 23, 1997)).

"If perjury pays benefits when it escapes detection, but has no cost when detected, there will be far too much perjury and the accuracy of judicial decisions will be degraded." *Rivera v. Drake,* 767 F.3d 685, 686-87 (7th Cir. 2014). It is this guiding principle that directs courts to respond with dismissal when perjury is revealed regardless of whether the subject matter is important or tangential. Stated another way, perjury does not mandate dismissal simply because the subject matter of the perjury was misrepresented. Rather, it merits dismissal because: (1) it calls into question the *entirety* of the perjurer's testimony; (2) it compromises the integrity of the entire judicial system (which is reliant on litigants telling the truth); and (3) permitting perjury sends an unmistakable message to other litigants that perjury is acceptable and, thus, begets more perjury. *See Quela,* 2000 WL 656681 at \*6; *Rhodes v. LaSalle Bank, N.A.,* 2005 WL 281221, \*3 (N.D. Ill. Feb. 1, 2005); *Brady v. U.S.,* 877 F. Supp. 444, 453 (C.D. Ill. 1994); *Escamilla v. Jungwirth,* 426 F.3d 868, 870 (7th Cir. 2005) *abrogated on other grounds by McQuiggin v. Perkins,* 133 S. Ct. 1924 (2013).

Judge Castillo explained the duties upon the Court when faced with deliberate perjury:

Lying cannot be condoned in any formal proceeding. This Court, too, has a responsibility: where we find deliberate falsehoods told in proceedings, we cannot allow such conduct to go unchecked. Turning a blind eye to false testimony erodes the public's confidence in the outcome of judicial decisions, calls into question the legitimacy of courts, and threatens the entire judicial system. Our entire civil justice system is dependent on accurate and truthful discovery. Every day, litigants make settlement decisions on the basis of information obtained during the discovery process. Across the country, our fellow judges enter summary judgment in numerous cases on the basis of undisputed facts determined during the discovery process. Ultimately, the discovery process aids parties, who need to proceed all the way through trial to resolve a case, ensure that the trial is based on objective facts and not the parties' selective and subjective recollections about their respective positions. Therefore, the importance of accurate and truthful discovery to the civil justice system cannot be overstated. *Quela,* 2000 WL 656681 at \*7-8.

Regardless of any potential merit of a plaintiff's underlying claim or whether the perjury involves matters material to the litigation at bar, dismissal for perjury remains appropriate to protect the integrity of the civil judicial system. In *Dotson v. Bravo*, 202 F.R.D. 559, 572 (N.D. Ill. Aug. 22, 2001), *aff'd*, 321 F.3d 663 (7th Cir. 2003), a plaintiff was convicted of criminal offenses relating to his alleged discharge of a firearm at a police officer. *Id.* at 665-66. The defendant officer, Bravo, had testified against plaintiff at this criminal trial that plaintiff was the person who had shot at him. *Id.* However, audio recordings later surfaced which appeared to directly contradict the veracity of the defendant officer's account. *Id.* The plaintiff was immediately released from prison as a result and filed suit. *Id.* The plaintiff's problems began, however, when it was revealed that he had misrepresented his identity in the underlying criminal proceedings. *Id.* Despite the fact that the misrepresentation had nothing to do with the veracity of the plaintiff's version of the events, the Court dismissed the suit as a sanction for his dishonesty. *See id.* at 572. The Court held:

> Credibility and veracity issues are among the ultimate factually disputed issues in a trial, and are not to be resolved beforehand or otherwise be used as a basis for a sanction. Admitted perjury, however, is quite another matter. The fact is that whether or not [the defendant's] testimony under oath in prior state court proceedings or in these proceedings is inconsistent, contradictory, or in any way false remains to be determined by a trier of fact. [Plaintiff] has to prove before a jury of his peers that [defendant] is a prevaricator. [Plaintiff], on the other hand, is an admitted perjurer...Defendants need prove nothing with respect to this matter. No jury need make any factual determination regarding the matter. The only issue is whether [Plaintiff] will be permitted to profit from his deceit.

