**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **THOMAS BISHOP,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 16 C 6040** |
| | ) | |
| **v.** | ) | |
| | ) | **Judge Jorge L. Alonso** |
| **JOSEPH WHITE, PEDRO ORTIZ,** | ) | |
| **CARLOS DELATORRE, JAMES** | ) | |
| **GOCHEE, MARK MENDEZ, NEIL** | ) | |
| **EVANS, PHILLIP RIDER, WADE** | ) | |
| **GOLAB, HENRY MORRISON, RYAN** | ) | |
| **MILLER, STACY HEUBAUM, as** | ) | |
| **Special Representative of deceased** | ) | |
| **JAMES HEUBAUM, BRIDGET** | ) | |
| **BRUBAKER, and the CITY OF** | ) | |
| **CHICAGO,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Plaintiff, Thomas Bishop, brings this civil rights action under 42 U.S.C. § 1983 against several police officers who allegedly shot him without justification and falsely accused him of murder and attempted murder. Based on information learned in discovery, defendants assert that plaintiff has tampered with witnesses and perjured himself. They move for dismissal of this case as a sanction for plaintiff's litigation misconduct. For the following reasons, the Court grants defendants' motion.

**I.     Background**

On the evening of October 23, 2014, plaintiff was shot by Chicago police officers. The shooting took place in an alley intersecting with West 80th Street between South Ashland Avenue and South Justine Street. Moments earlier, there had been another shooting in the vicinity, in which

one victim—Tepete Davis, known as "Tabik"—was killed and at least one other victim—Antwon Lee—was injured. Several of the defendants reported afterward that they were on patrol in the area when they heard gunshots. Upon turning into the alley, they say, they saw plaintiff firing a gun. Plaintiff fled, and the officers gave chase. Defendant White reported that he saw plaintiff turn and point a dark object at him. White fired two shots, striking plaintiff in the back of the neck.

Plaintiff claims, however, to have had no weapon, done nothing threatening, and played no part in the Davis/Lee shooting. According to plaintiff, he was passing through the area on the way home from his grandmother's house when he heard gunshots. Then, several of the defendant officers approached him with guns drawn. He turned to run, and he was shot. Plaintiff alleges that defendants proceeded to frame him for the shooting in the alley in order to cover up their unjustified use of force against him. Following the incident, defendants Miller and Heubaum went to Stroger Hospital to question Antwon Lee. Pursuant to their scheme, plaintiff alleges, Miller and Heubaum coerced Lee to identify plaintiff as the person who had shot him.

Lee identified plaintiff as the shooter in a photo array and, later, before a grand jury. Isaiah Watkins, who was also shot near where Davis and Lee were found that night, also testified before the grand jury. Plaintiff was charged with first degree murder and two counts of attempted murder.

At plaintiff's criminal trial in December 2018, Lee recanted. He testified that plaintiff was not the man who had shot him and that he had only ever said otherwise due to police pressure. Watkins did not show up to testify at trial, despite a court order to do so. Plaintiff was acquitted of all charges.

Plaintiff filed this suit in 2016, while his criminal case was still pending. The Court stayed this suit pending the outcome of plaintiff's criminal proceedings. Following his acquittal, this Court lifted the stay, and the parties proceeded with discovery.

Defendants contend, based on information obtained in discovery, that Lee recanted and Watkins stopped cooperating only due to plaintiff's improper influence, and that plaintiff lied about his efforts to contact them.

### A. Recordings of Lee's Incarcerated Phone Calls

Lee first signaled his intent to recant his grand jury testimony against plaintiff in a September 2016 affidavit sent by mail directly to the judge presiding over plaintiff's criminal case. At that time, Lee was incarcerated at Robinson Correctional Center in the Illinois Department of Corrections on unrelated charges. Defendants subpoenaed recordings of Lee's phone calls during the time frame surrounding his signing the recantation affidavit and recanting at trial. In certain of these recordings, Lee suggested that plaintiff, acting through intermediaries, had offered to pay Lee to recant his grand jury testimony, and he had physically intimidated witnesses who might testify against him.

In a March 2016 phone call, Lee told a friend whom defendants identify as Meshar Levi that plaintiff was the one who had shot him:

> LEVI: Did you know the person that did that --
> LEE: You know, actually --
> LEVI: -- to you?
> LEE: You know, actually what's so crazy? . . . Once the guy got shot by the police and they put his picture all up, you know, a few people commented like on Facebook and all like show pictures of his son. You know, my home -- one of my little guys off the block hang with one of his sons. You know what I'm sayin'? And that's how I found out really who this guy was . . . . He an older cat, you know. And I heard he was getting a little money. You know, he was like one of them all aggressified n****rs, you know. Wanted everybody to listen to him and all that. . . . The n****r name is Thomas Bishop.

(Mot. for Sanctions Ex. 12, Recording of Lee's Mar. 3, 2016 Call, at 7:05-8:52, *see* ECF No. 416 & 417.)

On September 8, 2016, a couple of weeks before submitting his recantation affidavit, Lee

told Lorene Overton, his "god sister" (*see id.*, Ex. 3, Lee Dep., at 36:17-38:8, ECF No. 415-3) the

following:

> LEE: Guess who the fuck wrote a letter to me though?
> OVERTON: Who?
> LEE: Now, you know, Dover know the n****r that shot me, right?
> OVERTON: Uh-huh.
> LEE: Why this n****r then reach out to Dover to send me a letter to ask me would
> I help him get out of jail, he made a mistake, and he's sorry and all this? Is you
> serious? . . . Like n****r, you know you was doing something wrong in the first
> place. Why would you even do that to me and kill my friend anyway? You know
> what I'm sayin'? … Come on, man. That's all about all this time that you want to
> send apologetic letters. Motherfucker, you could have been there then when the
> motherfucker was out there when I first got locked up. Now you trying to get out
> of jail and now you need me. This shit all backwards, man.
> OVERTON: What the fuck he need you for? What the fuck you supposed to do?
> LEE: I don't know what he want me to do. The police seen you shootin' us up. The
> police was right there. That's why they shot you in your neck and it came out your
> jaw, bitch. So pretty much how can I help you?
> OVERTON: Exactly.
> LEE: They want me saying that it wasn't him and all this.