In affirming the dismissal of plaintiff's claim, the Seventh Circuit stated that the potential merit of Plaintiff's claim did not preclude dismissal of this claim based on the acts of dishonesty:

> Given the evidence that supported his acquittal from all criminal charges, we note that [Plaintiff's] civil rights case may well have had some merit. But, we cannot allow a plaintiff to so abuse the court system in order to avoid criminal justice, yet obtain civil reward. If [Plaintiff] sought to expose the "truth" of what occurred on January 1, 1998, he should not have begun the lie that now leads to the dismissal of his case. *Id.* at 669.

Moreover, the Seventh Circuit has explicitly held that litigants may not simply commit perjury, change their story, and then insist that such change is a valid excuse to avoid dismissal as a sanction. For example, in *Dye v. Wargo*, 253 F.3d 296, 298 (7th Cir. 2001), a § 1983 plaintiff attempted to create a genuine

issue of material fact by contradicting a previous version of events given in an underlying criminal proceeding. *Id.* In affirming the entry of judgment in favor of defendants, the Court stated:

> Some of the statements that [Plaintiff] has made under oath in this litigation are inconsistent with statements he made under oath in state court…One or the other of [Plaintiff's] stories is perjury. His lawyer contends that [Plaintiff] was entitled to lie in state court to ensure that the judge accepted the favorable plea bargain, and that we should therefore disregard his earlier sworn statements. That is not a position any judicial system can, or does, tolerate. *Id.* at 298.

Similarly, the Seventh Circuit also rejected a habeas petitioner's attempt to seek post-conviction relief by changing the nature of his testimony in the underlying proceeding and noted:

> Litigants must live with the stories that they tell under oath…The legal system offers many ways to deal with problems; perjury is not among them. How could any court credit statements made by a litigant…who trumpets a willingness (indeed, asserts an entitlement) to lie under oath whenever deceit serves his interests? *See Escamilla*, 426 F.3d at 870.

As explained in *Rhodes v. LaSalle Bank, N.A.*, "[t]he decisions in these cases are premised on the fact that a litigant cannot be permitted to say 'oops, you've caught me,' and thereafter be 'allowed to continue to play the game.'" 2005 WL 281221 at *3. "Not to dismiss a case for such blatant disregard of the judicial process would 'erode the public's confidence in the outcome of judicial decision, call into question the legitimacy of courts, and threaten the entire judicial system.'" *Id.*

In this regard, the law is replete with dismissals being ordered even when the subject of the perjury concerns an issue that bears *little or no* relationship to the merits of the case. *See Dotson*, 321 F.3d at 667 (misrepresentation of name in criminal proceedings); *Thomas.*, 288 F.3d at 306, 308 (7th Cir.2002)(plaintiff knowingly filed false application to proceed *in forma pauperis*); *Secrease*, 800 F.3d at 402 (7th Cir. 2015)(lying on *in forma pauperis* form); *Rodriguez*, 1997 WL 349989, *2 (lying about criminal record).

Indeed, the courts find dismissal appropriate even when the case as a whole shows demonstrable merit. *See Dotson*, 321 F.3d at 669; *Ramirez*, 845 F.3d at 782 ("The court considered the possibility—indeed, it expressly assumed—that Ramirez may have had a meritorious case of employment discrimination, and that dismissal would foreclose Ramirez from pursuing relief for that injury."); *Lorillard Tobacco Co. v. Montrose Wholesale Candies & Sundries, Inc.*, 2006 WL 2434031, *1 (N.D. Ill. 2006)("[A]ssessment of the merits of the case are irrelevant to a determination of whether to enter default

judgment as a sanction for gross misconduct."); *Aura Lamp & Lighting, Inc. v. Int'l Trading Corp.*, 2002 WL 215535, *2 (N.D. Ill. Feb. 12, 2002) ("[T]his court believes that at some point attorney or party misconduct may rise to such a level that the probable merits become essentially irrelevant.").