(*Id.*, Tr. of Lee's Sep. 8, 2016 Recorded Call, Ex. 13 at 11:18-13:18, ECF No. 415-13; *see id.*, Ex.

3 at 43-45.) At Lee's July 30, 2020 deposition in this case, counsel played for Lee another

recording of a phone call between himself and Overton, this one from September 30, 2016. Lee

admitted that he told her again in that call that plaintiff had shot him and that plaintiff or someone

on his behalf was reaching out to him to help get him out of jail. (*Id.*, Ex. 3 at 74:5-22.)[1]

Lee claimed at the deposition that the truth of the matter was that his recantation was a

result of his own entrepreneurial efforts to shake plaintiff down, not plaintiff's efforts to bribe or

---

[1] In their motion for sanctions, defendants purport to reproduce the exact language Lee used, but
the Court cannot find the cited language at the cited place of the cited exhibit. (See Mot. for
Sanctions at 7 (citing Ex. 13 at 21-22).) The Court does not rely on defendants' representation of
the evidence in their briefs and looks instead to the evidence itself, so it treats that particular
transcript or recording as if it is lost.

coerce him to recant. (*Id.*, Ex. 3 at 74:23-75:24.) In his deposition testimony, Lee claimed that his scheme was unsuccessful and plaintiff never actually paid him, but he recanted anyway because "the Lord told [him] to do what was right." (*Id.*, Ex. 3 at 103:1-105:23.)

During a December 17, 2017 call, Lee told a friend, Gerry Lee ("Gerry"), that plaintiff was reaching out to him to pay for help with his criminal case. (*Id.*, Ex. 3 at 80:13-81:14.) On December 25, 2017, Lee told Gerry as follows:

> Yeah, man. Now the n****r tryin' to pay a motherfucker doctor to sign an affidavit for him. No, he was wrong in the first place. Man, I don't want your money, stud . . . . You in the wrong. Now you looking for help. Police, they nailed you. Jumped out and shot you. You then drop your move at me and get me all fucked up. . . . Now the n****r tryin' to talk about he got 10,000. Man, I don't play no games, man. I ain't trying to be playing with you, bro. Show me the money, n****r.

(*Id.*, Ex. 14, Tr. of Lee's Dec. 25, 2017 Recorded Call, at 17:19-19:12, ECF No. 415-14.) In a March 24, 2018 call, Lee told Gerry again that plaintiff was trying to pay him for help with his criminal case. (*Id.*, Ex. 15, Tr. of Lee's Mar. 24, 2018 Recorded Call, at 16:3-7, ECF No. 415-15 ("And the n****r that shot me up, the police shot him in the back of his neck. It came out his jaw. He got attempt and he got a murder. The n****r trying to get up with me to sign an affidavit for him. He trying to pay me."); *see id.*, Ex. 3 at 124:4-126:9.)

In an August 21, 2018 phone call with Karin Campbell, the mother of Lee's children, Lee told her that plaintiff had been released on bond, and Ms. Campbell mentioned that her car had been broken into. When Ms. Campbell seemed to suggest that the two events might be related, Lee told her that he believed otherwise, explaining, "I know for sure it ain't from no way like that because a mother fucker trying to reach out to me. A mother fucker trying to pay me $10,000 to do whatever. You know what I'm saying?" (*Id.*, Ex. 16 at 13:6-9, ECF No. 415-16.) Ms. Campbell responded, "They don't have to pay you $10,000 now Antwon because they could just kidnap your mother fucking kids for you not to do it." (*Id.*, Ex. 16 at 13:10-12.) Later in the same call, Lee

went on to discuss plaintiff's efforts to contact him through intermediaries, "Dover"[2] and "Solo."

According to Lee, the purpose of these contacts was to dissuade him from testifying against

plaintiff and to seek help dissuading Watkins (referred to as "Eichy," "Ikey" or "Icky") from

testifying against plaintiff:

> CAMPBELL**:** What is his name? . . .
> LEE**:** His name is Thomas Bishop.
> CAMPBELL**:** All right.
> . . .
> LEE**:** Now my man Dover and Solo talks to him. And these are guys I grew up
> with. That's who communicate with me for him. You know what I'm sayin'? They
> trying to beg me to get Eichy not to come to court on him.
> CAMPBELL**:** Mm-hmm.
> LEE**:** I'm not touching that shit, Karen. I said it is what it is. I'm not going to court
> on him, so I'm not a problem, Karen. I don't have no stake in this thing. I'm not
> going to court to testify on this man. That shit been established when I caught my
> case in jail. That's why the state got mad at me and gave me all this time because I
> wouldn't cooperate with that shit, Karen. Now you see what I'm sayin'? I'm not
> the problem. I ain't got to apologize or a sorry, we made a mistake, he acted out of
> anger, he was drunk. I'm not the problem, Karen. That man shot me.

(*Id.*, Ex. 16, Tr. of Aug. 21, 2018 Recorded Call, at 27:10- 29:2.) At his deposition, Lee confirmed

that Solo operated as an intermediary between Lee and plaintiff. (*Id.*, Ex. 3 at 198:12-200:19.)

In an August 27, 2018 call, Lee spoke with Campbell's mother, Doris Johnson. (*See id.*,

Ex. 3 at 176:9-18.) Ms. Johnson told Lee that she had heard that plaintiff was out of custody and

she would "prefer" that Lee not testify against plaintiff, fearing that plaintiff might retaliate against

Lee's family, including her daughter and grandchildren. (*Id.*, Ex. 17, Tr. of Lee's Aug. 27, 2018

Recorded Call with Johnson at 3:4-16, ECF No. 415-17 at 26.)[3] Lee explained that she should not

---

[2] As discovery proceeded, it became clear that "Dover" was a mistranscription of "Dober." The
Court will use the terms interchangeably, as the same person is meant by either.

[3] The Court notes that Exhibit 17, unlike most of the exhibits to defendants' motion for sanctions,
contains transcripts of two separate calls, and the internal pagination of the exhibit restarts with
the second call. For clarity, the Court will cite not only to the internal pagination of the transcript
but also the pagination of the electronic court filing system. The Court will do the same with

worry—and neither should "Eichy"—because plaintiff had offered him $10,000 not to testify. (*Id.* at 7:1-24, ECF No. 415-17 at 30; *see id.* at 7:13-14 ("The n****r offered me $10,000 to come to court to help him, Doris . . . . The motherfucker reached out for me to help them, and I sent word back to a person that told the person, man.").)