Countless courts addressing perjured testimony have found dismissal is necessary to protect the integrity of the judicial process. *See Dye*, 253 F.3d at 298; *Jackson*, 468 Fed. Appx. at 619-620 (dismissal of § 1983 case based on perjured testimony); *Allen v. Chic. Transit Auth.*, 317 F.3d 696, 703 (7th Cir. 2003)("it is arguable that a litigant who defrauds the court should not be permitted to continue to press his case"); *Secrease*, 800 F.3d at 401 ("Dismissal can be appropriate when the plaintiff has abused the judicial process by seeking relief based on information that the plaintiff knows is false."); *Fuery*, 2016 WL 5719442 at *2 (vacating verdict based on misconduct and misrepresentations); *Ridge Chrysler Jeep, LLC*, 2006 WL 2808158 at *8 (dismissing case as a sanction); *Thomas*, 288 F.3d at 308 (dismissing suit where plaintiff filed false document); *Brady*, 877 F. Supp. at 453 ("Permitting this lawsuit to proceed would be an open invitation to abuse the judicial process. Litigants would infer they have everything to gain, and nothing to lose, if manufactured evidence is merely excluded while their lawsuit continues. Litigants must know that the courts are not open to persons who would seek justice by fraudulent means."); *Rodriguez*, 1997 WL 349989 at *2 ("False testimony in a formal proceeding is intolerable. This court is aware that the law favors a trial on the merits. That right to a trial, however, is not absolute…In the instant case, plaintiff sought to conceal relevant information bearing directly upon her credibility both as a witness and a litigant…This court cannot and will not allow a litigant to so abuse the judicial process.").

## II. Plaintiff's Intentional and Deceitful Witness Tampering Warrants Dismissal as a Sanction.

Another area in which dismissal has been found appropriate is when a litigant has engaged in witness tampering (or even attempted to do so). It is well established that "[t]rying to improperly influence a witness is fraud on the court and on the opposing party…" *Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008). "[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." *Ramirez*, 845 F.3d at 782 (citing *Secrease*, 800 F.3d at 402).

The court in *Ramsey v. Broy*, dismissed suit although the plaintiff was unsuccessful in his attempts to bribe witnesses. In *Ramsey*, the court granted the defendant's motion to dismiss the plaintiff's case as a sanction after the plaintiff's neighbor revealed that the plaintiff attempted to bribe him to provide fabricated testimony, even though the witness declined the bribe and did not offer favorable testimony. 2010 WL 1251199, *3, 6 (S.D. Ill. 2010). Although the court found that the plaintiff "only *attempted* to tamper with witnesses without actually getting that witness' tampered testimony on the record[,]" the court still held that the sanction "best tailored to address the misconduct at hand and deter other is dismissal." *Id.* at *6 (emphasis in original). As the *Ramsey* Court explained:

> Litigants that attempt to coerce witnesses into giving false testimony abuse the truth-seeking function of the courts and obstruct the courts' ability to solve disputes accurately and efficiently. Not only does witness tampering interfere with the judicial branch's ability to function properly, it is a federal crime. *See* 18 U.S.C. § 1512(b) (2006)….As such, tampering by the parties deserves the harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process. When the plaintiff is the one that commits the offense, dismissing the case is sensible as the very individual that seeks the Court's jurisdiction to solve his dispute (*i.e.*, the plaintiff) is the party thwarting the Court's ability to get to the truth. *Id.* at *5.

Another case dealing with analogous misconduct is *Quela v. Payco-Gen. Am. Creditas, Inc.* In *Quela*, defendants willfully coerced an employee to lie about an issue central to the case, to the point where the defendants procured a false witness statement and had the employee perjure herself in a court proceeding. *Quela*, 2000 WL 656681, at *1. The court held the sanction of default judgment in favor of plaintiffs was "proportionate" to defendants' "egregious" misconduct. *Id.* at *8. The court stated, "[e]ntering a default judgment will send a strong message to other litigants, who scheme to abuse the discovery process and lie to the Court, that this behavior will not be tolerated and will be severely punished. *Id.*

Similarly, in *Ramirez v. T&H Lemont, Inc.*, the court affirmed dismissal with prejudice as a sanction for a plaintiff offering a witness money in exchange for favorable testimony. 845 F.3d at 774. The court found a witness's testimony that the plaintiff offered him money and that a discussion was had as to what favorable testimony the witness was to give supported a finding that plaintiff engaged in witness tampering. *Id.* at 781. The court concluded plaintiff "made a calculated effort to bolster his floundering case by offering payment to a witness to support his allegations[.]" *Id.* at 782.