In another August 27, 2018 call, Lee told his friend, Antwon Nelson, "I gonna need to talk to that Icky, man." (*Id.*, Ex. 17 at 3:7, Tr. of Lee's Aug. 27, 2018 Recorded Call with Nelson, ECF No. 415-17 at 4; *see id.*, Ex. 3 at 227:3-229:7.) Their conversation was as follows:

> LEE: Yeah. I don't know what's his problem though; but you know with my situation, he shouldn't have no reason to be going to court and doin' none of that. I don't even know the reason why he's still going to court. And all this time he been keepin' shit a fuckin' secret, man.
> NELSON: He's goin' to court for what?
> LEE: When I got shot up, bro.
> NELSON: I ain't know shit about that. The n***** just called me now. I was on my way to him.
> . . .
> LEE: I need to holler at him, man. . . . I ain't even goin' to court on no n*****. N***** shot me up on like that and killed Tabik. What the fuck is you goin' to court on this n***** for? And my homie and them told me -- He said the n***** from around our way goin' to court on him, man. And that got to be Icky, bro. You know what I'm sayin'? N*****, I'm a hit my family out that n*****. That affects everybody around on Justine.

(*Id.*, Ex. 17, ECF No. 415-17 at 3:14-5:3, ECF No. 415-17 at 5-6.) Later on in the same conversation, Nelson added Watkins to the call.

> NELSON: Hold on, I'm gonna call him. Hello. . . . Hey, Icky. Twon on the phone.
> WATKINS: I'm listening.
> LEE: Icky, man, . . . That little situation, you know, mother fucker put a bug into my homie and them sayin mother fucker from my way -- that situation went my way, man. That ain't nothin', bro. I don't even understand the situation why you would even be in that situation because I don't know.
> WATKINS: Right. I told his people. I'm like, boy, tell him, boy, I ain't got nothin' to do with this. They told me to come up there and fuck around. So I told -- (indiscernible) -- to holler at him.

---

subsequent citations to exhibits without continuous pagination, where it will help to avoid confusion.

LEE: Right. Right. They was sayin' that like a mother fucker coming up there like a -- (indiscernible). I'm like I have my people -- (Parties speaking simultaneously.)
WATKINS: No. I told him, G.
LEE: It is what it is. I told him my man ain't comin' up here doin' none of that.
WATKINS: I told his lawyer that. I told the guy. I told him. I told the guy.
LEE: Well as long as I hear from you, bro, you good because from my way -- you know what I'm sayin' -- my man don't spray that tune. You know what I'm sayin'? He on my bumper -- you know what I'm sayin' – cryin' and all that -- you know what I'm sayin' – tryin'
…
WATKINS: Right. That's why I'm already -- They talkin' about they get a warrant on me. (Indiscernible) -- told me the other day. I'm like fuckin' shit, man. That's what it is. That's what it is. Shit. But anything you need me to do, G, shit, I fuckin' doin' it.

(*Id.*, Ex. 17 at 12:7-13:21, ECF No. 415-17 at 13-14.)

On October 4, 2018, in a call between Lee and Antwone Nelson, Nelson told Lee that "Ikey" had told him that he had not gone to court but was worried there was consequently a "warrant out for" him. Lee replied that, if he had to go to court because of the "warrant," he had better "act like [he] got amnesia" and "forget everything" because, if anyone "ought to be doing something" in the case it was Lee himself, not Watkins. Nelson agreed and told Lee that Watkins, however, had said that he was "scared" because "the street's watching [him]" and there were "people on [his] heels," including an assistant State's attorney. Lee reiterated that, if Watkins had to "show up" to court in order to avoid a warrant, then he should do so, but he should "get on the stand and tell the judge" that he knows nothing about the shooting. (*Id.*, Ex. 18, Recording of Oct. 4, 2018 Call, at 1:16-5:40, *see* ECF Nos. 416 & 417.)

Defendants attempted to take Isaiah Watkins's deposition on October 8, 2020, but he failed to appear. Defendants moved for a rule to show cause why he should not be held in contempt, and Magistrate Judge Gilbert set a show-cause hearing for November 12, 2020. Mr. Watkins called in to the hearing and told Judge Gilbert that he was "scared for [his] life" and did not "want to have anything to do with Mr. Bishop." (*Id.*, Ex. 9, Tr. of Nov. 12, 2020 Hr'g, 10:11 a.m., at 3:5-11,

ECF No. 415-9.) When Judge Gilbert later asked him to confirm that he was afraid for his life, he responded as follows:

> Yes, sir. I mean, I -- Judge, I only said that because -- it's somebody died that night, and I don't want to die from the hands of nobody. I don't want to be involved with these people. I don't want somebody to say I said something bad. I don't want his lawyers to say, hey, well, he called and he said he is scared for his life. That may tick them off or somebody they know off. Not Mr. Bishop. I have nothing but good things to say about him because I don't want anything to happen to me. I don't know if it's true or false, but I want to stay the hell away from him.

(*Id.*, Ex. 10, Tr. of Nov. 12, 2020 Hr'g, 10:58 a.m., at 10:11-21, ECF No. 415-10.)

### B. Plaintiff's Recorded Phone Calls And Discovery Responses

Defendants served interrogatories in which they asked plaintiff about attempts to contact Lee and Watkins. First, they asked plaintiff to "[i]dentify/describe any contacts, interactions or communications [he] had with Antwon Lee and/or Isaiah Watkins, directly or indirectly," and, "[i]f the contact was through an intermediary," to "identify the names and contact information for each such intermediary including but not limited to the individuals referred to by Antwon Lee as Dover and Solo." Additionally, Defendants asked plaintiff to identify "Dover" and Solo by name and to explain the nature of his relationship with them. On November 25, 2020, plaintiff submitted a verified response in which he answered, "Plaintiff has never communicated with Isaiah Watkins or Antwon Lee, directly or indirectly," and "[p]laintiff does not know any people who go by the names Solo [or] Dover." (*Id.*, Ex. 19, Pl.'s Nov. 25, 2020 Interrog. Resps. ¶¶ 11, 16, ECF No. 415-19.) Further, defendants asked plaintiff if he had ever communicated "directly or through an intermediary with Antwon Lee or Isaiah Watkins," and he responded that he was "not aware of any communications" with either of them. (*Id.*, Ex. 20, Pl.'s Dec. 7, 2020 Interrog. Resps. ¶ 1, ECF No. 415-20.)