*Dewitt v. Ritz*, 2021 WL 915146, *1 (D. Md. 2021) also supports complete dismissal of this action based on Plaintiff's misconduct. In *Dewitt*, the plaintiff brought a civil rights suit against the Baltimore Police Department ("BPD") and seven of its officers alleging that BPD detectives withheld an alleged police report containing a crucial eyewitness statement that the plaintiff was not the shooter. *Id.* at *1. The defendants moved to dismiss plaintiff's complaint as a litigation sanction after the defendants learned that the plaintiff had tampered with witnesses and fabricated the alleged police report containing exculpatory evidence. *Id.* at *2. The defendants learned of the plaintiff's deceit with the help of an expert forensic document examiner, but more important to this case, through a series of the plaintiff's recorded prison calls that captured the plaintiff promising to pay off witnesses in exchange for favorable testimony. *Id.* at *8-9. The court found that involuntary dismissal was the most appropriate sanction, in part, because the recorded prison calls constituted "irrefutable" evidence that the plaintiff bribed three key witnesses to provide false testimony. *Id.* at *12. The court also reasoned that the "Plaintiff's brazen attempt to profit from his scheme by pursuing the current civil action and promising to pay conspirators for their lies out of the anticipated proceeds of a fraudulent civil case […] make a mockery of the truth-seeking objectives of the judicial system and weaken its credibility as an institution deserving of public trust." *Id.* The court not only dismissed plaintiff's action but also awarded the defendants attorney's fees. *Id.* at *13.

Acts of dishonesty and witness tampering are not the only basis on which dismissal is appropriate. Rather, the courts have found dismissal appropriate for a wide variety of abusive litigation tactics ranging from concealing key pieces of evidence, failing to provide complete or accurate discovery responses, and other gross abuses of the judicial process. *See Ladien v. Astrachan*, 128 F.3d 1051, 1057 (7th Cir. 1997)(dismissal based on repeated violation of the court's orders, failing to timely produce discoverable documents, inaccurately verifying that document production was complete, and other misconduct after having been repeatedly admonished by court); *Chung v. KPMG LLP*, 104 Fed. Appx. 576, 577-78 (7th Cir. 2004)(dismissal based upon "gross abuse" of judicial process); *China Ocean Shipping (Group) Co. v. Simone Metals Inc.*, 1999 WL 966443, *4 (N.D. Ill. 1999)(dismissal of suit under inherent powers of court and

36

Rule 37 based on destruction of evidence); *Philips Med. Sys, Int'l, B.V. v. Bruetman*, 982 F.2d 211, 214 (7th Cir. 1992)(affirming default judgment as sanction for deception of court); *Profile Gear Corp. v. Foundry Allied Ind., Inc.*, 937 F.2d 351, 353-54 (7th Cir.1991)(same); *Hal Commodity Cycles Mgmt. Co.*, 825 F.2d at 1138-39 (default judgment against defendant for and dishonesty). Indeed, even "[i]ncomplete or evasive responses to interrogatories can support, in part, dismissal of the entire actual under Rule 37(b)." *Dotson*, 321 F.3d at 667 (citing *Roland v. Salem Contract Carriers, Inc.*, 811 F.2d 1175, 1180 (7th Cir. 1987)).

### III. Dismissal Is The Only Appropriate Remedy Here Given The Severity of Plaintiff's Litigation Misconduct and its Prejudice to Defendants.

District Courts are not required to impose lesser sanctions to remedy misconduct if the misconduct rises to the appropriate level of seriousness. *See Patterson by Patterson*, 852 F.2d at 284-85 ("Plaintiffs urge this court to reverse the dismissal, arguing that less drastic sanctions would achieve the same result. Yet we see no reason to impose a requirement that prevents a district court from imposing sanctions if, under the circumstances, it is warranted. As this court stated in *Hal Commodity Cycle Mgmt. Co. v. Kirsh*, "[a] district court is not required to fire a warning shot." 825 F.2d at 1139. Furthermore, this court has affirmed dismissals even though lesser sanctions were not first imposed.").