Defendants also attempted to obtain the recordings of all jailhouse phone calls plaintiff placed during his pretrial detention in Cook County Jail between October 2014 and August 2018,

when he was released on bond. Plaintiff objected to wholesale production of these recordings, contending that the risk to his privacy interest in the calls outweighed the benefit of producing them in full. The Court agreed and quashed defendants' subpoena to the extent defendants sought plaintiff's 8,000 jail phone calls in full, without barring some narrower request for some subset of the calls.

As discovery proceeded, defendants obtained recordings of a limited number of plaintiff's phone calls. Plaintiff frequently mentioned a "Dober" or "Dover", whom he appeared to be using as an intermediary, and he also occasionally mentioned "Solo."

For example, in a December 2, 2014 call, in discussing the nature of the charges against him, plaintiff asked, "could we ask Dober to bring Dude in on the 4th . . . when I go to court to say that wasn't me? Would that change anything? Because he the only key witness." (*Id.*, Ex. 24 at 2:4-9, ECF No. 415-24.) In a May 10, 2016 call, plaintiff stated that he was trying to obtain a phone number for "that boy that was just in here with us with the freckles" who "can get next to Dober," and "if he can get back to Dude and Dober say that, do that, then my whole lick will go away." (*Id.*, Ex. 22 at 7:13-8:2, ECF No. 415-22.) In a February 3, 2018 call with an associate, whom he addressed as "Minor," about "get[ting] some people in there . . . to pack the place," plaintiff stated, "I need . . . Solo and Dober, for them to be there. . . So I mean, you know, it ain't no maybe. I want them there. . . . I need them there. Let them know my day is starting March 12th. I need them there." (*Id.*, Ex. 29 at 2:11-3:2, ECF No. 415-29.) In a July 12, 2018 call, plaintiff stated, "I need you to get with Solo and Dober and . . . raise everything to them. Let them . . . know that I'm goin' through trials and tribulations and losing the lawsuit and everything." (*Id.*, Ex. 29 at 56:7-19.) These were just a few examples among many references occurring in calls throughout plaintiff's pretrial detention. (*See id.*, Ex. 22 at 10:14-16, 13:6-14:12, 32:15-19, 71:18-24; Ex. 24

at 6:13; Ex. 25 at 2:8, 4:14-15, ECF No. 415-25; Ex. 26 at 21:30-22:00, ECF No. 415-26; Ex. 28

at 6:14-16, 8:17-18, 12:13-18, ECF No. 415-28; Ex. 29 at 15:2-16, 29:11-15, 42:1-19, 56:13-20.)

In May 2021, defendants served additional interrogatories to inquire about these associates.

Defendants asked plaintiff "why [he] lied" in his earlier interrogatory responses when he claimed

not to know any anyone going by the names "Dover" or "Solo." (*Id.*, Ex. 21, Jun. 4, 2021 Interrog.

Resps. ¶ 1, ECF No. 415-21.) In his June 4, 2021 answers to these interrogatories, plaintiff again

claimed that he "does not know any people who go by the names Solo [or] Dover." (*Id.*)

Defendants' other questions in the same set of interrogatories asked for certain information about

Dover or Solo, and plaintiff answered each interrogatory by reiterating that he knows no one by

those names, and he had never spoken with anyone going by those names or tried to contact them

directly or indirectly. The only exception was his admission that he asked through an intermediary,

in advance of his original trial date in March 2021 if "Solo" could bring "colleagues" to plaintiff's

trial, believing that Solo's standing in the community as "the head of Ceasefire," a violence

prevention program, would be helpful to plaintiff. (*Id.* ¶ 5.)

At plaintiff's deposition in July 2021, defendants confronted plaintiff with the recordings

in which he spoke of "Dover" or "Solo," which contradicted his statements that he knew no one

by either of those names. Plaintiff stated that he had never met Solo, but he knew him by reputation

as a leader with Ceasefire. He admitted that he did personally know someone called "Dober," but

that person was "[n]ever" known as "Dover," and that's why he "didn't allow" his "interrogatory

things," which had asked only about "Dover." (*Id.*, Ex. 4, Pl.'s Dep., at 169:2-3.) He testified that

he had sought to contact Dober not in order to reach Lee but instead for unrelated reasons: (1)

Dober was involved with Ceasefire and (2) Dober worked with plaintiff on illegal drug deals for

small amounts of marijuana, even while plaintiff was behind bars. Defendants found this

11

explanation fishy, as plaintiff had already testified earlier in the same deposition that, although he had gone to prison for marijuana trafficking years ago, he had not engaged in any drug dealing since his release in 2008. Following the deposition, defendants attempted to follow up on this new information by issuing new interrogatories, but plaintiff refused to answer any questions about Dober or any narcotics trafficking he had engaged in with Dober or otherwise, and instead invoked his Fifth Amendment privilege against self-incrimination. (*Id.*, Ex. 30, Pl.'s Oct. 1, 2021 Interrog. Resps. ¶¶ 13, *see id.* ¶¶ 14-15.)

## II. Discussion

In the present motion for sanctions, defendants assert that plaintiff improperly attempted to influence the testimony of witnesses to an incident lying at the heart of this case, the October 23, 2014 shooting in which Tepete Davis was killed and Antwon Lee was injured. Further, defendants argue, plaintiff perjured himself at his deposition and in discovery responses by, among other things, denying that he knew Dober and Solo, the intermediaries through whom he reached out to Lee, and denying that he made any attempts to contact any witnesses, whether directly or indirectly.

"[W]itness tampering is among the most grave abuses of the judicial process, and as such it warrants a substantial sanction." *Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 782 (7th Cir. 2016); *see also Secrease v. W. & S. Life Ins. Co.*, 800 F.3d 397, 401 (7th Cir. 2015) ("falsifying evidence to secure a court victory undermines the most basic foundations of our judicial system"). There are two bases for the Court's power to assess such sanctions: Federal Rule of Civil Procedure 37 and the Court's inherent authority to sanction litigation misconduct.