Additionally, in assessing dismissal as a sanction under the inherent powers of the Court, the Court need not find a party's misconduct caused its opponent any prejudice. *See Barnhill v. U.S.*, 11 F.3d 1360, 1368 (7th Cir. 1993)("We continue to eschew grafting a requirement of prejudice onto a district court's ability to dismiss or enter judgment as a sanction under its inherent power."); *Raziev v. Compass Truck Sales, LLC*, 2016 WL 1449933, *9 (N.D. Ill. 2016)("The Seventh Circuit has not imposed a requirement of prejudice on a court's ability to dismiss or enter judgment as a sanction under its inherent power."). Some misconduct "may exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court." *Barnhill*, 11 F.3d at 1368. Thus, a court may use its inherent powers to dismiss a case or enter default judgment even when the innocent party "incur[s] no real inconvenience"

and "suffer[s] no real prejudice." *Id.*; *see also Secrease*, 800 F.3d at 402 ("Even if it is not successful, the effort imposes unjust burdens on the opposing party, the judiciary, and honest litigants who count on the courts to decide their cases promptly and fairly."); *Fuery*, 2016 WL 5719442 at *11 ("Court may still impose sanctions even where there is no prejudice but the actions of the party exhibit such flagrant contempt for the court and its processes that to allow the offending party to continue to invoke the judicial mechanism for its own benefit would raise concerns about the integrity and credibility of the civil justice system that transcend the interests of the parties immediately before the court.").

Finally, while a court may attempt to fashion remedies other than dismissal such as adverse inferences and monetary sanctions, such sanctions should not be used when they would, in effect, not provide an effective remedy for the misconduct at issue *See Malibu Media, LLC v. Tashiro*, 2015 WL 2371597, *37 (S.D. Ind. 2015)("[A] sanction short of default would not appropriately address the goals of deterrence and punishment…[S]uch a sanction would allow the case to continue to trial and would thus allow Defendants to press their case to this Court. In light of their misconduct, Defendants should not be allowed to do so"); *White v. Lambert*, 2011 WL 691983, *8 (S.D. Ill. 2011)("The only meaningful sanction likely to deter Plaintiff and other inmates from submitting forged documents is to dismiss all claims against all of the defendants, with prejudice."); *Thomas*, 288 F.3d at 307 (dismissal with prejudice appropriate where "monetary sanction would probably be difficult to collect"). Thus, the Courts have been loath to impose only monetary sanctions to address perjury because such relief sends the message that perjury is permissible so long as the perjurer is willing to write a check if caught. As set forth by the Court in *Malibu Media, LLC*:

> [A] monetary sanction would help redress the prejudice [the opposing litigant] has suffered and would help punish the offenders, but it would not adequately protect the judiciary. Such a sanction would allow [the perjuring party] to continue to assert the protections of the judicial system against [the opposing party's] claim despite [the perjuring party's] continued abuse of that very system. Moreover, such a sanction would send a message that the Court is willing to accept perjury so long as parties are willing to write a check. This the Court will not do…" 2015 WL 2371597 at *37.

Here, Plaintiff has undeniably engaged in a pervasive pattern of perjury and other misconduct that warrants dismissal. Specifically:

38

- He lied about his knowledge or and relationship Dober and Solo, the persons implicated by Lee as intermediaries in a likely scheme to procure fabricated testimony to beat a murder charge;

- He lied about seeking to have these very same intermediaries attempt to contact Lee to get him to change his prior testimony against Plaintiff;

- He lied in Interrogatories about the manner in which he obtained Lee's recantation affidavit;

- He lied about seeking to have intermediaries approach witnesses against him to attempt to influence their testimony (a tactic that appears to have been successful);

- He perjured himself about his involvement in drug trafficking, attempted to contradict such perjury in the very same deposition to avoid being implicated in a scheme to procure false witness testimony, and then plead the Fifth when asked to provide further information;

- He perjured himself about incriminating calls implicating him in a testimony for pay scheme by falsely claiming he was attempting to send money to a different inmate at Robinson Correctional who Plaintiff knew was not there at the time;

- He lied and withheld information about his activities and communications leading up to (and on the day of) the incident at issue in this case;

- He lied about his nicknames and street monikers; and

- He lied about nearly every single aspect of his damages.