Rule 37(b)(2)(A)(v) authorizes courts to assess sanctions, including dismissal of the action, for a party's "fail[ure] to obey an order to provide or permit discovery," which, per Rule 37(a)(4),

12

includes making "evasive or incomplete" discovery responses. The Seventh Circuit has broadly construed this sanctioning power to reach not just the violation of a direct court order, but also situations in which parties hide evidence or improperly influence witness testimony. *See Ramirez v. T&H Lemont, Inc.*, 845 F.3d 772, 776 (7th Cir. 2016) (citing *Quela v. Payco–Gen. Am. Credits, Inc.*, No. 99 C 1904, 2000 WL 656681 (N.D. Ill. May 18, 2000)). Although this Court never directly ordered plaintiff not to tamper with witness testimony or lie about it, it is axiomatic that "such an order is not required to provide notice that parties must not engage in such abusive litigation practices as coercing witness testimony, lying to the court, and tampering with the integrity of the judicial system." *Quela*, 2000 WL 656681, at \*6. "Because all litigants are presumed to know that contumacious conduct of this sort is absolutely unacceptable," courts can "properly consider the sanctions available under Rule 37" in addressing it. *Id.*

Apart from Rule 37, "a court has the inherent authority to manage judicial proceedings and to regulate the conduct of those appearing before it, and pursuant to that authority may impose appropriate sanctions to penalize and discourage misconduct." *Ramirez*, 845 F.3d at 776 (citing *Chambers v. NASCO, Inc.*, 501 U.S. 32, 46-50 (1991).) "Any sanctions imposed pursuant to the court's inherent authority must be premised on a finding that the culpable party willfully abused the judicial process or otherwise conducted the litigation in bad faith." *Id.* "Where a party's 'entire course of conduct throughout the lawsuit evidence[s] bad faith and an attempt to perpetrate a fraud on the court,' the conduct is sanctionable under the inherent power of the court." *Young v. Off. of U.S. Senate Sergeant at Arms*, 217 F.R.D. 61, 66 (D.D.C. 2003) (quoting *Chambers*, 501 U.S. at 50-51); *see Ty Inc. v. Softbelly's, Inc.*, 517 F.3d 494, 498 (7th Cir. 2008) ("Trying improperly to influence a witness is fraud on the court and on the opposing party."); *see also Goodvine v. Carr*, 761 F. App'x 598, 601 (7th Cir. 2019) ("[W]e conclude that the district court

properly dismissed the cases after determining that Goodvine had deliberately defrauded the court. Courts have 'sound discretion' to dismiss suits with prejudice as a reasonable sanction for falsifying evidence, which 'undermines the most basic foundations of our judicial system.'") (quoting *Secrease*, 800 F.3d at 402).

"In civil cases, the facts underlying a district court's decision to dismiss the suit or enter a default judgment as a sanction under Rule 37 or the court's inherent authority need only be established by a preponderance of the evidence." *Ramirez*, 845 F.3d at 781. "In deciding what measure of sanctions to impose, the district court should consider 'the egregiousness of the conduct in question in relation to all aspects of the judicial process.'" *Dotson v. Bravo*, 321 F.3d 663, 667 (7th Cir. 2003) (quoting *Barnhill v. United States*, 11 F.3d 1360, 1367-68 (7th Cir. 1993)).

The key evidence supporting defendants' motion for sanctions can be broken into two categories. The first category consists of Lee's statements in the recordings of his incarcerated phone calls. The second category consists of plaintiff's evasive and misleading responses to defendants' discovery requests concerning factual issues raised by those recordings.

## A. Whether Lee's Recorded Statements Are Reliable And Credible

Lee's statements in his recorded calls represent the most direct evidence of witness tampering; Lee directly stated that plaintiff was offering to pay him to recant and trying to influence him to convince Watkins to do the same. In his response brief, plaintiff does not really engage with these statements; he simply points out that Lee testified at his deposition that these statements were part of a "con" that Lee was "running," *i.e.*, Lee was trying to shake plaintiff down for money by offering to change his testimony. According to plaintiff, Lee's account of the shooting goes to the very core of plaintiff's claims, and the Court should leave a determination of his credibility to the jury.

As an initial matter, plaintiff's argument ignores a potentially important threshold issue: Lee's statements in the recorded incarcerated phone calls are hearsay. *See Anderson v. City of Rockford*, 932 F.3d 494, 509 (7th Cir. 2019). Some courts have suggested that hearsay may be considered for purposes of imposing sanctions because the Federal Rules of Evidence do not apply in such proceedings. *See Forsberg v. Pefanis*, 261 F.R.D. 694, 699 (N.D. Ga. 2009) (citing *Cook v. Am. S.S. Co.*, 134 F.3d 771, 774-75 (6th Cir. 1998)); *Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n*, 349 F. Supp. 3d 298, 307 (S.D.N.Y. 2018) ("[T]he Court is persuaded that in ruling upon U.S. Bank's sanctions motion Magistrate Judge Francis did not need to rely only on admissible evidence."); *Jensen v. Phillips Screw Co.*, 546 F.3d 59, 66 (1st Cir. 2008) ("We do not suggest that the rules of evidence necessarily apply to factfinding in the context of sanctions. That is not the case.") (citing *Cook*, 134 F.3d at 774-75). Other courts have assumed that, as at summary judgment, courts cannot rely on inadmissible evidence in assessing sanctions. *See Dewitt v. Ritz*, No. CV DKC 18-3202, 2021 WL 915146, at *6 (D. Md. Mar. 10, 2021); *see also Garvais v. Reliant Inventory Sols. Inc.*, No. 2:09-CV-0389, 2010 WL 4722260, at *5 (S.D. Ohio Nov. 15, 2010) (concluding that the Federal Rules of Evidence generally bar hearsay evidence in sanctions proceedings, but conceding that the Sixth Circuit in *Cook* had "allowed the lower court to rely upon" written witness statements in imposing sanctions).