As detailed above, the law would support dismissal even based on a *single one* of the above instances as they constitute provable and undisputed lies and perjury. However, the fact that there are so many instances of such outrageous conduct leaves little doubt that dismissal justified. Plaintiff "cannot be permitted to say 'oops, you've caught me,' and thereafter be 'allowed to continue to play the game.'" *Rhodes*, 2005 WL 281221, at *3 (quoting *Dotson*, 202 F.R.D. at 570).

While prejudice is not required to enter this sanction, it is clear Defendants have suffered great prejudice. Defendants have doggedly pursued evidence showing that Plaintiff was directly involved in procuring false witness testimony to literally get away with murder. Plaintiff chose to file this lawsuit alleging his innocence for such crimes and blame all of his woes on overbearing police conduct. It is Defendants' absolute right to have unfettered access to the evidence needed to prove up their case. While Defendants have undoubtedly developed powerful evidence, it is incomplete. Plaintiff has obstructed and obfuscated the facts. He has lied and changed his story and concocted additional lies to excuse other lies. As a result, names of intermediaries Plaintiff referenced, remain shrouded in secrecy because of his

dishonesty, rendering Defendants incapable of locating and deposing key witnesses. Because of the timing of the revelation of Plaintiff's lies, Defendants were not permitted to probe further into these issues.

Plaintiff has also refused to provide accurate or truthful information regarding nearly any aspect of his alleged damages in this case. It is simply not fair to ask Defendants to continue having the taxpayers foot the bill defending a case brought by a person who has no regard for the rules and who has made it clear that the simple act of telling the truth is not something he is capable of doing.

Frankly, given the gravity of the context in which these lies occurred (specifically, in the context of an underlying murder case in which Plaintiff strongly appears to have obstructed justice), permitting Plaintiff to continue in hopes of securing a monetary award would be unconscionable. Even worse, this would send a clear message to others that repeated lies and obstruction is no barrier to the federal courthouse. Even worse, permitting Plaintiff to get away with the misconduct at issue would send a clear message to persons awaiting trial for criminal charges that the courts are willing to "look the other way" in response to perjury and witness tampering. The cases discussed above clearly support entering the relief requested by Defendants.

## **CONCLUSION**

WHEREFORE, Defendants respectfully request that this Court grant their Motion to Dismiss with Prejudice Plaintiff's Claims as a sanction for Plaintiff's abuse of the litigation process, award Defendants their reasonable attorneys' fees and costs in bringing this motion for sanctions, and for whatever other relief this Court deems fit.

Respectfully submitted,

**NEIL EVANS, WADE GOLAB, RYAN MILLER**

By: *s/ Natalie Y. Adeeyo*

Avi T. Kamionski, Shneur Z. Nathan, Robin D. Shoffner, Natalie Y. Adeeyo
Nathan & Kamionski LLP
33 W. Monroe St., Ste. 1830
Chicago, IL 60603
(312) 612-2255

*Attorneys for the Individual Detectives*

**JOSEPH WHITE, CARLOS DELATORRE, JAMES GOCHEE, MARK MENDEZ, HENRY MORRISON, PEDRO ORTIZ, BRIDGET BRUBAKER**

By: *s/ Timothy P. Scahill*

Steven B. Borkan, Timothy P. Scahill, Whitney N. Hutchinson, Graham P. Miller, Andrew M. Cook, Emily Schnidt
Borkan & Scahill, Ltd.
20 S. Clark St., Ste. 1700
Chicago, IL 60603
(312) 580-1030