The Court need not take a position in this debate for two reasons. First, plaintiff doesn't raise a hearsay objection, so the issue is waived. *Igasaki v. Illinois Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 955 (7th Cir. 2021); *Freeland v. Enodis Corp.*, 540 F.3d 721, 738 (7th Cir. 2008). Even if it were not waived, and even assuming that the Federal Rules of Evidence apply, the very centrality of the issue, in addition to other factors, weighs in favor of applying the residual hearsay exception in Federal Rule of Evidence 807. Under Rule 807, hearsay is admissible if "it is

supported by sufficient guarantees of trustworthiness considering the totality of the circumstances and any corroboration, and it is more probative as to the point for which it is offered than could otherwise be attained by reasonable effort." *Fields v. City of Chicago*, 981 F.3d 534, 544 (7th Cir. 2020). The adverse party must also have adequate and timely notice of the intent to offer the hearsay into evidence. Fed. R. Evid. 807(b). Because the statements occur in recordings of Lee's own voice, the trustworthiness of the evidence as a record of what Lee actually said is beyond dispute. Of course, that says nothing about the truthfulness of Lee's statements, but the fact that Lee was speaking with friends and family members in unguarded conversations provides circumstantial guarantees of trustworthiness on that score. *See United States v. Thurman*, 915 F. Supp. 2d 836, 875-77 (W.D. Ky. 2013) (admitting recorded incarcerated phone calls between declarant and family members or equivalently trusted associates). Lee's statements are partially corroborated by plaintiff's statements mentioning Dober and Solo and by his conduct in recanting. As plaintiff admits, this evidence bears on the incident at the core of the case, and it is therefore highly probative. In fact, given the seriousness of defendants' accusations of witness tampering, which, if true, may have made it difficult to obtain trustworthy testimony from Lee, these fly-on-the-wall accounts are uniquely probative, and their admission serves the interests of justice. Finally, plaintiff has had notice that defendants would rely on Lee's statements as evidence supporting their motion for sanctions, and he has filed a response but made no objection to this evidence. Therefore, the Court considers the requirements of the residual exception met. *See id.*; *see also United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002); *United States v. Santos*, 65 F. Supp. 2d 802, 823 (N.D. Ill. 1999). The Court reiterates that it considers plaintiff to have waived any hearsay objection, but for the above reasons it would consider Lee's statements for their truth even if the objection were not waived, and even assuming the hearsay rules apply here.

16

Plaintiff's argument that Lee's statements in the recordings are entitled to little weight because Lee disavowed them at his deposition, when he claimed to be "running" a "con" to extort money from plaintiff, is not persuasive. Lee's disavowal is not convincing, when considered in its full circumstances. Lee gave detailed grand jury testimony identifying plaintiff as the person who had shot him, describing circumstances in which he would have had several opportunities to get a good look at the shooter. (*See generally* Mot. for Sanctions Ex. 6, Tr. of Lee's Nov. 19, 2014 Grand Jury Testimony, ECF No. 415-6.) The theory that he concocted such a detailed lie for the grand jury based on police suggestion or coercion, then saw an opportunity to extort money from plaintiff by offering to recant, and ended up recanting without being paid based on a sudden religious conviction to "do what was right" (*id.*, Ex. 3 at 103:23-24), is uncorroborated and strains credulity. Lee spoke relatively plainly about the matter in some of his incarcerated phone calls, and he told Lorene Overton, Gerry Lee, Karin Campbell, and Doris Johnson that plaintiff had offered him $10,000 for his changed testimony.

The Overton call is particularly probative and persuasive because Overton is a trusted friend of Lee's, so close as to be the equivalent of a family member, and Lee described for her not just the bare fact of having been offered $10,000 but also his outrage and indignity at the nerve of plaintiff for making the offer. The Court is at a loss as to why Lee would not just lie but make a performance of it for Overton, whom Lee described as a "Christian woman" not involved in any criminal endeavors. (*Id.*, Ex. 3 at 53:3.) If so, he had no need to mention the matter at all.

Additionally, Campbell and Johnson raised security concerns with plaintiff, suggesting that he should not testify against plaintiff because plaintiff might retaliate by harming plaintiff's children, and Lee told them not to worry because plaintiff was offering a $10,000 carrot rather than a stick. It seems unlikely he would make up this elaborate lie to ease their concerns if the truth

were either that Lee was antagonizing plaintiff by shaking him down or that Lee had resolved of his own accord to tell everyone that plaintiff had done nothing wrong. If the former were true, the lie would be reckless; if the latter, it would be pointless.

Perhaps tellingly, Lee himself seemed to forget his own theory at his deposition, sometimes stating that he was trying to shake plaintiff down because he was mad or angry with him, only to be reminded in defendants' counsel's follow-up questioning that, in the scenario he was positing, he had no reason to be angry with plaintiff. (*See, e.g.*, *id.*, Ex. 3, at 97:17-98:12, 101:8-102:18.) For all these reasons, the Court finds that Lee's statements stating that plaintiff had offered to pay him $10,000 to recant are reliable and credible, his disavowal at his deposition notwithstanding.

### B. Plaintiff's Evasive Discovery Misconduct And Resulting Inferences

For purposes of the present motion, the Court need not determine precisely how much weight to give Lee's testimony because it can also rely on plaintiff's conduct—his evasiveness— in the face of defendants' attempts to take discovery in order to investigate Lee's statements. Plaintiff's evasiveness and, in particular, his obstruction of attempts to reach Dober corroborate Lee's statements, and when plaintiff's conduct is combined with Lee's statements, there is sufficient proof to impose the sanction of dismissal by a preponderance of the evidence.

In his November 2020 interrogatory responses, plaintiff was asked whether he had communicated with Lee or Watkins through "Dover" or Solo and to describe his relationship with "Dover" or Solo, and he answered by denying any communication with Lee or Watkins, direct or indirect, and denying any acquaintance with "Dover" or Solo. But plaintiff's calls showed that he was acquainted with two individuals known as Dober and Solo, and defendants were understandably interested in the statements in plaintiff's calls in which he seemed to use "Dover" as an intermediary; in one call, plaintiff even mentioned using Dober to bring "the only key witness" to "court" to say "that wasn't me." It was certainly reasonable for defendants to think that

18

the "only key witness" sounded suspiciously like Lee. But when defendants followed up with additional interrogatories in May 2021, plaintiff still denied knowing any individual going by "Dover" and claimed to know Solo only by reputation. At the deposition, when defendants pressed plaintiff about Dober, he admitted he knew him and reversed his testimony about whether he was involved in the narcotics trade, stating that he knew Dober as someone who was involved in Ceasefire and who helped him with drug deals, though not as a "major piece" of the puzzle. (*Id.*, Ex. 4 at 219:8.) But he provided no other information about Dober, and he refused to answer any further questions about him when defendants tendered yet another set of interrogatories, invoking his Fifth Amendment self-incrimination privilege.