*Attorneys for the Individual Officers*

**CITY OF CHICAGO**

CELIA MEZA
Corporation Counsel of the City of Chicago

By: */s/ Stacy Benjamin*

*Special Assistant Corporation Counsel for Defendant City of Chicago*
Eileen E. Rosen, Stacy Benjamin, Theresa Berousek Carney, Austin G. Rahe
ROCK FUSCO & CONNELLY, LLC
321 N. Clark Street, Suite 2200
Chicago, IL 60654
(312) 494-1000
*Attorneys for the City of Chicago*

## APPENDIX OF EXHIBITS

**Exhibit 1** – Case Supplemental Reports

**Exhibit 2** – Original Case Incident Report

**Exhibit 3** – Deposition of Antwon Lee

**Exhibit 4** - Deposition of Plaintiff

**Exhibit 5** – Illinois State Police Report

**Exhibit 6** – Grand Jury Transcript of Antwon Lee

**Exhibit 7** – Grand Jury Transcript of Isaiah Watkins

**Exhibit 8** – Deposition Transcript of ASA Villareal

**Exhibit 9** – Transcript of November 12, 2020 Colloquy between Court and Mr. Watkins

**Exhibit 10** – Transcript of November 12, 2020 Proceedings

**Exhibit 11** – Affidavit of Antwon Lee

**Exhibit 12** – Antwon Lee's March 3, 2016 Recorded Telephone Call

**Exhibit 13** – Transcript of Antwon Lee's September 8, 2016 Recorded Telephone Call

**Exhibit 14** – Transcript of Antwon Lee's December 25, 2017 Recorded Telephone Call

**Exhibit 15** – Transcript of Antwon Lee's March 24, 2018 Recorded Telephone Call

**Exhibit 16** – Transcript of Antwon Lee's August 21, 2018 Recorded Telephone Call

**Exhibit 17** – Transcript of Antwon Lee's August 27, 2018 Recorded Telephone Call

**Exhibit 18** – Antwon Lee's October 4, 2018 Recorded Telephone Call

**Exhibit 19** – Plaintiff's Answers to Defendant Golab's Interrogatories

**Exhibit 20** – Plaintiff's Answers to Defendant Miller's Interrogatories

**Exhibit 21** – Plaintiff's Answers to Defendant Evan's Interrogatories

**Exhibit 22** – Transcribed Excerpts of Plaintiff's 2016 Recorded Telephone Calls

**Exhibit 23** – Plaintiff's June 15, 2016 Recorded Telephone Call

**Exhibit 24** – Transcribed Excerpts of Plaintiff's 2014 Recorded Telephone Calls

**Exhibit 25** – Transcribed Excerpts of Plaintiff's 2016 Recorded Telephone Calls

**Exhibit 26** – Plaintiff's November 25, 2016 Recorded Telephone Call

**Exhibit 27** – Plaintiff's Answers to Defendant Officers' Requests to Admit

**Exhibit 28** – Transcribed Excerpts of Plaintiff's 2017 Recorded Telephone Calls

**Exhibit 29** – Transcribed Excerpts of Plaintiff's 2018 Recorded Telephone Calls

**Exhibit 30** – Plaintiff's Answers to Defendant Ortiz's Interrogatories

**Exhibit 31** – Illinois Department of Corrections Records Re: Terrance Haynes

**Exhibit 32** – Plaintiff's Answers to Defendant White's Interrogatories

**Exhibit 33** – Deposition Transcript of JL "Jerry" Bishop

**Exhibit 34** – Forensic Image of Plaintiff's Text Messages

**Exhibit 35** – Forensic Image of Plaintiff's Call Logs

**Exhibit 36** – Documentation of Plaintiff's Employment

**Exhibit 37** – Plaintiff's Bankruptcy Filing

**Exhibit 38** – Complaint to Foreclose Mortgage, *HSBC, et. al. v. Bishop*, 2013 CH 16301 (Circuit Court of Cook County)

**Exhibit 39** – Affidavit of Complaint, *State of Tennessee v. Thomas Bishop*, 2021 CR 1079

## **CERTIFICATE OF SERVICE**

I, Natalie Y. Adeeyo, an attorney, hereby certify that on the date marked on the top header of this document, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which sent electronic notification of the filing on the same day to all counsel of record.


*/s/ Natalie Y. Adeeyo*