Plaintiff may choose to invoke his Fifth Amendment rights in order to protect Dober's identity and their illegal narcotics trafficking venture, but that decision is not without consequences for him in this civil case. Defendants were attempting to follow up on credible information suggesting that (1) plaintiff may have been the true shooter in an incident at the heart of this case, the shooting he claims police wrongly accused him of committing, and (2) he may have tampered with the testimony at his criminal trial to contrive an acquittal. Of course, had plaintiff not been acquitted, most—perhaps all—of his claims in this case would never have accrued, or if any claims did accrue, they would be narrower than they are in their current form, with plaintiff alleging that he did nothing illegal. *See Heck v. Humphrey*, 512 U.S. 477, 486-87 (1994) (holding that a § 1983 claim cannot proceed if "a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction"); *see also McCann v. Neilsen*, 466 F.3d 619, 621-22 (7th Cir. 2006) (explaining that a plaintiff can "steer[] an action into *Heck* territory by making specific factual allegations in the complaint that [are] inconsistent with the facts upon which his criminal convictions were based"), *Rice v. Murphy*, No. 17 C 6887, 2018 WL 4616354, at *2 (N.D. Ill. Sept. 26, 2018).

It goes without saying that this matter is of the utmost seriousness. Witness tampering "'strikes at the heart of the judicial system. . . Our legal system is dependent on the willingness of the litigants to allow an honest and true airing of the real facts.'" *Young*, 217 F.R.D. at 71 (quoting *Quela*, 2000 WL 656681, at \*7). If it is true, as it appears, that plaintiff secured an acquittal by bribing Lee to change his testimony, then dismissal is an appropriate exercise of the Court's discretion:

> Litigants that attempt to coerce witness[es] into giving false testimony abuse the truth-seeking function of the courts and obstruct the courts' ability to solve disputes accurately and efficiently. Not only does witness tampering interfere with the judicial branch's ability to function properly, it is a federal crime. *See* 18 U.S.C. § 1512(b) (2006). As such, tampering by the parties deserves the harshest sanction that the Court can deliver given the seriousness of the matter and in order to protect the judicial process. When the plaintiff is the one that commits the offense, dismissing the case is sensible as the very individual that seeks the Court's jurisdiction to solve his dispute (i.e., the plaintiff) is the party thwarting the Court's ability to get to the truth.

*Ramsey v. Broy*, No. 08-CV-0290-MJR-DGW, 2010 WL 1251199, at \*4 (S.D. Ill. Mar. 24, 2010) (internal quotation omitted); *see Ramirez*, 845 F.3d at 782-83. And, although plaintiff does not make the argument, the Court observes that it makes no difference that the evidence draws a clearer link to tampering with testimony at plaintiff's state criminal trial than at any proceedings in this federal lawsuit. As the Court has already explained, the identity of the person who shot Lee is a factual matter that sits at the heart of both lawsuits. Beginning with the Overton call in September 2016, all of the phone calls in which Lee mentioned plaintiff's offer to pay him to recant took place *after* plaintiff filed this lawsuit in June 2016. Thus, it appears that this suit was pending—although stayed—while the alleged witness tampering efforts were ongoing. Plaintiff would have known that he needed to secure an acquittal in state court in order to litigate this suit, so the Court makes no distinction between any tampering with testimony at his criminal trial and tampering with testimony in the present lawsuit. *Dewitt v. Ritz*, No. CV DKC 18-3202, 2021 WL 915146, at \*5

20

(D. Md. Mar. 10, 2021) (citing *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1121 (1st Cir. 1989) ("Once a litigant chooses to practice fraud, that misconduct infects his cause of action, *in whatever guises it may subsequently appear.*") (emphasis added); *Johnson v. Baltimore Police Dep't*, No. CV ELH-19-0698, 2022 WL 9976525, at *35 (D. Md. Oct. 14, 2022) ("Of import here, a court may impose sanctions even when the misconduct occurred before another tribunal, rather than in its own case.") (citing *Chambers*, 501 U.S. at 57).

Given the seriousness of this disturbing possibility and the substantial evidentiary support for it, it was and is incumbent on plaintiff to fully cooperate with defendants' attempts to learn more in discovery. But plaintiff has not cooperated, and he has not been forthcoming with information.

To begin with, the Court finds it highly unlikely that plaintiff really did not know who defendants meant to ask about when they inquired about "Dover." This is particularly true given that defendants mentioned "Dover" alongside Solo in their interrogatories. If plaintiff knew that Dober and Solo worked together at Ceasefire, then surely plaintiff would have made the connection when defendants asked about "Dover" and Solo. He referred to them together in at least one call, when he admits that he asked someone to have them both present for his March 2018 trial date. Additionally, it is suspicious that when defendants brought up Dober at plaintiff's deposition, asking if plaintiff knew "Dover" or Dober, he immediately brought up the interrogatories, admitting that he did know someone called "Dober," but that person was "[n]ever" known as "Dover," and that's why he "didn't allow" his "interrogatory things." (Mot. for Sanctions Ex. 4 at 169:2-3.) Neither side had mentioned the interrogatories at all to this point in the deposition, and plaintiff's bringing them up on his own suggests that he was conscious of having been less than forthcoming in his interrogatory responses.

21

But even if the Court gives plaintiff the benefit of the doubt and assumes that he really had no idea who defendants meant when they asked about "Dover," he has known at the very latest since the date of his deposition that defendants want to know about Dober, and he has known since then that defendants had reason to believe that plaintiff communicated with Lee through him. (*Id.*, Ex. 4 at 179:23-180:20.) Still, plaintiff has made no effort, despite defendants' requests, to help defendants contact or identify Dober. In response to the present motion for sanctions, he still signals no change of tack.

If he did not use Dober to tamper with Lee's testimony, despite the evidence defendants have unearthed that suggests alarmingly otherwise,[4] then he could have helped defendants identify and locate Dober so that Dober could have told them the truth. It certainly would have been possible to limit defendants' inquiry to matters within the scope of this case, without asking plaintiff or Dober to waive any Fifth Amendment protections arising out of any marijuana trafficking. Instead, plaintiff has chosen to stonewall. Based on plaintiff's repeated refusal to be forthcoming with information about Dober, the Court may—and is inclined to—draw an adverse inference against plaintiff. 2 McCormick On Evid. § 264 (8th ed.) ("When it would be natural under the circumstances for a party to call a particular witness . . .  and the party fails to do so, tradition has allowed the adversary to use this failure as the basis for invoking an adverse inference.") (citing, *inter alia*, *United States v. Mahone*, 537 F.2d 922, 926-28 (7th Cir. 1976) ("The rule . . . is that, if a party has it peculiarly within his power to produce witnesses

---

[4] This evidence includes not only Lee's statements but other evidence that plaintiff was inclined toward exerting influence over witnesses to secure his acquittal. In addition to some of the statements the Court has cited above, it is alarming and perhaps telling that plaintiff all but admitted at his deposition to attempting to influence witnesses by asking certain of his associates to show up to his trial so that "whoever testif[ied] against [him]" would "feel under the gun," having to "pledge an oath in front of all of them." (Mot. for Sanctions Ex. 4 at 270:17-271:12, 279:6-25.)

whose testimony would elucidate the transaction, the fact that he does not do it creates the [inference] that the testimony, if produced, would be unfavorable.") (internal quotation marks omitted)).

Plaintiff has offered nothing against Lee's reliable and credible statements except bare denials, and his changing stories and evasiveness make his denials difficult to credit. Further, the Court can—and does—infer from the fact that plaintiff has invoked the Fifth Amendment that, had defendants been able to identify and locate Dober and secure his cooperation, it would have led to evidence supporting their witness-tampering theory. *See Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976) (recognizing the "prevailing rule" that "the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them"); *see also LaSalle Bank Lake View v. Seguban*, 54 F.3d 387, 390 n.4 (7th Cir. 1995) (recognizing the same rule and noting that, when a party asserts his Fifth Amendment privilege in civil litigation, that party "is not the only one whose case is consequently impaired" because "the opponent, unable to obtain discovery, is also disadvantaged"); *SEC v. Henderson*, No. 1:19-CV-06183, 2022 WL 3135015, at *2 (N.D. Ill. Mar. 17, 2022) (citing *United States v. 6250 Ledge Rd., Egg Harbor, Wis.*, 943 F.2d 721, 729 (7th Cir. 1991) (recognizing that a civil litigant may be "force[d] . . . to choose between preserving his privilege against self-incrimination and losing the civil suit").

Thus, the Court finds and concludes that plaintiff offered to pay Lee $10,000 to recant his testimony identifying plaintiff as the person who shot him, and he sought to influence Lee to convince Watkins not to testify against plaintiff. The Court grants defendants' motion for dismissal of this case with prejudice as a sanction for plaintiff's litigation misconduct. *See Ramirez*, 845 F.3d at 782.

Alternatively, the present motion does not require the Court to reach any firm conclusion as to whether plaintiff actually committed the witness tampering defendants accuse him of committing. By refusing to say what he knows that might permit defendants to identify and locate Dober, plaintiff has acted in bad faith to frustrate defendants' attempts to investigate their witness-tampering theory, in spite of the fact that defendants have demonstrated a reasonable evidentiary foundation for the theory. His evasiveness is tantamount to "lying to avoid giving evidence." *Donelson v. Hardy*, 931 F.3d 565, 570 (7th Cir. 2019). Dismissal is an appropriate sanction for his misconduct under these circumstances. *See id.*; *see also Banco Del Atlantico, S.A. v. Woods Indus. Inc.*, 519 F.3d 350, 354 (7th Cir. 2008) (affirming dismissal as a sanction for plaintiff's evasiveness at depositions); *Negrete v. Nat'l R.R. Passenger Corp.*, 547 F.3d 721, 722 (7th Cir. 2008) (affirming dismissal as a sanction for evasiveness in discovery, including by failing to identify potential witnesses who might provide damaging information); *Collins v. Illinois*, 554 F.3d 693, 696-97 (7th Cir. 2009) (affirming dismissal as a sanction for plaintiff's refusal to provide "essential" information at her deposition); *Green v. Illinois Power Co.*, 640 F. Supp. 2d 1043, 1045 (C.D. Ill. 2009) (evasive interrogatory answers justified dismissal). No lesser sanction would provide adequate deterrence or punishment, particularly to the extent that plaintiff has either tainted the evidence in this case such that no court can ever be confident of reaching the truth of the matter, or he has so thoroughly obstructed efforts to answer defendants' reasonable questions about plaintiff's witness tampering as to effectively bring about the same result. *Martin v. Redden*, 34 F.4th 564, 568 (7th Cir. 2022) (citing *Oliver v. Gramley*, 200 F.3d 465, 466 (7th Cir. 1999)). Further, plaintiff has had adequate notice and an opportunity to respond; defendants explained painstakingly in a forty-page brief why they believe plaintiff committed misconduct that justifies

24

dismissal, and plaintiff filed a response brief. That is sufficient process; no live oral hearing is required. *Martin*, 34 F. 4th at 569; *Donelson*, 931 F.3d at 569.

In their forty-page brief and voluminous exhibits, defendants raise a number of other instances in which they claim that plaintiff perjured himself or obstructed or evaded discovery requests. These other issues are generally less serious, and defendants do not succeed in clearly establishing plaintiff's wrongdoing in all of them. The Court need not address them because the seriousness of the above-described matters is such that they suffice to justify the dismissal sanction defendants seek.

## <u>CONCLUSION</u>

For the foregoing reasons, defendants' motion to dismiss this case as a sanction for plaintiff's abuse of the litigation process [415] is granted. Civil case terminated.

**SO ORDERED.**                                    **ENTERED:  January 4, 2023**

_____
**JORGE L. ALONSO**
**United States District Judge**